1  Jeffrey G. Sheldon (State Bar No. 67516)
   jgsheldon@usip.com
2  Marc A. Karish (State Bar No. 205440)
   mkarish@usip.com
3  SHELDON MAK ROSE & ANDERSON PC
   100 Corson Street, Third Floor
4  Pasadena, California 91103-3842
   Telephone: (626) 796-4000
5  Facsimile: (626) 795-6321

6

7  Attorneys for Plaintiff and Counterdefendant
   APIO, INC.

8                 **UNITED STATES DISTRICT COURT**

9               **NORTHERN DISTRICT OF CALIFORNIA**

10

11 APIO, INC., a Delaware corporation,          )  Case No.  CV 07-5628 JF/PVT
                                                )
12          Plaintiff,                          )  **PLAINTIFF'S OPENING CLAIM**
                                                )  **CONSTRUCTION BRIEF AND**
13      vs.                                     )  **EVIDENCE IN SUPPORT**
                                                )
14 MANN PACKING COMPANY, INC., a                )  [N.D.Cal. Patent Local Rule 4-5]
15 California corporation; and DOES 1 – 10,     )
   inclusive,                                   )  DATE:  September 15, 2008
16                                              )  TIME:  9:00 a.m.
            Defendants.                         )  PLACE:  Courtroom 3, 5th Floor
17 _____        )      The Honorable Jeremy Fogel
                                                )
18 MANN PACKING COMPANY, INC., a                )
19 California corporation,                      )
                                                )
20          Counterclaimant,                    )
                                                )
21      vs.                                     )
                                                )
22 APIO, INC., a Delaware corporation,          )
                                                )
23          Counterdefendant.                   )
                                                )
24 _____        )

25

26      Pursuant to Local Patent Rule 4-5 of the United States District Court for the Northern

27 District of California and this Court's Minute Order of February 29, 2008, Plaintiff Apio ("APIO")

28 moves the Court for construction of claim terms and in support thereof submits this memorandum

   and evidence regarding proper construction of the claims at issue.

TABLE OF CONTENTS

I.    CONSTRUCTION OF CLAIM TERMS ON WHICH THE PARTIES AGREE .......................................................................................... 2

II.   THE TERMS TO BE CONSTRUED BY THE COURT AND THE PARTIES' RESPECTIVE DEFINITIONS ................................................ 2

III.  FACTS RELATING TO CLAIM CONSTRUCTION ................................................ 3

      A.    The Flip Tray Invention ..................................................................... 3

      B.    Claim 1 ............................................................................................ 4

      C.    Mann's Accused Party Tray ............................................................. 5

IV.   LEGAL STANDARD FOR CLAIM CONSTRUCTION ............................................ 5

      A.    Focus On Language Of Claims ........................................................ 5

      B.    Doctrine Of Claim Differentiation ................................................... 6

      C.    Claims Are Not Limited To The Preferred Embodiment Described In The Specification ............................................................................ 6

      D.    Applicants Can Be Their Own Lexicographer And Define Terms As They Wish ...................................................................................... 6

      E.    Narrowing Of A Term From Its Ordinary Meaning Requires Clear Disavowal In The   Specification Or Prosecution History .................. 7

      F.    Intrinsic Evidence Versus Extrinsic Evidence ................................. 7

V.    ARGUMENT RE CLAIM CONSTRUCTION ........................................................ 8

      A.    "Ribs" ............................................................................................... 8

      1)    "Ribs" Should Be Construed As "Any Conformation Which Ensures That Air Can Circulate Between The Support Tray And The Atmosphere Control Member." ........................................................ 8

      2)    Mann's Proposed Construction Of "Ribs" Should Be Rejected ...... 9

      B.    "Atmosphere Control Member" ..................................................... 11

      1)    "Atmosphere Control Member" Should Be Construed As "Any Member Which Modifies The Rates At Which Oxygen And Carbon Dioxide Pass Into And Out Of The Sealed Package." ................... 11

**APIO'S OPENING CLAIM CONSTRUCTION BRIEF AND EVIDENCE IN SUPPORT**

2)      Mann's Proposed Construction Of "Atmosphere Control Member"
        Should Be Rejected ................................................................. 13

C.      "Sealing Sheet".......................................................................... 13

1)      "Sealing Sheet" Should Be Construed As Having Its Ordinary And
        Customary Meaning Or APIO's Proposed Construction Of "Sealing
        Sheet" Should Be Adopted.......................................................... 13

2)      Mann's Proposed Construction Of "Sealing Sheet" Should Be
        Rejected ..................................................................................... 14

D.      "Atmosphere Control Member Included In The Sealing Sheet"................... 15

1)      "Atmosphere Control Member Included In The Sealing Sheet"
        Should Be Construed To Provide "Included In" With Its Ordinary
        And Customary Meaning Or To Be "Comprising"...................................... 15

2.      Mann's Proposed Construction Of "Atmosphere Control Member
        Included In The Sealing Sheet Should Be Rejected..................................... 16

VI.     CONCLUSION ........................................................................................ 17

APPENDIX A ................................................................................................... 18

1

## TABLE OF AUTHORITIES

2

3                                      FEDERAL CASES

4    *Amgen Inc. v. Hoechst Marion Roussel Inc.,*

5           314 F.3d 1313 (Fed. Cir. 2003) ...................................................................... 1, 7

6    *Ballard Medical Products v. Allegiance Healthcare Corp.,*

7           268 F.3d 1352 (Fed. Cir. 2001) ......................................................................... 3

8    *Electro Medical System S.A. v. Cooper Life Sciences, Inc.,*

9           34 F.3d 1048 (Fed. Cir. 1994) ........................................................................... 6

10   *Honeywell Inc. v. Victor Co. of Japan Ltd.,*

11          298 F.3d 1317 (Fed. Cir. 2002) ......................................................................... 8

