1  Jeffrey G. Sheldon (State Bar No. 67516)
2  Marc A. Karish (State Bar No. 205440)
   SHELDON MAK ROSE & ANDERSON PC
3  100 East Corson Street, Third Floor
   Pasadena, California 91103-3842
4  Telephone: (626) 796-4000
5  Facsimile: (626) 795-6321
6  E-Mail: mkarish@usip.com

7
   Attorneys for Plaintiff and Counterdefendant
8  APIO, INC.

9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12

13  APIO, INC., a Delaware corporation,    )  Case No.  CV 07-5628 PVT

14              Plaintiff,                  )  **DECLARATION OF RAYMOND**
                                           )  **CLARKE IN SUPPORT OF**
15       vs.                               )  **PLAINTIFF'S OPENING CLAIM**
                                           )  **CONSTRUCTION BRIEF**
16  MANN PACKING COMPANY, INC.,            )
17  a California corporation; and DOES 1 – )
    10, inclusive,                         )
18                                         )
              Defendants.                  )
19  ──────────────────────────────        )

20  MANN PACKING COMPANY, INC.,            )
    a California corporation,              )
21                                         )
              Counterclaimant,             )
22                                         )
         vs.                               )
23                                         )
    APIO, INC., a Delaware corporation,    )
24                                         )
              Counterdefendant.            )
25  ──────────────────────────────        )

26       I, Raymond Clarke, declare:

27  **MY QUALIFICATIONS**

28       1.     I am an expert in the design of atmosphere control membranes for

J:\Apio\18171.21                1          **DECLARATION OF RAYMOND CLARKE**

1 | packaging for fruits and vegetables.

2 |       2.      I have over 17 years of experience in the fruit and vegetable
3 | packaging industry.  I earned an Honors Degree in Chemistry from the University
4 | of Bradford in the United Kingdom.

5 |       3.      I was a polymer chemist at Gillette Research and Development
6 | Laboratories in the United Kingdom from 1966 to 1973.  While there I studied
7 | gamma radiation effects on polymers and medical devices.

8 |       4.      I was a project leader in corporate technology for Raychem Ltd. in the
9 | United Kingdom from 1973 to 1977.  While I was there, I developed novel
10 | polymeric memory materials.  I also worked as a technical manager in the
11 | Fiberoptic Development Group of Raychem Corporation in California from 1977
12 | to 1984.

13 |       5.      From 1984 to 1987, I worked as a technical director for Kelsius Inc. in
14 | California developing fiber optic sensors for pH, carbon dioxide and oxygen
15 | sensors for use in the radial artery.  From 1987 to 1990, I was a manager for the
16 | Catheter Development Group of MCM Laboratories Inc. in California developing
17 | fiber optic coronary and peripheral catheters for use in laser angioplasty.

18 |       6.      From 1990 to 2000 I was the director of product development at
19 | Landec Corporation in California.  While I was there, I developed temperature
20 | responsive membranes for use in controlling respiration rate of fresh produce.  I
21 | also developed temperature sensitive adhesives.  From 2000 to the present I have
22 | been the principle scientist at Apio, Inc.  In this role, I have developed a family of
23 | membranes and products using temperature switchable technology.

24 |       7.      I have developed membrane technology used by Apio, Inc. for
25 | preserving fresh produce.  With these temperature switchable membranes, the
26 | permeability ratio of carbon dioxide to oxygen is controllable as is the total
27 | permeability.  I am a listed inventor on five U.S. patents and five published
28 | applications relating to this technology.

8.    I am also a listed inventor on 11 additional U.S. patents relating to temperature sensitive adhesives, distributed temperature sensors for fiber optic wave-guides, fiber optic coronary and peripheral catheters, polymeric memory compositions, and the effect of gamma radiation on polymers.

9.    My qualifications and publications, including U.S. patents are more fully detailed in my curriculum vitae attached hereto as Exhibit A.

**MATERIALS REVIEWED**

10.    To prepare my opinion I reviewed U.S. Patent No. 7,083,818 ("the '818 Patent"), the portions of the file history of the '818 Patent discussed below, the Joint Claim Construction and Prehearing Statement filed in this lawsuit, the portion of "Film Properties of Thermoplastic Films" Handbook of Plastics and Elastomers, McGraw-Hill Book Company ©1975, pp. 1-101, 1-102, the definitions of "seal" discussed below; U.S. Patent Nos. 5,832,699, 6,296,923 and 6,441,340 and U.S. Patent Publication No. 2003/0057217.

**ANALYSIS**

11.    In my opinion one skilled in the art for which the '818 Patent pertains for purposes of practicing the invention taught in the '818 Patent as of the filing date of the '818 Patent (August 16, 2002) is someone with two or more years of hands on experience designing food packaging.  This opinion is based on the education level of the inventor of the '818 Patent and those who typically work in the industry, and the sophistication of the technology involved.

**Atmosphere Control Member**

12.    For the reasons provided below, it is my opinion that an "atmosphere control member" as used in the claims of the '818 Patent would be understood at the time of filing of the '818 Patent by one of ordinary skill in the art as "any member which modifies the rates which oxygen and carbon dioxide pass into and out of the sealed package."

13.    The language of claims 1 and 8 does not limit the "atmosphere control

1    member" to any particular structure, except for reciting that the "atmosphere

2    control member" is "included in the sealing sheet."