12   *Interactive Gift Exp. Inc. v. Compuserve Inc.,*

13          256 F.3d 1323 (Fed. Cir. 2001) ................................................................. 5, 6, 7

14   *Johnson Worldwide Associate Inc. v. Zebco Corp.,*

15          175 F.3d 985 (Fed. Cir. 1999) ........................................................................... 6

16   *Lucent Technologies, Inc. v. Gateway, Inc.,*

17          525 F.3d 1200 (Fed. Cir. 2008) ..................................................................... 6, 7

18   *Marsh-McBirney Inc. v. Montedoro-Whitney Corp.,*

19          882 F.2d 498 (Fed. Cir. 1989) ........................................................................... 6

20   *Ortho-McNeil Pharmaceutical, Inc. v. Mylan Laboratoriess,  Inc.,*

21          520 F.3d 1358 (Fed. Cir. 2008) ..................................................................... 5, 9

22   *Phillips v. AWH Corp.,*

23          415 F.3d 1303 (Fed. Cir. 2005) ......................................................................... 5

24   *CCS Fitness Inc. v. Brunswick Corp,*

25          288 F.3d 1359 (Fed. Cir. 2002) ......................................................................... 6

26   *Serrano v. Telular Corp.,*

27          111 F.3d 1578 (Fed. Cir. 1997) ......................................................................... 2

28

1    *Sinorgchem Co., Shandong v. International Trade Com'n,*

2         511 F.3d 1132 (Fed. Cir. 2007) ...................................................................... 2

3    *Specialty Composites v. Cabot Corp.,*

4         845 F.2d 981 (Fed. Cir. 1988) ...................................................................... 6

5    *Teleflex Inc. v. Ficosa North America Corp.,*

6         299 F.3d 1313 (Fed. Cir. 2002) ................................................................. 6, 7

7    *Vitronics Corp. v. Conceptronic Inc.,*

8         90 F.3d 1576 (Fed. Cir. 1996) ............................................................. 3, 7, 9

9    *York Products Inc. v. Central Tractor Farm & Fam. Ctr.,*

10        99 F.3d 1568 (Fed. Cir. 1996) ...................................................................... 7

11

12                                   **FEDERAL STATUTES**

13        35 U.S.C. §292 .............................................................................................. 3

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APIO'S OPENING CLAIM CONSTRUCTION
BRIEF AND EVIDENCE IN SUPPORT**

1       Apio presents constructions for the disputed claim terms to be construed by the Court.

2  Apio's proposed constructions find full support in the claims themselves and the intrinsic evidence

3  of U.S. Patent No. 7,083,818 ("the '818 Patent). In contrast, Mann Packing Company Inc. ("Mann")

4  offers constructions typical of an accused infringer, namely constructions improperly limited to

5  specific embodiments taught in the specification, rather than the true scope of the claims.

6  **I.**      **CONSTRUCTION OF CLAIM TERMS ON WHICH THE PARTIES AGREE**

7       The parties agree that the term "solid color" should be construed as "uniform in tone, and not

8  clear or transparent. (See Apio, Inc.'s Joint Claim Construction and Prehearing Statement, D.N. 41.)

9       Additionally, the parties agree that the term "display orientation" should be construed as "the

10  container body is oriented so that the base of the container body in the loading orientation provides

11  the top surface of the sealed package."[1]

12

13  **II.**      **THE TERMS TO BE CONSTRUED BY THE COURT AND THE PARTIES'**
   **RESPECTIVE DEFINITIONS**

14

15       The claim terms that the parties have collectively identified for construction by the Court and

16  each party's proposed constructions, are as follows:

| Claim Term and Claims in Which It Appears | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| Ribs<br><br>Claims 1, 4, 8 and 11 | "any conformation which ensures that air can circulate between the support tray and the atmosphere control member" | "upstanding projections that support the portion of the sealing sheet that extends over the fillable compartments when the tray is loaded and turned upside down and ensure that air can reach the atmosphere control member" |
| Atmosphere control member<br><br>Claims 1, 6 and 8 | "any member which modifies the rates at which oxygen and carbon dioxide pass into and out of the sealed package" | "a gas-permeable element which modifies the rate at which oxygen and carbon dioxide pass into and out of the sealed container" |
| "Sealing sheet"<br><br>Claims 1 and 8 | ordinary and customary meaning -- no construction by the Court is necessary. However, if the Court finds that the term "sealing sheet" should be construed to have | "a substantially gas-impervious sheet" |

27

28  ---
[1] Although Apio had previously proposed a slightly different construction, after further considering the remainder of the claim language, Apio now agrees to the above construction.

     **APIO'S OPENING CLAIM CONSTRUCTION**
     **BRIEF AND EVIDENCE IN SUPPORT**

| Claim Term and Claims in Which It Appears | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| | other than its ordinary meaning, then it should be construed to mean "a sheet that closes the container body." | |
| "Atmosphere control member included in the sealing sheet"<br><br>Claims 1 and 8 | With the exception of the term "included in," the remaining terms are construed elsewhere. The term "included in" is entitled to its ordinary and customary meaning and no construction by the Court is necessary. However, if the Court finds that the term "included in" should be construed to have other than its ordinary meaning, then "Included in" should be construed to mean "comprises" such that the phrase "atmosphere control member included in the sealing sheet" is construed as "the sealing sheet comprises an atmosphere control member." | "a gas-permeable element placed over a gas pathway in a section of the sealing sheet which modifies the rate at which oxygen and carbon dioxide pass into and out of the sealed container" |

## III.    FACTS RELATING TO CLAIM CONSTRUCTION

### A.    The Flip Tray Invention

The '818 Patent is directed to the first successful mass produced party tray that appears store made. Prior to the '818 Patent, party trays were made in-house by a grocery store or were mass produced by vegetable packers such as plaintiff Apio and defendant Mann. The store made trays generally were perceived by consumers as tasting better and having a better appearance than mass produced party trays. However, a problem with these in-store trays is they had to be made on site by relatively costly labor, were labor intensive, and thus were more expensive than mass produced trays available from vegetable packers such as Apio. Another problem with these trays is the quality of the tray and the actual weight of the tray contents could vary from store to store. The variable weights could cause problems with regulatory agencies.