3        14.    The Applicant specifically explained that the term atmosphere control

4    member is "any member which modifies the rates at which oxygen and carbon

5    dioxide pass into and out of the sealed package" and included, for example, "a

6    nonwoven material, optionally having a polymer coating thereon," "a microporous

7    film, optionally having a polymeric coating thereon," and one or more perforations

8    having a size such that they control the packaging atmosphere. See Amendment

9    and Response to Office action filed on November 3, 2004, pg. 22, lines 2 to 18.

10        15.    At the time the '818 Patent was filed, there were numerous ways for

11    controlling the atmosphere in a package of respiring foodstuffs. For example, a

12    portion of the sealing sheet can be perforated to modify the rates at which oxygen

13    and carbon dioxide pass into and out of the sealed package as shown in U.S. Patent

14    No. 6,441,340, filed on March 17, 2000, U.S. Patent No. 5,832,699 issued on

15    November 10, 1998, and U.S. Patent No 6,296,923, issued on October 2, 2001.

16    True and correct copies of U.S. Patent Nos. 5,832,699, 6,296,923 and 6,441,340

17    are attached as Exhibit B.

18        16.    At the time the '818 Patent was filed, it was known that combinations

19    of selectively permeable membranes and perforations could be utilized to modify

20    the rates at which oxygen and carbon dioxide pass into and out of a sealed

21    package. For example, I wrote a paper with D.R. Paul entitled "Modeling of

22    Modified Atmosphere Packaging Based on Designs with a Membrane and

23    Perforations" for the Journal of Membrane Science 208 (2002) 269-283, which

24    specifically considered the effect of perforations in addition to a selectively

25    permeable membrane. The article was submitted for publication in January 2002,

26    about 5 months before the '818 Patent was filed. A true and correct copy of the

27    article is attached as Exhibit C.

28        17.    At the time the '818 Patent was filed, it was well known to include

1  perforations in the sealing sheet to modify the rates at which oxygen and carbon

2  dioxide pass into and out of the sealed package.  For example, at the time the '818

3  Patent was filed Apio had products, including the "Mini-Tray", Apio item number

4  10102, where perforations in the sealing sheet were used as atmosphere control

5  members.  Additionally, at least one third party, Foxy Foods, had a packaged

6  vegetable product utilizing perforations in the sealing sheet as atmosphere control

7  members.

8  **Sealing Sheet**

9      18.    For the reasons provided below, it is my opinion that a "sealing sheet"

10  as used in the claims of the '818 Patent would be understood at the time of filing of

11  the '818 Patent by one of ordinary skill in the art as a "sheet that closes the

12  container body."

13      19.    The language of claims 1 and 8 does not limit the "sealing sheet" to

14  any particular structure, except for reciting "a sealing sheet of polymeric material."

15      20.    The basic function of the sealing sheet is to keep the contents of the

16  package inside and to keep dirt and other contaminants out.  Beyond those basic

17  functions, the characteristics of the sealing sheet can be varied depending on the

18  foodstuffs.

19      21.    The use of polymeric sealing sheets in the prior art was discussed in

20  the Background portion of the '818 patent.  At the time the '818 Patent was filed,

21  polyethylene films were known as possible sealing sheets.  See e.g. U.S. Patent

22  Publication No. 2003/0057217, a copy of which is attached hereto as Exhibit O.

23  Polyethylene has permeability to oxygen and carbon dioxide as shown in **"Film**

24  **Properties of Thermoplastic Films,"** Handbook of Plastics and Elastomers,

25  McGraw-Hill BookCompany ©1975, pp. 1-101, 1-102, a copy of which is attached

26  as Exhibit D.

27      22.    Webster's Ninth New Collegiate Dictionary ©1991, defines "seal" as

28  "something that secures" and "a closure that must be broken to be opened and that

1  thus reveals tampering." Webster's Universal College Dictionary ©2001 defines

2  "seal" as "to close with a fastening that must be broken to gain access" and "to

3  fasten or close tightly by or as if by a seal."

4      23.    I have considered Mann Packing Company's proposed construction of

5  "sealing sheet" as "a substantially gas-impervious sheet" and find it to be

6  unsupported in the '818 Patent and excessively limiting. As explained above, such

7  a definition would not include known sealing sheet materials such as polyethylene

8  films.

9      24.    One skilled in the art at the time the '818 Patent was filed would

10  understand the term "sealing sheet" to include many different types of sealing

11  sheets and not just those that are "substantially gas-impervious."

12  **Atmosphere Control Member Included In The Sealing Sheet**

13      25.    I have considered Mann Packing Company's proposed construction of

14  "atmosphere control member included in the sealing sheet" as "a gas-permeable

15  element placed over a gas pathway in a section of the sealing sheet which modifies

16  the rate at which oxygen and carbon dioxide pass into and out of the sealed

17  container" and find it to be excessively limiting. As explained above, the sealing

18  sheet may include different structures, such as perforations, to modify the rates at

19  which oxygen and carbon dioxide pass into and out of the sealed package.

20      I declare under penalty of perjury under the laws of the United States that

21  the foregoing is true and correct and that this Declaration was executed this

22  8TH day of August, 2008 at Menlo Park, California.

23

24  _Raymond Clarke_

25  RAYMOND CLARKE

26

27

28

J:\Apio\18171.21                    6                    DECLARATION OF RAYMOND CLARKE