APIO'S OPENING CLAIM CONSTRUCTION
BRIEF AND EVIDENCE IN SUPPORT

1    The tray taught in the '818 Patent is commonly known in the industry as a "flip tray,"

2  because of how it is made and used. The method of making the flip tray starts with a transparent

3  container body of a size to accommodate the desired contents of the tray (i.e. the vegetables and any

4  other ingredients, e.g. other foodstuffs or a container of dip). The container body is filled with the

5  contents. A polymeric sealing sheet is placed on the container body to create a sealed package, and

6  the support tray is then placed over the sealing sheet. An atmosphere control member is provided to

7  help keep the vegetables fresh. Next, the sealed package and the support are "flipped" over so that

8  the vegetables rest on the sealing sheet and are visible to the consumer through the transparent

9  container body.

10    In use by a consumer, the "flip" feature again comes into play. In particular, the party tray is

11  turned upside down so that the vegetables rest on the container body, the support tray is removed,

12  and the sealing sheet is removed. The consumer can then replace the support tray, flip the assembly

13  over again, remove the container body, and serve the vegetables on the support tray.

14    Because of these features, the tray appears to be store made, mimicking the appearance of in-

15  house trays, the vegetables appear fresh and are fresh, with freshness comparable to the freshness of

16  store made trays, the trays have sufficient shelf life extension to enable the tray to move through the

17  complete supply chain, and the tray has the economic advantages of mass production and the

18  consistent quality and weight made possible by mass production. See Exhibit "J".

19    B.    Claim 1

20    The text of a representative claim is reproduced below so that the Court can see the terms at

21  issue (which are underlined) in context:

22  Claim 1:

23  1. A method of preparing a party tray which comprises the steps of
     A) providing a container body which

24        (i) is composed of a transparent polymeric material,
           (ii) has a depth of 1 to 4 in.,

25        (iii) has a circumference of 30 to 100 in.; and
           (iv) comprises 1) a base, 2) a continuous wall which extends away from the base and

26  is contiguous with the base, 3) a continuous rim which is contiguous with the wall, and 4)
     partitions which extend away from the base in the same direction as the wall; and

27        (v) has a loading orientation in which the wall extends upwards from the base, and
     the partitions extend upwards from the base and create fillable compartments within the

28  container body; the partitions being cavity walls, and the container body having been

prepared by molding a polymeric material, thus forming the base, wall, rim and partitions at the same time;

B) while the container body is in the loading orientation, placing foodstuffs in the compartments so that the foodstuffs rest on the base, at least some of the foodstuffs being fresh vegetables and the foodstuffs placed in at least one of the compartments being multiple pieces of a fresh vegetable;

C) after step B, and without any intermediate step between step B and step C, sealing a **sealing sheet** of polymeric material to the rim of the container body so that the **sealing sheet** extends over the compartments and creates a sealed package

(i) which contains the foodstuffs and a packaging atmosphere around the foodstuffs,
(ii) whose outer surface is defined by the container body end the **sealing sheet**, and
(iii) which includes an **atmosphere control member included in the sealing sheet**;

D) after step C, placing a support tray over the sealing sheet; and

E) after step D, turning the sealed package and the support tray placed thereon upside-down, so that the foodstuffs rest on the **sealing sheet**, and the sealing sheet is supported by the support tray, the support tray comprising **ribs** such that, after step (E) air can circulate between the support tray and the **atmosphere control member**; whereby the party tray can be displayed for sale in a **display orientation** in which the foodstuffs are viewed by a shopper through the container body.

See Exhibit "G."

    C.    <u>Mann's Accused Party Tray</u>

Apio is aware that some judges want to know of the accused product for claim construction and other judges do not. Accordingly, Apio includes a description of the accused Mann product in available Appendix A should the Court wish to have this information.

**IV.    LEGAL STANDARD FOR CLAIM CONSTRUCTION**

We now discuss the law relating to claim construction.

    A.    <u>Focus On Language Of Claims</u>

In construing claims, the analytical focus must begin with and remain centered on the language of the claims themselves. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005); *Interactive Gift Exp. Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). If the claim language is clear on its face, then consideration of the written description and prosecution history is restricted to determining whether a deviation from the clear language of the claims is specified. *Interactive Gift* at 256 F.3d 1323, 1331 ("in looking to the specification to construe claim terms, care must be taken to avoid reading 'limitations appearing in the specification ... into [the] claims.'"(internal citation omitted)).

1

    B.    Doctrine Of Claim Differentiation

2

        There is a presumption that an independent claim should not be construed as requiring a

3

limitation added by a dependent claim. *See e.g.,Ortho-McNeil Pharmaceutical, Inc. v. Mylan Labs.,*

4

*Inc.*, 520 F.3d 1358, 1562 (Fed. Cir. 2008)("this court strives to reach a construction that does not

5

render claim language in dependent claims meaningless"); *Marsh-McBirney Inc. v. Montedoro-*

6

*Whitney Corp.*, 882 F.2d 498 (Fed. Cir. 1989)(narrow claim limitations cannot be read into broad

7

claims either to avoid invalidity or to escape infringement)(judgment vacated and remanded on other

8

grounds, 498 U.S. 1061 (1991) and later reinstated 939 F.2d 969 (Fed. Cir. 1991)).

9

    C.    Claims Are Not Limited To The Preferred Embodiment Described In The
           Specification

10

11

        Limiting claims to the particular embodiments shown in the specification and drawings is

12

wrong. *CCS Fitness Inc. v. Brunswick Corp*, 288 F.3d 1359, 1365 (Fed. Cir. 2002); *Teleflex Inc. v.*

13

*Ficosa North Am. Corp.*, 299 F.3d 1313, 1326-1328 (Fed. Cir. 2002)(reversing claim construction

14

that impermissibly imported limitation from only embodiment in the specification); *Specialty*

15

*Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988)("particular embodiments appearing

16

in the specification will not generally be read into the claims. What is patented is not restricted to

17

the examples, but defined by the words in the claims if those claims are supported by the

18

specification in the manner required by 35 U.S.C. §112")(internal citations omitted); *Electro Med.*

19

*Sys. S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994)("although the

20

specifications may well indicate that certain embodiments are preferred, particular embodiments

21

appearing in a specification will not be read into the claims when the language is broader than such

22

embodiments."); *Interactive Gift* at 256 F.3d 1323, 1339 (reversing district court's claim

23

construction as being wrongly limited to the preferred embodiment).

24

    D.    Applicants Can Be Their Own Lexicographer And Define Terms As They Wish

25

        There is a heavy presumption in favor of the ordinary meaning of claim language as

26

understood by one of ordinary skill in the art. *Johnson Worldwide Assoc. Inc. v. Zebco Corp.*, 175

27

F.3d 985, 989-990 (Fed. Cir. 1999). This heavy presumption can be overcome if the patentees have

28

chosen to be their own lexicographer by clearly setting forth an explicit definition for a claim term.

APIO'S OPENING CLAIM CONSTRUCTION
BRIEF AND EVIDENCE IN SUPPORT

1   *Id.* at 989-990.

2       E.   Narrowing Of A Term From Its Ordinary Meaning Requires Clear Disavowal In The Specification Or Prosecution History

3

4       Narrowing claim terms from their common and ordinary meaning requires clear disavowal of

5   claim coverage. *See, Amgen Inc. v. Hoechst Marion Roussel Inc.*, 314 F.3d 1313, 1327-1328 (Fed.

6   Cir. 2003)(the prosecution history may not be used to infer the intentional narrowing of a claim

7   absent the applicant's clear disavowal of claim coverage); *York Prods. Inc. v. Central Tractor Farm & Fam. Ctr.*, 99 F.3d 1568, 1575 (Fed. Cir. 1996)("[u]nless altering claim language to escape an

8   examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing

9   claim coverage"); *Lucent Technologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1211-1212 (Fed. Cir.

10  2008).

11

12      F.   Intrinsic Evidence Versus Extrinsic Evidence

13      In most situations, an analysis of the intrinsic evidence alone resolves any ambiguity in a

14  disputed claim term.  In such circumstances it is improper to rely on extrinsic evidence.  It is the

15  claims, specification and file history, not extrinsic evidence, which constitute the record of the

16  patentee's claim, a record on which the public is entitled to rely. *Vitronics Corp. v. Conceptronic*

17  *Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *Interactive Gift* at 256 F.3d 1323, 1332-1333.

18      Relying on extrinsic evidence to construe a claim is only proper when the claim language

19  remains genuinely ambiguous after consideration of the intrinsic evidence. *Vitronics Corp.* at 1583 -

20  1585 (district court wrongfully considered extrinsic evidence to vary or contradict the manifest

21  meaning in the claims).  Extrinsic evidence, which is evidence external to the patent and file history,

22  such as expert testimony, inventor testimony, dictionaries, technical treatises and articles, may be

23  used to help the court if the intrinsic evidence is insufficient to enable the court to determine the

24  meaning the claims. *Vitronics Corp.* at 1584.  Extrinsic evidence may also be used to help the court

25  understand the technology. *Vitronics Corp.* at 1584.

26  ////

27

28

APIO'S OPENING CLAIM CONSTRUCTION
BRIEF AND EVIDENCE IN SUPPORT

1    **V.    ARGUMENT RE CLAIM CONSTRUCTION**

2         A.    "Ribs"

3             1)    "Ribs" Should Be Construed As "Any Conformation Which Ensures That Air

4                 Can Circulate Between The Support Tray And The Atmosphere Control

5                 Member."

6         Apio's construction of the term ribs is based verbatim on the definition provided during

7    prosecution of the application that issued as the '818 patent.

8         The term "ribs" is used in independent claims 1 and 8 as follows:

9         "(E) after step D, turning the sealed package and the support tray placed thereon
          upside-down, so that the foodstuffs rest on the sealing sheet, and the sealing sheet is
10        supported by the support tray, the support tray comprising **ribs** such that, after step
          (E) air can circulate between the support tray and the atmosphere control member."

11   The term "ribs" is also used in dependent claims 4 and 11 which recite "wherein the ribs on the

12   support tray are discontinuous upstanding ribs."

13        The term "rib" is introduced in the specification at col. 6, lines 28 to 33 which state that

14   "[w]hen the sealing sheet includes an atmosphere control member, the support tray preferably

15   comprises ribs such that air can circulate between the support tray and at least the portion of the

16   sealing sheet including the atmosphere control member."

17        Applicant's definition of the term "rib" was made explicit during the prosecution history.

18   This is entirely proper - a patentee may define a claim term either in the written description of the

19   patent or in the prosecution history. *Honeywell Inc. v. Victor Co. of Japan Ltd.*, 298 F.3d 1317,

20   1324 (Fed. Cir. 2002)(applicant's broader definition in the file history trumped the narrower more

21   common definition).  Applicant stated in response to an office action:

22        "the term 'rib' is used, and would be understood by one of ordinary skill in the art to
          be used, in a broad sense to include any conformation which ensures that 'air can
23        circulate between the support tray and the atmosphere control member'.  The
          Random House Dictionary, 2nd edition, unabridged, after giving various definitions
24        of the term 'rib' in the fields of anatomy and architecture, then states: 5.   something
          resembling a rib in form, position or use, as a supporting or strengthening part. 6.   a
25        structural member that supports the shape of something: an umbrella rib."[2]
          Amendment and Response to Office Action filed on January 16, 2006, pg. 18, line 24
26        to pg. 19, line 1.

27   _____

28   [2]  A copy of the definition of "rib" from the Random House Dictionary, 2nd Edition, unabridged ©1987 is attached as
     Exhibit "N" to the Compendium of Exhibits filed concurrently herewith.

**APIO'S OPENING CLAIM CONSTRUCTION
                                         BRIEF AND EVIDENCE IN SUPPORT**

Exhibit "H," pp. H-059 to H-060.

The explicit definition from the file history is Apio's definition. This is the construction that the Examiner relied on in granting the patent and the construction on which the public could rely in interpreting the scope of the claims. *Vitronics Corp v. Conceptronic Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

Another use of the term "rib" consistent with Apio's definition appears in another portion of the file history. While describing a tray of a third party, shown below, Applicant stated "It is not apparent from the photographs that there are any ribs or other conformations on the transparent lid, except around the periphery where the lid engages the rim of the container body." (emphasis added)(Information Disclosure Statement submitted on July 21, 2006). Thus, the file history acknowledges that ribs can be at the periphery of the tray.



Apio's definition of rib also finds support in dictionaries. For example, see Webster's Universal College Dictionary ©2001 which states that "rib" means "something resembling a rib in form, position, or use, as a supporting part: *the ribs of an umbrella*." Exhibit "K."

2)    Mann's Proposed Construction Of "Ribs" Should Be Rejected

Mann's proposed construction of "ribs" improperly limits the term, and therefore the claims, to a preferred embodiment of the invention. As explained in section IV(C) above, the Federal Circuit has repeatedly stated that limiting the claims to the preferred embodiments shown in the

1    specification and drawings is wrong. *See e.g.,Ortho-McNeil Pharmaceutical, Inc. v. Mylan Labs.,*

2    *Inc.*, 520 F.3d 1358, 1562 (Fed. Cir. 2008).

3           The patent specification itself says that limiting the invention to the specific embodiments

4    described is improper. As explained in col. 2, lines 39 to 42 of the '818 patent: "the invention

5    includes, but is not limited to, the specific aspects of the invention which are set out in the Detailed

6    Description of the Invention below." Moreover, the specification of the '818 patent states, at col. 6,

7    lines 35 to 38, that "[t]hose skilled in the art will have no difficulty, having regard to their own

8    knowledge and the disclosure of this specification, in manufacturing suitable container bodies,

9    partitions and support trays.

10          While the specification at col. 7, lines 20 to 24 and Fig. 13 shows a particular embodiment of

11   the present invention where "[s]upport tray 5 has discontinuous upstanding ribs 51 so that air can

12   circulate between the support tray and the sealing sheet 4 and the atmosphere control member 41 can

13   regulate the atmosphere around the fresh vegetables in the party tray", there is no reason to limit the

14   claims to this preferred embodiment. The specification and file history simply do not show any

15   intent by the applicant to limit the ribs to "upstanding projections that support the portion of the

16   sealing sheet that extends over the fillable compartments when the tray is loaded and turned upside

17   down" as required in defendant's definition. As explained in section IV(E) above, the Federal

18   Circuit has repeatedly held that narrowing of claim terms from their common and ordinary meaning

19   requires clear disavowal of claim coverage. *See, Amgen Inc. v. Hoechst Marion Roussel Inc.*, 314

20   F.3d 1313, 1327-1328 (Fed. Cir. 2003).

21          Moreover, insertion of the term "upstanding" into the broadest construction of "ribs" is

22   improper under the doctrine of claim differentiation as discussed above in IV(B).    Here, that the

23   "ribs" are "upstanding" is not recited until dependent claims 4 and 11. Construing the term "ribs" to

24   being "upstanding" in independent claims 1 and 8 would render "upstanding" redundant in

25   dependent claims 4 and 11 and is therefore inappropriate.

26          Thus, the Court should adopt Plaintiff's proposed construction that "ribs" should be

27   construed to mean "any conformation which ensures that air can circulate between the support tray

28   and the atmosphere control member."

**APIO'S OPENING CLAIM CONSTRUCTION
                                                    BRIEF AND EVIDENCE IN SUPPORT**

B.    "Atmosphere Control Member"

      1)    "Atmosphere Control Member" Should Be Construed As "Any Member Which Modifies The Rates At Which Oxygen And Carbon Dioxide Pass Into And Out Of The Sealed Package."

Claims 1 and 8 recite "an **atmosphere control member** included in the sealing sheet." The term "atmosphere control member" is later narrowed in dependent claims 3 and 9 which recite "wherein the atmosphere control member covers a window in the sealing sheet."

The term "atmosphere control member" was explicitly defined in the specification and that definition controls the interpretation of the term. *Serrano v. Telular Corp.*, 111 F.3d 1578, 1582 (Fed. Cir. 1997)(definition and explanation in specification controls interpretation of claim term rather than inconsistent dictionary definition); *Sinorgchem Co., Shandong v. International Trade Com'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007)(when a term is set off by quotation marks that is often a strong indication that what follows is a definition and when a term is followed by "is" it likely signifies that a patentee is serving as its own lexicographer)(internal citations omitted). The patent specification in col. 4, lines 48 to 50 states

> "[t]he term 'atmosphere control member' is used herein to denote any member which modifies the rates at which oxygen and carbon dioxide pass into and out of the sealed package."

During the prosecution history Applicant specifically explained that the term atmosphere control member is "any member which modifies the rates at which oxygen and carbon dioxide pass into and out of the sealed package." See Amendment and Response to Office action filed on November 3, 2004, pg, 22, lines 2 to 18,  Exhibit "H," p. H-259.

Thus the intrinsic evidence supports Apio's construction. If the Court desires to consult extrinsic evidence, that also supports Apio's definition: (1) the file history of a continuation application, (2) the declaration of an expert, and (3) the declaration of the inventor all support this definition.

First, in related U.S. Patent Application Nos. 11/408,442, 11/408,443 and 11/409,354, all having the same specification as the '818 Patent, the Examiner noted that the term "atmosphere control member" is specifically defined in the specification as being very broad stating:

**APIO'S OPENING CLAIM CONSTRUCTION BRIEF AND EVIDENCE IN SUPPORT**

1    "The specification recites wherein the limitation "atmosphere control member"
     denotes any member which modifies the rates at which oxygen and carbon dioxide
2    pass into and out of the sealed package."  In the claims this limitation is broad since
     any member can modify the rate at which oxygen and carbon dioxide pass into and
3    out of a sealed package.  For instance, adding a second layer on top of the sealed
     package would also modify the rate at which oxygen and carbon dioxide pass."
4    Exhibit "I."

5    Consideration of the file histories of related applications to help determine claim scope is

6    appropriate where the applications have identical disclosures. *Ballard Med. Prods. v. Allegiance*

7    *Healthcare Corp.*, 268 F.3d 1352, 1360-1361 (Fed. Cir. 2001)

8         Second, one skilled in the art at the time the application was filed would understand the term

9    "atmosphere control member" to include any member which modifies the rates at which oxygen and

10   carbon dioxide pass into and out of the sealed package, including nonwoven materials, microporous

11   films, and perforations sized to control the packaging atmosphere.  See Declaration of Raymond

12   Clarke ("Clarke Decl."), ¶¶12-15.   Mr. Clarke notes that he himself submitted a paper on

13   atmosphere control utilizing a selectively permeable membrane in conjunction with perforations five

14   months before the '818 Patent was filed.  Clarke Decl., ¶16.   Mr. Clarke also notes that at the time

15   the '818 Patent was filed Apio had products, including the "Mini-Tray" where holes in the sealing

     sheet were used as atmosphere control members.  Clarke Decl., ¶17.

16        A court may admit and rely on prior art proffered by a party, whether or not cited in the

17   specification or file history, because the prior art may be indicative of what those skilled in the art

18   believe a term means. *Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

19   U.S. Patent Nos. 5,832,699, 6,296,923 and 6,441,340 and U.S. Patent Publication No. 2003/0057217

20   show that at the time the application was filed it was well known that perforations in the sealing

21   sheet could function to modify the rates at which oxygen and carbon dioxide pass into and out of the

22   sealed package.  See, Clarke Decl. ¶15 and Exhibit "B".

23        Third, Apio produced multiple embodiments of the present invention, including an

24   embodiment utilizing perforations in the sealing sheet as an atmosphere control member, the same

25   type of atmosphere control member used by defendant Mann .  See Declaration of Wesley Pratte

26   ("Pratte Decl."), ¶ 5.   This product has been marked with the patent number of the patent in suit and

27   there is no claim by defendant Mann of false patent marking under 35 U.S.C. §292. *Id.*  Thus, the

28   definition is consistent with Apio's actual commercialization of the invention and Mann's pleadings.

**APIO'S OPENING CLAIM CONSTRUCTION
                                       BRIEF AND EVIDENCE IN SUPPORT**

1

      2)     Mann's Proposed Construction Of "Atmosphere Control Member" Should Be

2

          Rejected

3

     Mann's proposed definition substitutes the term "gas-permeable element" for "member," the

4

term "rate" for "rates" and the term "container" for "package." Mann's proposed construction has

5

no basis in the patent or file history. As will be seen in the discussion of the term "atmosphere

6

control member included in the sealing sheet" below, Mann's proposed construction is fabricated to

7

help support Mann's tortured theories of non-infringement.

8

     Accordingly, the Court should reject Mann's proposed construction and adopt Apio's

9

proposed construction -- the definition clearly stated in the specification of the '818 Patent.

10

C.    "Sealing Sheet"

11

      1)    "Sealing Sheet" Should Be Construed As Having Its Ordinary And Customary

12

          Meaning Or APIO's Proposed Construction Of "Sealing Sheet" Should Be

13

          Adopted

14

     APIO contends that the term "sealing sheet" is entitled to its ordinary and customary

15

meaning and that no construction by the Court is necessary. However, if the Court finds that the

16

term "sealing sheet" should be construed to have other than its ordinary meaning, then "sealing

17

sheet" should be construed to mean "a sheet that closes the container body."

18

     Claims 1 and 8 recite "sealing a **sealing sheet** of polymeric material to the rim of the

19

container body so that the **sealing sheet** extends over the compartments and creates a sealed

20

package."

21

     The specification does not suggest that the sealing sheet should have specific characteristics.

22

In the Background section, the '818 Patent points out that transparent polymeric sealing sheets were

23

known in the prior art. See col. 1, lines 27 to 45. Additionally, in col. 6, lines 39 to 46, the

24

specification states:

25

       "[t]he sealing sheet is preferably heat-sealed to rim of the container body. Suitable
       sealing sheets, and methods for sealing them to the container bodies, are well known,

26

       and those skilled in the art will have no difficulty, having regard to their own
       knowledge and the disclosure of this specification, in identifying suitable sealing

27

       sheets and using them to produce sealed packages in accordance with the invention."

28

The above portion of the specification clearly recites "suitable sealing sheet<u>s</u>" (emphasis added)

**APIO'S OPENING CLAIM CONSTRUCTION**
**BRIEF AND EVIDENCE IN SUPPORT**

1  thereby implying that many different types of sealing sheets having different characteristics may be

2  suitable for use.

3      As shown in Webster's Ninth New Collegiate Dictionary ©1991, "seal" is defined as

4  "something that secures" and "a closure that must be broken to be opened and that thus reveals

5  tampering." Webster's Universal College Dictionary ©2001 defines "seal" as "to close with a

6  fastening that must be broken to gain access" and "to fasten or close tightly by or as if by a seal."

7  See Exhibit "L."

8      As seen in the accompanying declaration of Raymond Clarke, one skilled in the art of food

9  packaging would understand "sealing sheet" to mean "a sheet that closes the container body." See

10 Clarke Decl. ¶18. Mr. Clarke bases his opinion on several reasons, including that the claims do not

11 limit the sealing sheet to any particular structure, except for reciting "a sheet of polymeric material",

12 the basic function of the sealing sheet is to keep the contents of the package inside and to keep dirt

13 and other contaminants out, and there were many types of known sealing sheets. See Clarke Decl.,

14 ¶¶19-20.

15          2)    Mann's Proposed Construction Of "Sealing Sheet" Should Be Rejected

16     Mann's proposed construction of "sealing sheet" as "a substantially gas-impervious sheet"

17 improperly limits the term and introduces uncertainty into the claims, because the term

18 "substantially gas-impervious" is not mentioned or defined in the patent. The Mann definition

19 includes a term not easily understood by an ordinary juror, i.e. "substantially gas-impervious."

20     Simply because the application and claims teach an atmosphere control member does not

21 mean that the container body, sealing sheet, and/or support tray have to be "substantially gas

22 impermeable." As explained in the prosecution history, it was known to use selectively permeable

23 membranes on containers that are relatively impermeable to gasses and on containers that are

24 substantially gas permeable. November 3, 2004 Response to Office action, pg. 21, lines 8 to 18,

25 Exhibit "H," p. H-258. There is no clear and unambiguous indication in the prosecution history that

26 the Applicant intended to limit the claims to a "substantially gas-impervious" sealing sheet.

27     Moreover, Mann's proposed construction of "sealing sheet" violates the doctrine of claim

28 differentiation, because it renders dependent claim 6 redundant. Claim 6 recites "wherein the

**APIO'S OPENING CLAIM CONSTRUCTION**
                                                                    **BRIEF AND EVIDENCE IN SUPPORT**

1    atmosphere control member provides substantially the only pathways for oxygen and carbon dioxide

2    to enter or leave the packaging atmosphere." For the atmosphere control member to provide the

3    only pathways for oxygen and carbon dioxide to enter or leave the packaging atmosphere, the

4    remainder of the package, including the sealing sheet, would have to be substantially gas-

5    impervious. This therefore suggests that in the broadest claims, at least the container body or the

6    sealing sheet is not substantially gas-impervious.

7         Additionally, Mann's proposed claim construction is inconsistent with the claim language

8    itself which recites a sealing sheet of "polymeric material". As explained in "Film Properties of

9    Thermoplastic Films," Handbook of Plastics and Elastomers, McGraw-Hill Book Company ©1975,

10   pg. 1-101, 1-102, most polymeric sheets are not "substantially gas impervious". See Clarke Decl.

11   ¶21 and Exhibit "D." Moreover, it was known that polyethylene, a material that is not substantially

12   gas-impervious, was suitable for use as a sealing sheet. See Clarke Decl. ¶21.

13        Therefore, Mann's proposed construction of "sealing sheet" should be rejected and the term

14   given its ordinary and customary meaning.

15        D.    "Atmosphere Control Member Included In The Sealing Sheet"

16             1)    "Atmosphere Control Member Included In The Sealing Sheet" Should Be

17                   Construed To Provide "Included In" With Its Ordinary And Customary

18                   Meaning Or To Be "Comprising"

19        With the exception of the term "included in," the remaining terms have already been

20   separately construed. Apio contends that the term "included in" is entitled to its ordinary and

21   customary meaning and that no construction by the Court is necessary. However, if the Court finds

22   that the term "included in" should be construed to have other than its ordinary meaning, then

23   "included in" should be construed to mean "comprises", then the phrase "atmosphere control

24   member included in the sealing sheet" should be construed as "the sealing sheet comprises an

25   atmosphere control member." The case law has held that "included" is a term of art in patent

26   applications that is synonymous with "comprising". *Lucent Technologies, Inc. v. Gateway, Inc.*, 525

27   F.3d 1200, 1214 (Fed. Cir. 2008).

28        Apio's proposed construction of "included in" is consistent with the dictionary definitions of

                                   15        **APIO'S OPENING CLAIM CONSTRUCTION
                                             BRIEF AND EVIDENCE IN SUPPORT**

"include" at the time the application was filed.  For example, Webster's Ninth New Collegiate Dictionary ©1991 defines "include" as "to take in or comprise as part of a whole."  See Exhibit "M."  Additionally, Webster's Universal College Dictionary ©2001 defines "include" as "to contain or encompass as part of a whole."  Id.

2.     Mann's Proposed Construction Of "Atmosphere Control Member Included In The Sealing Sheet Should Be Rejected

Mann's proposed construction of "atmosphere control member included in the sealing sheet" as "a gas-permeable element placed over a gas pathway in a section of the sealing sheet which modifies the rate at which oxygen and carbon dioxide pass into and out of the sealed container" is an attempt to improperly limit the claims to a particular embodiment of the invention in a transparent attempt to avoid literal infringement.  See section IV(C) above; see also, Teleflex Inc. v. Ficosa North Am. Corp., 299 F.3d 1313, 1326-1328 (Fed. Cir. 2002)(reversing claim construction that impermissibly imported limitation from only embodiment in the specification).

In col. 4, lines 54 to 56, the specification states that "An atmosphere control member can <u>for example</u> be placed over a window in the container body and/or over a window in the sealing sheet." (emphasis added)  Placement of an atmosphere control member over a window in the container body and/or sealing sheet" is explicitly qualified as "an example."  The specification and file history do not show any intent by the applicant to limit the "atmosphere control member" to "a gas-permeable element placed over a gas pathway in a section of the sealing sheet."  As explained in section IV(E) above, narrowing of claim terms from their common and ordinary meaning requires clear disavowal of claim coverage in the specification or prosecution history.

Moreover, requiring that the "atmosphere control member included in the sealing sheet" as recited in claims 1 and 8 be "a gas-permeable element placed over a gas pathway in a section of the sealing sheet" is improper under the doctrine of claim differentiation.  As explained in section IV(B) above, the Federal Circuit has repeatedly stated that an independent claim should not be construed as requiring a limitation added by a dependent claim.  Dependent claims 3 and 9 recite "wherein the atmosphere control member covers a window in the sealing sheet."  Mann's proposed construction of "atmosphere control member included in the sealing sheet" would impermissibly render claims 3

**APIO'S OPENING CLAIM CONSTRUCTION BRIEF AND EVIDENCE IN SUPPORT**

1 │ and 9 redundant.

2 │      Accordingly, Mann's proposed construction should be rejected.

3 │

4 │ **VI.**    **CONCLUSION**

5 │      For the foregoing reasons, the Court should adopt Plaintiff's claim constructions.

6 │

7 │ DATED:  August 11, 2008                    SHELDON MAK ROSE & ANDERSON PC

8 │

9 │                         By: _____

10 │                                Jeffrey G. Sheldon
       │                                Marc A. Karish

11 │                                Attorneys for Plaintiff
       │                                APIO, INC.

12 │

13 │

14 │

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

**APIO'S OPENING CLAIM CONSTRUCTION
                                       BRIEF AND EVIDENCE IN SUPPORT**

1

**APPENDIX A**

2

Mann's Accused Party Tray

3    There are two features of Mann's accused party tray that differ from the specific

4    embodiments disclosed in the '818 Patent.  We are discussing the differences so that the claim

5    construction issues are in context.

6    First, instead of having an atmosphere control member in the form of a selectively permeable

7    membrane placed over a window in the sealing sheet, Mann's accused party tray has as its

8    atmosphere control member a plurality of perforations in the sealing sheet.

9    Second, instead of having ribs interior from the rim of the support tray as shown in Fig. 13 of

10    the '818 Patent, Mann has limited its ribs to the rim of the support tray.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APIO'S OPENING CLAIM CONSTRUCTION
BRIEF AND EVIDENCE IN SUPPORT**

**PROOF OF SERVICE**
CCP §§ 1013, 1013a  (New January 1, 2005)

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

1.    At the time of service I was over 18 years of age and **not a party to this action**.

2.    My business address is: 100 Corson Street, Third Floor, Pasadena, CA 91103-3842.

3.    On **August 11, 2008**, I served the following document(s):


    X   The documents are listed on Attachment "A."

4.    I served the documents on the **persons** below, as follows:

    a. **Name** of person served:

    b. **Address** of person served:

    c. **Fax Number** or **e-mail address** of person served, if service was by fax or e-mail:

    d.  Time of service, if personal service was used:

    X The names, addresses, and other applicable information about the persons served is on Attachment "B."

5.    The documents were served by the following means (specify):

    a. ☐    **By personal service**.  I personally delivered the documents to the persons at the addresses listed in Item 4. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.  (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

    b. ☐    **By United States mail**.  I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in Item 4 and (specify one):

        (1) ☐    **deposited** the sealed envelope with the United States Postal Service, with the postage fully prepaid.

        (2) ☐    **placed** the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with this business's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

        I am a resident or employed in the county where the mailing occurred.  The envelope or package was placed in the mail at Pasadena, California.

    c. ☐    **By overnight delivery**.  I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in Item 4.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. ☐ **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in Item 4 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. ☐ **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in Item 4. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

f. X **By e-mail or electronic transmission.** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed in Item 4. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

g. X **By E-FILING.** The document will be E-Filed with the Court and a "Notification of E-Filing" will be e-mailed by the Court to all registered attorneys.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I further declare that I am employed in the office of a member of the bar of this Court, at whose direction the service was made.

Executed on **August 11, 2008** at Pasadena, California.

_____
Donald K. Piper

## DECLARATION OF MESSENGER

☐ **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in Item 4. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package, which was clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on (date):

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on **August 11, 2008** at _____, California.

_____        _____
(Name of Declarant)                              (Signature of Declarant)

## ATTACHMENT "A" TO PROOF OF SERVICE

### LIST OF DOCUMENTS SERVED

1. **PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF AND EVIDENCE IN SUPPORT;**

2. **DECLARATION OF RAYMOND CLARKE IN SUPPORT OF PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF;**

3. **DECLARATION OF MARC A. KARISH IN SUPPORT OF PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF;**

4. **DECLARATION OF WESLEY PAUL PRATTE IN SUPPORT OF PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF;**

5. **COMPENDIUM OF EXHIBITS IN SUPPORT OF PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF.**

## ATTACHMENT "B" TO PROOF OF SERVICE

**NAMES, ADDRESSES, AND OTHER APPLICABLE INFORMATION ABOUT PERSONS SERVED:**

| Name of Person Served | Address (business or residential), Fax, or E-mail (as applicable) Where Served | Manner of Service |
|---|---|---|
| Virginia A. Crisp, Esq. | COBLENTZ, PATCH, DUFFY & BASS LLP<br>One Ferry Building, Suite 200<br>San Francisco, California 94111-4213<br>Fax: 415-989-1663<br>Email: ef-vac@cpdb.com | Email and ECF |
| Joseph S. Presta, Esq.<br>Michael E. Crawford, Esq. | NIXON & VANDERHYE P.C.<br>901 North Glebe Road<br>Arlington, Virginia 22203<br>Fax: 703-816-4100<br>Email: jsp@nixonvan.com;<br>mec@nixonvan.com | Email and ECF |