1   Virginia A. Crisp (State Bar No. 121387)
    ef-vac@cpdb.com
2   COBLENTZ, PATCH, DUFFY & BASS LLP
    One Ferry Building, Suite 200
3   San Francisco, California  94111-4213
    Telephone:  415-391-4800
4   Facsimile:  415-989-1663
5
    Joseph S. Presta (*pro hac vice*)
6   jsp@nixonvan.com
    Michael E. Crawford (*pro hac vice*)
7   mec@nixonvan.com
    NIXON & VANDERHYE P.C.
8   901 North Glebe Road
    Arlington, Virginia  22203
9   Telephone:  703-816-4000
    Facsimile:  703-816-4100
10
11  Attorneys for Defendant and Counterclaimant
12  MANN PACKING COMPANY, INC.,
    a California corporation
13
14
                    UNITED STATES DISTRICT COURT
15      NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION
16
17
18  APIO, INC., a Delaware corporation,         Case Number:  5:07-CV-5628-JF/PVT
19              Plaintiff,
                                                **Mann's Response to Apio's Claim
20      v.                                      Construction Brief**
21  MANN PACKING COMPANY, INC., a               Judge:  Honorable Jeremy Fogel
    California corporation,
22                                              Trial Date:    August 10, 2009
23              Defendant.
24
    AND RELATED COUNTERCLAIMS
25
26
27
28

# Table of Contents

**Page**

I.   Introduction ................................................................................................................. 1

II.  The Law Of Claim Construction ..................................................................................... 3

III. Argument ...................................................................................................................... 6

    A.   The Correct Construction of the Term "Ribs" ................................................... 6

        1.   The Claim Language Supports Mann's Definition of "Ribs" ................... 7

        2.   The Specification Supports Mann's Construction of "Ribs" ................... 8

        3.   Mann's Proposed Construction of "Ribs" is Entirely
            Consistent with the Express Disclaimers Made By Apio
            During Prosecution in Order to Obtain Allowance of the Claims...................... 11

        4.   Apio's Construction of "Ribs" Conflicts with the Intrinsic Record................... 16

    B.   The Correct Construction of the Term "Sealing Sheet" ............................................... 17

    C.   The Correct Construction of the Term "Atmosphere Control Member" ..................... 21

    D.   The Correct Construction of the Term
        "Atmosphere Control Member Included in the Sealing Sheet" .................................. 22

IV.  Conclusion................................................................................................................... 25

# Table of Authorities

**Cases** **Page**

*Adco Products, Inc. v Carlisle Syntec Inc.,*
  110 F.Supp.2d 276 (D. Del. 2000) .................................................................................. 4

*AquaTex Indus., Inc. v. Techniche Solutions,*
  419 F.3d. 1374 (Fed. Cir. 2005) .................................................................................... 24

*CIAS, Inc. v. Alliance Gaming Corp.,*
  504 F.3d 1356 (Fed. Cir. 2006) .................................................................................... 15

*Ekchian v. Home Depot, Inc.,*
  104 F.3d 1299 (Fed. Cir. 1997) ...................................................................................... 4

*Hakim v. Cannon Avent Group, PLC,*
  479 F.3d 1313 (Fed. Cir. 2007) .................................................................................... 15

*Honeywell Int'l v. ITT Indus.,*
  452 F.3d 1312 (Fed. Cir. 2006) .......................................................................... 5, 17, 25

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,*
  381 F.3d 1111 (Fed. Cir. 2004). ..................................................................................... 3

*Markman v. Westview Instruments, Inc.,*
  517 U.S. 370 (1996) ........................................................................................................ 3

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995) .................................................................................... 5, 16

*MBO Labs, Inc. v. Becton, Dickinson & Co.,*
  474 F.3d 1323 (Fed. Cir. 2007) ...................................................................................... 5

*Medtronic, Inc. v. Guidant Corp.,*
  465 F.3d 1360 (Fed. Cir.2006) ....................................................................................... 5

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
  357 F.3d 1340 (Fed. Cir. 2004) .................................................................................... 15

*Nystrom v. Trex Co.,*
  424 F.3d 1136 (Fed. Cir. 2005) .................................................................................... 17

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................................. *passim*

1
2

# Table of Authorities (Cont.)

3

**Cases**                                                                                    **Page**

4
5

*ResQNet.com, Inc. v. Lansa, Inc.,*
    346 F.3d 1374 (Fed. Cir. 2003) ...........................................................................4

6
7

*Seachange Int'l, Inc. v. C-COR Inc.,*
    413 F.3d 1361 (Fed. Cir. 2005) ......................................................................8, 15

8

*SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001) ......................................................................4, 25

9
10

*Southwall Technologies, Inc. v. Cardinal IG Co.,*
    54 F.3d 1570 (Fed. Cir. 1995) ........................................................................5, 16

11
12

*Teleflex, Inc. v. Ficosa North Am. Corp.,*
    299 F.3d 1313 (Fed. Cir. 2002) ...........................................................................4

13
14

*Toro Co. v. White Consolidated Industries Inc.,*
    199 F.3d 1295 (Fed. Cir. 1999) ....................................................................17, 20

15

*V-Formation, Inc. v. Bennetton Group SpA,*
    401 F.3d 1307 (Fed. Cir. 2005) ...........................................................................5

16
17

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ..........................................................................3, 5

18
19

*W.E. Hall Co. v. Atlanta Corrugating LLC,*
    370 F.3d 1343 (Fed. Cir. 2004) ...........................................................................4

20

*Zenon Envtl., Inc. v. U.S. Filter Corp.,*
    506 F.3d 1370 (Fed. Cir. 2007) .........................................................................24

21
22
23
24
25
26
27
28

## I.    INTRODUCTION

The '818 patent is directed to a method for preparing a specific type of product, known as a "party tray," that contains vegetables or other foodstuffs and is made available for purchase at grocery stores and the like. (Declaration of Joseph S. Presta (hereafter, "Presta Decl."), Ex. A, '818 Patent)[1]. The '818 specification admits that party trays and methods of preparing party trays were in existence for many years prior to the '818 application. (*See e.g., Id.* at col. 1, lns. 25-45). In fact, a review of the specification and prosecution history of the '818 patent confirms that all of the individual features described in this patent were well-known in the party tray industry for years prior to the filing of Apio's patent application. For instance, sealed party trays and party trays that are designed to be flipped over (*i.e.*, "flip trays") for purposes of serving or displaying the foodstuffs contained therein were known at the time of the '818 application. An example of one such prior art party tray is the clear plastic trays marketed by the Albertson's supermarket chain, containing cut up fresh produce, that could be inverted or "flipped" for display purposes. (Ex. B, Suppl. IDS filed May 18, 2004, Albertson's Manual, p. 37). The specification also admits that the use of support trays, sealing sheets and atmosphere control members (ACMs) to extend the shelf-life of such party trays were also well-known prior to the filing of the '818 application. (Ex. A, col. 1, lns. 25-33; col. 4, ln. 51; col. 6, lns. 39-41).

During prosecution of the '818 patent, the Patent Office did not find anything new about the claimed invention except for one very limited feature. The alleged novel feature of Apio's claimed party tray is simply the use of upstanding "ribs" on a support tray that is placed over a sealing sheet having an atmosphere control member thereon. The claimed "ribs" contact and support the sealing sheet when the product is turned upside-down. Apio convinced the Patent Office after repeated rejections that such upstanding "ribs" were novel because they prevented the sealing sheet from drooping under the weight of the foodstuffs, thereby preventing the airflow to the atmosphere control member from being blocked by the tray when the product is turned up-

---

[1] Citations to the exhibits to the Presta Declaration are denoted "(Ex. #)".

1   side down. As explained in detail below, the claims were allowed only <u>after</u> this "rib" feature

2   was added to all of the independent claims and Apio explained the specific structure, location and

3   function of these ribs to the patent examiner.

4        Apio's proposed claim construction for "ribs" (as well as the other disputed terms)

5   completely ignores the claim language, specification and prosecution history of the '818 patent.

6   Indeed, Apio's proposed construction reads critical limitations out of the claims by proposing

7   overly broad and incomplete definitions that are entirely inconsistent with the intrinsic record.

8   By proposing such broad and incomplete claim constructions, Apio is trying to improperly

9   expand the scope of the '818 patent to cover subject matter that has, by its own admission, long

10  existed in the prior art, and that Apio clearly and intentionally disclaimed during prosecution of

11  the '818 patent.[2]

12       Mann, on the other hand, simply requests that the Court construe the scope of the '818

13  patent in a manner that is consistent with the intrinsic record and hold Apio to the clear

14  disclaimers it made during prosecution to get the patent allowed over the prior art. Mann is a

15  family-owned business that began in the 1930's and is based in California. Its product offerings

16  include party trays containing various foodstuffs that are primarily sold to retail grocery stores.

17  The Mann party trays accused of infringing the '818 patent are very different from the invention

18  of the '818 patent. For example, Mann's accused products have flat bottom trays and do not

19  contain the claimed supporting ribs that were the sole basis for the issuance of the '818 patent.

20  Knowing that the accused trays lack the critical ribs feature of the '818 patent, Apio is attempting

21  to salvage its baseless infringement allegations by proposing overly broad claim interpretations

22  that ignore the true claim scope dictated by the intrinsic record. Apio is also attempting to divert

23  attention from the damaging intrinsic record by submitting improper extrinsic evidence in the

---

[2] Mann has uncovered evidence proving that Apio concealed from the Patent Office certain of its own prior art party trays that it sold more than a year before filing the '818 application. These prior art trays were highly material to the patentability of the pending '818 application claims and would have precluded issuance thereof. This evidence forms the basis of the inequitable conduct counterclaim pending in this action and will be presented to the Court at the appropriate time.

28

1  form of declarations and other documents that are entirely irrelevant to claim construction and

2  should be ignored under controlling Federal Circuit law.

3  **II.     THE LAW OF CLAIM CONSTRUCTION**

4         Claim construction is an issue of law to be determined by the court. *Markman v.*

5  *Westview Instruments, Inc.,* 517 U.S. 370, 385 (1996).   Typically, the words of a claim are given

6  their "ordinary and customary meaning" as would be understood by one skilled in the applicable

7  art at the time of the invention. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005)

8  (*en banc*).   However, as discussed below, there are circumstances under which a claim term is

9  properly construed more narrowly than the term's ordinary meaning, such as when the applicant

10  disclaims or disavows a particular claim scope.   To assist the courts in conducting a proper claim

11  construction undertaking, the Federal Circuit has provided controlling guidelines and an

12  established hierarchy of sources that should be consulted for the purpose of construing claim

13  terms. *Id.* at 1312-19.

14         It has long been a principle of patent law that "the claims of a patent define the invention

15  to which the patentee is entitled the right to exclude." *Phillips,* 415 F.3d at 1312 (quoting

16  *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,* 381 F.3d 1111, 1115 (Fed. Cir.

17  2004)).   Accordingly, claim construction begins with the language of the claim itself as "the

18  claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.*

19  at 1312, 1314.   Claims, however, are not interpreted in a vacuum and must be construed "not

20  only in the context of the particular claim in which the disputed term appears, but in the context

21  of the entire patent, including the specification." *Id.* at 1313.   The specification "is always highly

22  relevant to the claim construction analysis." *Id.* at 1315 (citations omitted).   Indeed, the

23  specification has been held to be "the single best guide to the meaning of a disputed claim term"

24  and is usually dispositive. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.

25  1996); *see also, Phillips*, 415 F.3d at 1315.   This is because the specification establishes the

26  scope and outer boundaries of the claims which must be construed in accordance with "what the

27  inventors actually invented." *Phillips,* 415 F.3d at 1316.

28

1    Where the specification "makes clear that the invention does not include a particular

2    feature, that feature is deemed to be outside the reach of the claims of the patent, even though the

3    language of the claims, read without reference to the specification, might be considered broad

4    enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced*

5    *Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). Such disclaimer or disavowal

6    of claim scope is evidenced by the use of words or "'expressions of manifest exclusion or

7    restriction, representing a clear disavowal of claim scope.'" *ResQNet.com, Inc. v. Lansa, Inc.*,

8    346 F.3d 1374, 1378 (Fed. Cir. 2003) (quoting *Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d

9    1313, 1325 (Fed. Cir. 2002)). A disavowal or disclaimer of a particular claim scope or

10    construction may occur, for example, when an applicant criticizes the prior art or makes express

11    statements about the claimed invention such as the criticality of a particular feature or element.

12    *SciMed*, 242 F.3d at 1341-43; *W.E. Hall Co. v. Atlanta Corrugating LLC*, 370 F.3d 1343, 1353

13    (Fed. Cir. 2004).

14    In addition to reviewing the patent claims and specification, the Court should also

15    consider the patent's prosecution history, and whether the inventor demonstrated any special

16    understanding of the invention, or limited the scope of the invention during the course of

17    prosecution. *Phillips*, 415 F.3d at 1317. The prosecution history consists of the complete record

18    of the proceedings before the PTO and includes the prior art cited during the examination of the

19    patent. *Id.* "[T]he prosecution history can often inform the meaning of the claim language by

20    demonstrating how the inventor understood the invention and whether the inventor limited the

21    invention in the course of prosecution, making the claim scope narrower than it would otherwise

22    be." *Id.* Therefore, "[t]he public has a right to rely on statements made by the patent applicant or

23    his attorney during prosecution that define the scope of the claims." *Adco Products, Inc. v.*

24    *Carlisle Syntec Inc.*, 110 F.Supp.2d 276, 286 (D. Del. 2000) (citing *Ekchian v. Home Depot, Inc.*,

25    104 F.3d 1299, 1304 (Fed. Cir. 1997)).

26    In that regard, "[p]rosecution arguments . . . which draw distinctions between the

27    patented invention and the prior art are useful for determining whether the patentee intended to

28

surrender territory, since they indicate in the inventor's own words what the invention is not."

*MBO Labs, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007); *Honeywell*

*Int'l v. ITT Indus.*, 452 F.3d 1312, 1319 (Fed. Cir. 2006). This is especially important as to

material that was disclaimed during prosecution: "The prosecution history limits the

interpretation of claim terms so as to exclude any interpretation that was disclaimed during

prosecution . . . *Claims may not be construed one way in order to obtain their allowance and in a*

*different way against accused infringers.*" *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54

F.3d 1570, 1576, 1579 (Fed. Cir. 1995) (emphasis added). Such a "surrender can occur by

argument as well as by amendment." *MBO Labs,* 474 F.3d at 1330 (citing *Medtronic, Inc. v.*

*Guidant Corp.*, 465 F.3d 1360, 1373 (Fed. Cir. 2006)).

The foregoing sources – the patent's claims, specification and prosecution history –

constitute what is referred to as the intrinsic evidence or intrinsic record, which "provides the

technological and temporal context to enable the court to ascertain the meaning of the claim to

one of ordinary skill in the art at the time of the invention." *V-Formation, Inc. v. Bennetton*

*Group SpA,* 401 F.3d 1307, 1310 (Fed. Cir. 2005). This intrinsic evidence is the primary source

for construing claims. *Id.*; *see also*, *Phillips,* 415 F.3d at 1317-18 (discussing the value of

intrinsic versus extrinsic evidence to the claim construction analysis).

In addition to the intrinsic evidence discussed above, the Court may, if necessary,

consider sources external to the patent documents – or *extrinsic* evidence. Such extrinsic

evidence "consists of all evidence external to the patent and prosecution history, including expert

and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quoting

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 980 (Fed. Cir. 1995)). The Federal Circuit

has observed that such evidence may be provided in order for the court "'to better understand the

underlying technology' and the way in which one of skill in the art might use the claim terms." *Id.*

at 1318 (quoting *Vitronics*, 90 F.3d at 1584 n. 6). Though extrinsic evidence may shed useful

light on the relevant art, it is "less significant than the intrinsic record in determining the legally

operative meaning of claim language." *Id.* at 1317 (citations omitted). Thus, "a court should

1  discount any expert testimony [or other extrinsic evidence] 'that is clearly at odds with the claim

2  construction mandated by the claims themselves, the written description [or specification], and

3  the prosecution history, in other words, with the written record of the patent.'" *Id.* at 1318

4  (citation omitted).

5  **III.    ARGUMENT**

6        When a proper claim construction analysis is undertaken, the terms "ribs," "sealing

7  sheet," "atmosphere control member," and "atmosphere control member included in the sealing

8  sheet" as used in the '818 patent cannot be construed as proposed by Apio. Rather, in keeping

9  with the claims, specification and prosecution history, one skilled in the art would understand the

10 disputed terms to carry the meanings proposed by Mann.[3]

11 **A.    The Correct Construction of the Term "Ribs"**

12       The following chart shows the parties' competing constructions for the term "ribs."

| Claim Term | Defendant's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| "ribs" | "upstanding projections that support the portion of the sealing sheet that extends over the fillable compartments when the tray is loaded and turned upside down and ensure that air can reach the atmosphere control member" | "any conformation which ensures that air can circulate between the support tray and the atmosphere control member" |

18       Apio's proposed construction of "ribs" fatally ignores the fundamental principles of claim

19 construction. Specifically, Apio completely excludes key limitations regarding the claimed

20 "ribs" as set forth in the claim language and required by the specification. In addition, Apio's

21 proposed claim construction of "ribs" ignores the express disclaimers it made during prosecution

22 in order to get the claims allowed. In contrast, Mann's proposed construction is fully consistent

23 with the intrinsic record and should therefore be adopted.

24

25

26 [3] Mann and Apio agree that one skilled in the art of the '818 patent would have two or more

27 years of hands on experience designing food packaging.

28

1    **1. The Claim Language Supports Mann's Definition of "Ribs"**

2         Adhering to the Federal Circuit hierarchy of claim construction sources, the Court

3    must first look to the claim language when construing a claim term. Independent claims 1, 8 and

4    14 have identical recitations for the term "ribs," and read, in pertinent part, as follows:

5         D) after step C, placing a support tray over the sealing sheet; and

6
         E) after step D, turning the sealed package and the support tray placed
7              thereon upside-down, so that the foodstuffs rest on the sealing sheet,
              and the sealing sheet is supported by the support tray, the support tray
8              comprising ribs such that, after step (E) air can circulate between the
              support tray and the atmosphere control member;....
9

10   (Ex. A, claims 1, 8 and 14).

11        The claim language makes clear that the claimed ribs are designed to provide a

12   *supporting* function for the *sealing sheet when* the sealed package is *turned upside-down.* As

13   claimed, the ribs on the support tray function to support the sealing sheet when the package is

14   turned upside-down and the foodstuffs rest on the sealing sheet. By supporting the sealing sheet,

15   the ribs prevent the sealing sheet from drooping downwardly under the weight of the foodstuffs.

16   Claims 1, 8 and 14 make clear that without the supporting ribs the sealing sheet would sag or

17   droop onto a flat tray when inverted and block air flow to the atmosphere control member (ACM)

18   attached to the sealing sheet. *Id.* Thus, in accordance with the claimed invention, the portion of

19   the sealing sheet that includes the atmosphere control member (ACM) needs to be supported by

20   the upstanding ribs when inverted to prevent the atmosphere control member from being

21   rendered inoperative by flush contact with the support tray. By providing this support function,

22   the ribs of the claimed invention enable air to circulate between the support tray and the

23   atmosphere control member when the package is inverted.

24        Consequently, it is clear from the claim language that the "ribs" must be upstanding

25   and positioned to support the sealing sheet at a location that is in close proximity to the

26   atmosphere control member. Otherwise, when the support tray is turned upside-down, the weight

27

28

7

1    of the foodstuffs resting on the sealing sheet will cause the sealing sheet to sag or droop in a way

2    that obstructs or otherwise blocks the flow of air to the atmosphere control member.

3    　　　　Mann's proposed construction of "ribs" (*i.e.*, "upstanding projections that support the

4    portion of the sealing sheet that extends over the fillable compartments when the tray is loaded

5    and turned upside-down and ensure that air can reach the atmosphere control member") is fully

6    consistent with the claim language.  In contrast, Apio's proposed construction is divorced from

7    and ignores the structure and support function that is required by the claim language.  Apio's

8    proposed construction is an attempt to read-out the support structure and function that the claims

9    expressly recite for the ribs.  For example, Apio's definition ignores the fact that the ribs provide

10    support for the sealing sheet when the package is turned upside-down.  The Court should reject

11    Apio's reliance on an alleged definition selected from the prosecution history that is taken out of

12    context, divorced from the claim language, and contradicted by the remainder of the intrinsic

13    record. *Phillips*, 415 F.3d at 1318.

14    　　　　Apio's reliance on the doctrine of claim differentiation to support its overly broad

15    interpretation of "ribs" is equally erroneous.  This doctrine is only applicable when the

16    construction of a term will cause two claims to have the identical scope.  *See e.g., Seachange*

17    *Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1368-69 (Fed. Cir. 2005).  That situation does not arise

18    with Mann's proposed construction because dependent claims 4 and 11, relied on by Apio, have

19    the further limitation that the upstanding ribs be "discontinuous," a feature not required by

20    Mann's proposed construction.  Thus, claim differentiation is irrelevant to this claim construction

21    inquiry.  Moreover, claim differentiation "is not a hard and fast rule and will be overcome by a

22    contrary construction dictated by the written description or prosecution history." *Id.* at 1369.

23    　　　　**2.  The Specification Supports Mann's Construction of "Ribs"**

24    　　　　Mann's proposed construction of "ribs" is entirely consistent with the specification of

25    the '818 patent.  For example, the specification states that "[t]he support tray can be formed with

26    corrugations, ribs or other conformations which increase its yes meter structural strength.  When

27    the sealing sheet includes an atmosphere control member, the support tray preferably comprises

28

1 | ribs such that air can circulate between the support tray and at least the portion of the sealing

2 | sheet including the atmosphere control member." (Ex. A, col. 6, lns. 26-32).

3 | The patent drawings further support Mann's proposed construction. Figure 13,

4 | showing the claimed package in the upside-down position, is particularly instructive. Figure 13

5 | is reproduced below and annotated to identify that the support tray (5) is comprised of ribs (51)

6 | that support the portion of the sealing sheet (4) that extends over the fillable compartments when

7 | the package is turned upside-down so that air can circulate between the support tray (5) and the

8 | sealing sheet (4).

9 | **INVERTED PRODUCT**



*FIG.13*

container body — 14 — 14 — 22 — 31 — 131 — 22

ribbed support tray — 51 (ribs) — Atmosphere Control Member (ACM) 41 — 51 (ribs) — sealing sheet — 5 — 4

16 | As Figure 13 shows, the "ribs" of the support tray (5) must support the portion of the sealing

17 | sheet (4) that extends over the foodstuff compartments when the tray is loaded and turned upside-

18 | down, and that such support must be provided in a way that ensures air can reach the atmosphere

19 | control member included in the sealing sheet (4)[4]. (*See also,* Ex. A, col. 7, lns. 5-24).

20 | Consequently, the "ribs" must be upstanding and positioned in close proximity to the atmosphere

21 | control member. Otherwise, when the support tray is turned upside-down, the weight of the

22 | foodstuffs resting on the sealing sheet will cause the sealing sheet to sag or droop in a way that

23 | obstructs or otherwise blocks the flow of air to the atmosphere control member. This sagging or

24 | dropping problem that the invention is intended to overcome is shown in the modified Figure 13

25 | below created for the purpose of illustrating the particular problem addressed by the claimed

26 | [4] The atmosphere control member (ACM) is shown in, for example, Fig. 11 as element 41 and

27 | has been added to Fig. 13 above in order to facilitate a proper understanding of the invention.

28 |

1  invention.  The modified figure below illustrates the support tray without upstanding ribs and the

2  problematic effect that the absence of such ribs has on the position of the sealing sheet when

3  inverted.



**INVERTED PRODUCT WITHOUT RIBS**

11  As shown above in the modified figure, if the support tray does not include the upstanding

12  projections, or ribs 51, that support the body of the sealing sheet when inverted, then the weight

13  of the foodstuffs resting on the sealing sheet (4) will cause the sealing sheet to droop or sag down

14  onto the flat tray, thereby blocking the flow of air to the atmosphere control member (41).  This

15  is the specific problem that the '818 invention was designed to overcome and the *only* feature

16  that the Patent Office considered patentable during examination.

17      The specification states that "[w]hen the sealing sheet includes an atmosphere control

18  member, the support tray preferably comprises ribs such that air can circulate between the

19  support tray and at least the portion of the sealing sheet including the atmosphere control

20  member." (Ex. A, col. 6, lns. 28-32).  Thus, the specification teaches that "ribs" are provided to at

21  least support the portion of the sealing sheet that contains the atmosphere control member.

22  Clearly, the "ribs" of the claimed support tray cannot be defined merely by their function of

23  allowing air to circulate between the support tray and the atmosphere control member, as Apio

24  proposes.  Instead, the structure and location of the ribs is critical to their support functionality

25  and must be properly reflected in the construction of this term.

26      Apio's proposed construction of "ribs" completely ignores the specification and the

27  solution it teaches, *i.e.*, providing upstanding ribs 51 on the support tray to support the portion of

28

10

1    the sealing sheet where the atmosphere control member is located when the product is in the

2    upside-down position. In contrast, Mann's proposed construction is fully consistent with the

3    context in which the term "ribs" is used in the specification and claims, and properly captures the

4    structural and functional requirements of this key claimed element.

### 3. Mann's Proposed Construction of "Ribs" is Entirely Consistent with the Express Disclaimers Made By Apio During Prosecution in Order to Obtain Allowance of the Claims

7        If there is any doubt as to the incorrectness of Apio's proposed construction of the

8    term "ribs" and the correctness of Mann's proposed construction, one need only review the

9    prosecution history for the '818 patent. On numerous occasions, Apio made arguments to the

10   PTO and distinguished cited prior art based on the characterization of the support tray ribs as

11   supporting the sealing sheet when inverted such that air can circulate between the support tray

12   and the atmosphere control member. These express disclaimers cannot be ignored, as Apio's

13   proposed construction attempts to do.

14       In an April 11, 2005 amendment and response to the examiner's rejection of February

15   9, 2005, Apio distinguished the claimed invention from the prior art Wyslotsky reference,

16   published U.S. Patent Application No. 2003/0057217 A1. (*See*, Exs. C and D). In the April 11

17   amendment and response, Apio described Wyslotsky as requiring that "the sealing sheet lie

18   between two separate compartments." (Ex. C, p. 4, ¶ 3a.). In contrast, Apio represented the

19   claimed invention to require that "the foodstuffs rest on [the] sealing sheet and that the *sealing*

20   *sheet is supported by the support tray*." *Id.* (Emphasis added). Apio stated that because the

21   sealing sheet of Wyslotsky lies between two separate compartments, Wyslotsky does not (and

22   cannot) provide a support tray that supports the sealing sheet. *Id.*

23       In that same response, to further overcome the examiner's rejections, Apio

24   characterized its claimed invention as requiring "that the sealing sheet comprises an ACM

25   [atmosphere control member] covering a window in the sealing sheet and that the support tray

26   comprises ribs such that air can circulate between the support tray and the ACM." *Id.* at p. 4, ¶3b.

27   Apio argued that the ribs of Wyslotsky serve to increase the surface area of the container, rather

28

11

1    than increase gas flow.  More importantly, Apio expressly argued that the ribs of Wyslotsky "do

2    not ensure the flow of air to an ACM which *would otherwise be blocked*, nor is there any

3    suggestion that they should do so." *Id.* (Emphasis added).

4           Thus, in the April 11, 2005 response, Apio characterized its claimed invention as

5    having a support tray comprised of ribs that supports the sealing sheet and that facilitates the

6    circulation of air between the support tray and atmosphere control member.

7           Apio made additional statements about its invention in order to overcome the prior art

8    relied on by the examiner in rejecting the pending claims.  In distinguishing a modified

9    Albertson's prior art tray, Apio stated that, unlike the claimed invention, in the modified

10   Albertson's:

11            (i)    The atmosphere control member (ACM) is part of the main container
              (containing the principal foodstuff); it is not part of the sealing sheet.
12

13            (ii)   The sealing sheet lies between two distinct compartments, each
              formed by a concave container and each containing foodstuffs.  *This*
14            *makes it impossible for the sealing sheet to be supported by a support tray*
              *or any other member;*
15

16            (iii)  *The ribs on the body and the lid* provide structural integrity and/or
              provide the compartments with additional permeability.  *They are not in*
17            *contact with the sealing sheet.  They do not, therefore, either facilitate or*
              *hinder the operation of the atmosphere control member.*  In particular,
18            they do not "provide sufficient air flow between the atmosphere control
              member and the package." *Id.* at p. 54. (Emphasis added).
19

20          This further distinction also makes clear that the ribs of the support sheet must be *in*

21   *contact with* (and thus support) the otherwise unsupported sealing sheet – not just "ensure that air

22   can circulate between the support tray and the atmosphere control member" as proposed by Apio.

23          In subsequent submissions to the PTO, Apio consistently argued that the support tray

24   ribs of the claimed invention must support the sealing sheet in a manner that allows air to reach

25   the atmosphere control member.  For example, in a submission dated January 16, 2006, Apio

26   responded to another examiner rejection. (Ex. E).  To overcome the examiner's rejections, Apio

27   again amended claims covering the support tray ribs and characterized the claimed invention as

28

1    having a "support tray" *on which rests* a sealing sheet comprised of "ribs such that air can

2    circulate between the support tray and the atmosphere control member included in the sealing

3    sheet." *Id.* at p. 20.  Specifically, Apio stated:

4    
5    > Before the proposed amendments, [the rejected claims] included this
>    feature.  Each of [the rejected claims] was rejected over a combination
>    of references including Wyslotsky, which was relied upon as making it
6    > obvious to modify Albertson's container body to include this feature....
>    However, as discussed and agreed at the interview, *the ribs disclosed in*
7    > *Wyslotsky do not form part of a support tray on which rests a sealing*
>    *sheet including an atmosphere control member."*
8    

9    *Id.* (Emphasis added).

10   In the January 16, 2006, submission, Apio specifically amended the claims to require

11   that after the support tray is placed over the sealing sheet, the sealed package and support tray are

12   turned upside down "so that the foodstuffs rest on the sealing sheet, and the sealing sheet is

13   supported by the support tray, the support tray comprising ribs such that, after step (E), air can

14   circulate between the support tray and the atmosphere control member." *See e.g.*, *Id.* at p. 9.

15   After this amendment, the PTO allowed the pending claims, as amended.  Thus, the arguments

16   and amendments presented by Apio that limited the claimed invention to ribs that are in contact

17   with and support the sealing sheet were the very basis for allowance of the issued claims in the

18   '818 patent.  Under these circumstances, Apio cannot now credibly argue that its patent is not

19   limited to upstanding ribs that support the sealing sheet when the product is in the upside-down

20   position.

21   Moreover, after Apio paid the issue fee, it submitted a post-allowance Information

22   Disclosure Statement (IDS) submitting information regarding a prior art tray made by Foxy

23   Foods. (Ex. F).  The position, function and importance of the support tray ribs claimed in the

24   '818 patent are again made clear in Apio's discussion of the Foxy Foods tray.  Specifically, Apio

25   stated that:

26   > *If ... the Foxy 2001 tray had been turned upside down*, the foodstuffs
>    would then have rested on the sealing sheet, which is thin and flexible.
27   > This would have forced the sealing sheet, including the atmosphere

28

control member, into contact with the lid. *The section of the lid which would have been contacted by the atmosphere control member is completely flat, and as a result there would have been intimate contact between the atmosphere control member and the lid. This intimate contact would have rendered the atmospheric control member inoperative.*

*Id.* at pp. 8-9. (Emphasis added).

With this argument, Apio made clear that its claimed support tray cannot be flat and must include ribs that are in contact with the sealing sheet such that the sealing sheet and its atmosphere control member are supported and not allowed to droop in a manner that would render the atmosphere control member inoperative. Apio's proposed claim construction that is designed to cover Mann's flat bottom trays flies in the face of this clear disclaimer of flat bottom trays. As such, it should be rejected.

The fact that the ribs of the claimed support tray must not only support the sealing sheet and its atmosphere control member, but must also be positioned near the atmosphere control member, is further evidenced by Apio's additional statements regarding the "ribs" of the prior art Foxy Foods tray. In the post-allowance IDS, Apio stated that the "ribs" of the Foxy Foods tray appear to be …

the conformations which form a circular pattern corresponding to the top of the dip container. *Whether or not those conformations permit air circulation around the top of the dip container under any circumstances, they are too far removed from the atmosphere control member to permit air to circulate between the lid and the atmosphere control member if the party tray is turned upside down, i.e. they will not prevent the intimate contact which would render the atmosphere control member inoperative….* Thus, the allowed claims in this application are yet further distinguished from the 2001 Foxy Foods party trays by the requirement that the support tray comprises ribs such that, after step (E) – i.e., the step in which the party tray is turned upside down – air can circulate between the support tray and the atmosphere control member. *Id.* at p. 9. (Emphasis added).

Again, by this statement Apio is making clear that its invention must have ribs that support the sealing sheet at a location that is in close proximity to the location of the atmosphere control member and prevent intimate contact which would otherwise render the atmosphere

14

1  control member inoperative.  *See*, Presta Decl., Ex. K (consolidating the relevant figures and

2  arguments from the IDS provided as Exhibit F for ease of reference).

3       All of Apio's arguments cited above distinguishing the prior art from the claimed

4  invention constitute clear and unambiguous disavowals of subject matter and claim scope.

5  Accordingly, under applicable law, the proper claim constructions must reflect Apio's disavowal

6  of claim scope made during prosecution. *CIAS, Inc. v. Alliance Gaming Corp.,* 504 F.3d 1356,

7  1362-63 (Fed. Cir. 2006); *Hakim v. Cannon Avent Group, PLC,* 479 F.3d 1313, 1316-17 (Fed.

8  Cir. 2007) (patentee specifically distinguished the claimed invention from the prior art during

9  prosecution and thus disclaimed claim scope, which could not be recaptured); *Seachange,* 413

10  F.3d at 1372-74 (discussing the narrowing of claim terms through prosecution disclaimer).

11       Mann's proposed construction of the term "ribs" finds further support in a declaration

12  signed by the inventor and submitted to the PTO in a subsequent continuation application based

13  on the '818 patent. (Ex. G).[5]  Although Apio relies on this declaration in an attempt to support its

14  claim construction positions, it ignores the inventor's explanation of the problem purportedly

15  solved by the invention claimed in the '818 patent and its continuation application:  "how to

16  support the [foodstuffs] on a fragile sealing sheet when the tray was flipped over." *Id.* at ¶ 9.

17  (Emphasis added).  According to the inventor, this support problem was solved ...

18          by sizing the support tray so that it not only supported the sealing sheet at

19          locations around the rim of the container body, but *also supported the*
        *sealing sheet at one or more locations within the circumference of the rim*

20          *and spaced apart from the rim* if, after flipping, the sealing sheet was
        deformed downwards by the weight of the [foodstuffs].

21
  *Id.* (Emphasis added).  Thus, the inventor himself has admitted that his invention involved

22  supporting the sealing sheet at locations within the circumference of the rim, as reflected in

23  Mann's proposed construction (*i.e.,* where the sealing sheet extends over the fillable

24  compartments).

25  _____

26  [5] The Federal Circuit has held that statements made by the inventor during continued prosecution
of a related application can be relevant to claim construction. *Microsoft Corp. v. Multi-Tech Sys.,*

27  *Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004); *Phillips*, 415 F.3d at 1317.

28

Case No. 5:07-CV-5628-JF/PVT
Mann's Response to Apio's Claim Construction Brief

1    The above argument and disclaimers also confirm that Apio's infringement

2    allegations against Mann are frivolous. Apio has admitted in Appendix A to its brief that

3    "Mann's accused party trays differ from the embodiments in the '818 patent" because "instead of

4    having ribs interior to the rim of the support tray as shown in Fig. 13 of the '818 patent, Mann

5    has limited its ribs to the rim of the support tray." (Apio Brief, D.N. 42, p. 18). Of course, any

6    alleged "ribs" at the rim of the support tray cannot provide the required contact and support

7    function to prevent the sealing sheet from drooping under the weight of the foodstuffs when the

8    product is inverted. It is a fundamental rule of patent law that "[c]laims may not be construed

9    one way in order to obtain their allowance and in a different way against accused infringers," as

10   is being attempted here by Apio. *Southwall,* 54 F.3d at 1579.

11    In view if the prosecution history outlined above, Apio clearly disclaimed the broad

12   interpretation for the term 'ribs" that it is now asks this Court to adopt.

### 4. Apio's Construction of "Ribs" Conflicts with the Intrinsic Record

14    Apio attempts to focus construction of the term "ribs" solely on the function of

15   allowing air to circulate between the support tray and the atmosphere control member (or ACM).

16   Apio's construction ignores the claim language, the specification and its repeated arguments to

17   the Patent Office to obtain allowance of the '818 patent. In fact, if Apio's construction of ribs is

18   adopted, this term will improperly read on the elements in the prior art, including the "ribs" on

19   the Foxy Foods tray, that Apio expressly distinguished during prosecution to get its claims

20   allowed.

21    Apio's out-of-context reliance on a self-serving dictionary definition of the term

22   "ribs" that it submitted to the PTO as part of the January 16, 2006 amendment and response (*see*

23   Ex. E, pp. 18-19; Apio Brief, D.N. 42, p. 8) is clearly at odds with the patent claims and the

24   specification, as well as the '818 patent prosecution history. The Federal Circuit has repeatedly

25   held that where the definition of a term is clear from the intrinsic record, any "*post facto*

26   explanations found only in the prosecution history" that the patentee "intends his claims to cover

27   more than what his specification discloses [are] entitled to little weight." *Markman,* 52 F.3d at

28

1   980; *Honeywell*, 452 F.3d at 1319. Moreover, the dictionary definition of "ribs" relied on by

2   Apio is trumped by the patent claims and specification, as well as the arguments and claim

3   amendments made by Apio in order to get the '818 patent allowed. *Nystrom v. Trex Co.*, 424

4   F.3d 1136, 1145 (Fed. Cir. 2005).[6] *See also*, *Phillips*, 415 F.3d at 1321-22; *Toro Co. v. White*

5   *Consolidated Indus., Inc.*, 199 F.3d 1295, 1299-1301 (Fed. Cir. 1999). Submission of a

6   dictionary definition during prosecution does not erase the numerous arguments and amendments

7   made by an applicant to get his claims allowed. Accordingly, Apio's selective reliance on a

8   dictionary definition of "ribs" taken out-of-context from the prosecution history must be rejected.

9          Under a proper claim construction analysis, the intrinsic record does not support

10  Apio's proposed construction of "ribs. In contrast, when the patent claims, the specification and

11  the prosecution history are viewed in context, the "ribs" of the support tray should be defined as

12  "upstanding projections that support the portion of the sealing sheet that extends over the fillable

13  compartments when the tray is loaded and turned upside down and ensure that air can reach the

14  atmosphere control member."

15  **B.    The Correct Construction of the Term "Sealing Sheet"**

16         The following chart shows the parties' competing constructions for the term "sealing

17  sheet."

18

| Claim Term | Defendant's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| "sealing sheet" | "a substantially gas-impervious sheet" | Ordinary and customary meaning – no construction by the Court is necessary. However, if the Court finds that the term "sealing sheet" should be construed to have other than its ordinary meaning, then it should be construed to mean "a sheet that encloses the container body." |

23

24  [6] In *Nystrom*, the Federal Circuit held that "in the absence of something in the written description
    and/or prosecution history to provide explicit or implicit notice to…those of ordinary skill in the

25  art…that the inventor intended a disputed term to cover more than the ordinary and customary
    meaning revealed by the context of the intrinsic record, it is improper to read the term to

26  encompass a broader definition simply because it may be found in a dictionary, treatise, or other
    extrinsic source." 424 F.3d at 1145.

27

28

1    All of the independent claims 1, 8 and 14 have identical recitations for the term "sealing

2  sheet," and read, in pertinent part, as follows:

3           C)    ... sealing a sealing sheet of polymeric material to the rim of the
             container body so that the sealing sheet extends over the compartments
4           and creates a sealed package (i) which contains the foodstuffs and a
             packaging atmosphere around the foodstuffs, (ii) whose outer surface is
5           defined by the container body and the sealing sheet, and (iii) which
             includes an atmosphere control member included in the sealing sheet;
6

7  (Ex. A, claims 1, 8 and 14).

8    The claim language itself makes clear that the claimed "sealing sheet" is sealed to the rim

9  of the container and, together with the container body, "creates a sealed package." *Id.*  In order to

10  create a sealed package, the sealing sheet must operate to prevent gases from entering or exiting

11  the sealed package.  That is, the sealing sheet must be at least substantially gas-impervious, as

12  required by Mann's proposed construction, so that a "packaging atmosphere" will exist around

13  the foodstuffs, as expressly required by the claims.  If the sealing sheet is not substantially gas-

14  impervious, gases such as oxygen and carbon dioxide would freely flow into and out of the

15  package through the sheet which would destroy the purpose behind the invention of helping to

16  preserve the freshness of foodstuffs for longer periods of time.

17    Moreover, the claim language requires that the sealing sheet include an "atmosphere

18  control member." *Id.*  The specification explains that the function of the atmosphere control

19  member is to "modify the rates at which oxygen and carbon dioxide pass into and out of the

20  sealed package.  (Ex. A, col. 4, lns. 47-50).  Unless the sealing sheet is at least substantially gas-

21  impervious, the atmosphere control member will be incapable of controlling the flow of gases

22  into and out of the container, as required by the claims, because the gases would simply flow in

23  and out of the package in an uncontrolled manner through the sealing sheet.  Thus, it is a

24  fundamental requirement of the claim language that the sealing sheet must do what its name says

25  – seal the package – which can only be done with a substantially gas-impervious sheet.  Thus,

26  Mann's proposed construction of sealing sheet is entirely consistent with the claim language and

27  specification.

28

1    Mann's proposed construction is also supported by the prosecution history. During

2    prosecution, the examiner rejected claims directed to the sealing sheet based in part on the

3    Wyslotsky reference discussed above. (*See e.g.*, Ex. C, p. 3). To overcome the rejection, Apio

4    argued that if the atmosphere control member of Wyslotsky was part of the sealing sheet, it

5    would not function as an atmosphere control member because "it would not allow oxygen to

6    enter, and carbon dioxide to leave" the package, which would "result in damage to the

7    foodstuffs." *Id.* According to Apio, the atmosphere control member must be "exposed to the

8    outside atmosphere" and to the atmosphere to be controlled within the package. *Id.* In

9    subsequent statements made to overcome claim rejections, Apio represented that one skilled in

10    the art would understand that "an atmosphere control member must have one surface exposed to

11    air and the other surface exposed to the atmosphere which is to be controlled." (Ex. E, p. 18).

12    Thus, the prosecution history confirms that the atmosphere control member must operate to

13    control the flow of gases into and out of the package. This function can only be achieved if the

14    sealing sheet is substantially gas impervious and creates a sealed package atmosphere regulated

15    by the control member.

16    Apio's proposed construction (*i.e.*, a sheet that closes the container) ignores the claim

17    language, specification and the prosecution history. Apio is attempting to read-out the sealing

18    function of the sealing sheet that is expressly required by the claims and the remainder of the

19    intrinsic record. Moreover, Apio represented to the PTO that a key function of the sealing sheet

20    is to seal the container. (Ex. C, pp. 38 and 42). Apio's construction improperly attempts to alter

21    the claimed feature of sealing the container to simply "closing" the container. This construction

22    makes no sense in the context of the invention. For example, a screen door can be closed but it

23    certainly does not operate to seal a room. However, under Apio's construction, a screen would

24    qualify as the claimed sealing sheet. Apio asserts, without any support in the intrinsic record,

25    that the claimed sealing sheet is not provided to seal the package, but to instead merely keep dirt

26    out of the package (Apio Brief, D.N. 42, p. 14). Of course, there is no mention of this alleged

27    "dirt" problem in the specification. Instead, Apio relies entirely on the declaration of Mr. Clarke

28

19

1   for its argument that the sealing sheet is only intended to keep dirt out of the package. (Clarke

2   Decl., D.N. 43, ¶20). The Clarke declaration constitutes improper extrinsic evidence because it

3   flatly contradicts the clear intrinsic record and should therefore be ignored. A court "should

4   discount any expert testimony [or other extrinsic evidence] that is clearly at odds with the claim

5   construction mandated by the claims themselves, the written description [or specification], and

6   the prosecution history, in other words, with the written record of the patent.'" *Phillips*, 415 F.3d

7   at 1318 (citation omitted).

8       Moreover, what Mr. Clarke failed to disclose in his declaration is that he is employed by

9   Apio's parent company, Landec Corporation, and has obviously submitted this self-serving

10  declaration to help his employer in this litigation. Proper claim construction must focus on the

11  intrinsic record, not on contradictory and biased extrinsic sources like the alleged "expert"

12  declaration submitted by Apio. *Phillips,* 415 F.3d at 1318-19. For the same reason, Apio's

13  reliance on dictionary definitions and other extrinsic sources should be rejected because they

14  contradict the meaning of the term provided by the intrinsic record. *Toro,* 199 F.3d at 1299-1301

15  (rejecting dictionary definition relied on by district court and focusing on the intrinsic record to

16  construe claims). Apio's reliance on claim differentiation is also misplaced. There is nothing

17  inconsistent in Mann's proposed construction of sealing sheet and Claim 6. Claim 6 simply

18  precludes the use of another atmosphere control member or gas pathway in the package, such as

19  another control member located in the container body instead of the sealing sheet, as taught in the

20  specification. *See e.g.,* Ex. A, col. 4, lines 54-57 (the atmosphere control member may be

21  "placed over a window in the container body *and/or* over a window in the sealing sheet").

22      Mann's proposed construction for sealing sheet stays true to the claims, specification and

23  prosecution history. In contrast, Apio's proposed construction ignores the intrinsic record and is

24  based entirely on unreliable and biased extrinsic evidence that improperly contradicts the clear

25  intrinsic record.

26

27

28

1  **C.    The Correct Construction of the Term "Atmosphere Control Member"**

2      The following chart shows the parties' competing constructions for the term "atmosphere

3  control member."

| Claim Term | Defendant's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| **"atmosphere control member"** | "a gas-permeable element which modifies the rates at which oxygen and carbon dioxide pass into and out of the sealed container"[7] | "any member which modifies the rates at which oxygen and carbon dioxide pass into and out of the sealed package" |

8      The only determination for the Court to make regarding the construction of "atmosphere

9  control member" is whether the term is broad enough to cover "any member" as proposed by

10  Apio or must be limited to "a gas-permeable element" as proposed by Mann. The '818 claims,

11  specification and prosecution history fully support Mann's proposed construction.

12      Independent claims 1, 8 and 14 each requires the "atmosphere control member" to be

13  included in the sealing sheet. (Ex. A). Despite the statement in the specification that refers to an

14  atmosphere control member as "any member…" (*Id.* at col. 4, lns. 48-50), the term cannot be

15  accorded such a broad definition in view of the totality of the intrinsic evidence.

16      As the specification explains, the atmosphere control member "regulate[s] the atmosphere

17  around the fresh vegetables in the party tray." *Id.* at col. 7, lns. 22-24. Moreover, in the

18  prosecution history, Apio consistently characterized the "atmosphere control member" as an

19  element that "allows oxygen to enter, and carbon dioxide to leave," the atmosphere of the

20  package environment. (Ex. C, p. 3; Ex. E, p.3, stating that those skilled in the art know that "an

21  atmosphere control member must have one surface exposed to air and the other surface exposed

22  to the atmosphere which is to be controlled"). Thus, Apio characterized the atmosphere control

23  member as being a gas-permeable element in the intrinsic record. As such, the specification and

24  prosecution history operate to limit the definition of this term to a gas-permeable element.

25

---

26  [7] The word "rate" has been changed to "rates" in Mann's proposed definition for this term and

27  the term "atmosphere control member included in the sealing sheet."

28

1    Construing the claimed atmosphere control member to be a gas-permeable element is also

2    correct in view of the construction of "sealing sheet" as being substantially gas-impervious, as

3    explained above.  Since the "sealing sheet" must be substantially gas-impervious in order for the

4    atmosphere control member to effectively control the atmosphere within the sealed package

5    environment, the "atmosphere control member" cannot merely be any member but must be a gas-

6    permeable element in order to function as claimed in the '818 patent.

7
**D.    The Correct Construction of the Term**
8
**"Atmosphere Control Member Included in the Sealing Sheet"**

9    The following chart shows the parties' competing constructions for the term "atmosphere

10   control member included in the sealing sheet."

| Claim Term | Defendant's Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| "atmosphere control member included in the sealing sheet" | "a gas-permeable element placed over a gas pathway in a section of the sealing sheet which modifies the rates at which oxygen and carbon dioxide pass into and out of the sealed container" | With the exception of the term "included in," the remaining terms are construed elsewhere.  The term "included in" is entitled to its ordinary and customary meaning and no construction by the Court is necessary.  However, if the Court finds that the term "included in" should be construed to have other than its ordinary meaning, then "included in" should be construed to mean "comprises" such that the phrase "atmosphere control member included in the sealing sheet" is construed as "the sealing sheet comprises an atmosphere control member." |

21   In each of independent claims 1, 8 and 14, the claim language states that the sealing sheet

22   has an "atmosphere control member included in the sealing sheet."  (Ex. A).  The plain meaning

23   of this claim language makes clear that the sealing sheet and the atmosphere control member are

24   two distinct elements of the claimed invention.  As explained above, the claim language confirms

25   that the sealing sheet seals the package and the atmosphere control member on the sheet operates

26   to control the package atmosphere by regulating the flow of gases into and out of the package.

27   Thus, the atmosphere control member must be located over a gas pathway in a section of the

28

22

1  sealing sheet so that it can function to control the flow of gases into and out of the package.

2  Mann's proposed construction properly reflects the relationship and function of these two

3  elements as required by the claims.

4      The '818 specification provides further support for Mann's construction.  Discussing the

5  relation between the sealing sheet and the atmosphere control member, the specification explains:

6      When the sealing sheet includes an atmosphere control member,
   the support tray preferably comprises ribs such that air can
7      circulate between the support tray and at least *the portion of the*
   *sealing sheet including the atmosphere control member.*
8

9  (Ex. A, col. 6, lns. 28-32). (Emphasis added).  In addition, Figure 11 (see Ex. A) clearly shows

10  the atmosphere control member 41 as a separate element on a discrete section of the sealing sheet

11  4.  Moreover, in describing the "atmosphere control member," the specification directs the reader

12  to two documents that Apio purports to have incorporated by reference:  U.S. patent 6,376,032

13  ("the '032 patent") and document WO 00/0477.  (Ex. A, col. 4, lns. 51-54).  The '032  patent is

14  assigned to Apio's parent company, Landec Corporation, and is entitled "Gas-Permeable

15  Membrane." (Ex. H, front page).  Apio's alleged expert, Mr. Clarke, is one of the inventors listed

16  on this patent.  The '032 patent confirms the correctness of all of Mann's proposed constructions.

17  More particularly, the gas-permeable membrane of the '032 invention is described as being

18  "generally used as *control sections which provide the sole, or at least the principal, pathway for*

19  *gases to enter or leave a sealed container* containing a respiring material." *Id.* at col. 2, lns. 6-10.

20  (Emphasis added).  "The properties of the [gas-permeable] membranes are such that they can be

21  used to control the atmosphere within a [container] whose walls are relatively impervious to

22  gases except over one or more control sections, the control section, or at least one of the control

23  sections if there are two or more, being provided by a membrane of the invention.  In one

24  embodiment, the control section *is an aperture which lies in a gas-impervious wall* of the

25  container *and which is covered by a membrane of the invention.*" *Id.* at col. 8, lns. 19-27.

26  (Emphasis added).  Incorporating the '032 patent by reference to define the scope of this term,

27  makes it "highly relevant" to the claim construction analysis, and confirms that that the applicant

28

1  intended it to be a separate element that is placed over a gas pathway. *AquaTex Indus., Inc. v.*

2  *Techniche Solutions*, 419 F.3d. 1374, 1381 (Fed. Cir. 2005). The second document incorporated

3  by reference is identified as WO 00/0477; however, no such document exists. The reference to

4  this second document is therefore irrelevant to this analysis and must be ignored.[8]

5     Mann's accused products do not have the claimed sealing sheet or the claimed

6  atmosphere control member. Instead, Mann uses a pinholed cover sheet that is gas-permeable

7  and thus does not use the claimed additional atmosphere control member as required by all of the

8  '818 claims. Apio's proposed construction attempts to improperly remove these claim

9  limitations by blurring the distinction between these two claimed elements. Apio again relies on

10  improper extrinsic evidence (*e.g.*, the Clarke declaration) that contradicts the intrinsic evidence to

11  try to expand the scope of the claims beyond the teachings in the patent. With the Clarke

12  declaration, Apio is trying to expand its claims to cover a gas-permeable sheet (such as a sheet

13  with pinholes therein) instead of a sealing sheet with an atmosphere control member as claimed.

14  However, Apio's own literature confirms that a sheet with pinholes is not the same as the

15  atmosphere control member described in the '818 patent, as filed. (Ex. I).[9] Moreover, the

16  incorporated '032 patent criticizes the prior art, including perforations or pinholes, as having

17  "many shortcomings" to which the invention was specifically designed to overcome. (Ex. H, col.

18  1, lns. 40-46 and 60-63). Thus, contrary to Mr. Clarke's conflicting declaration, one skilled in

19

20  [8] Apio may claim that the reference to WO 00/0477 is an error. That argument is moot because the law of incorporation by reference strictly requires a clear indication of what document and what material within the document is being incorporated at the time the application is filed.

21  *Zenon Envtl., Inc. v. U.S. Filter Corp.,* 506 F.3d 1370, 1378 (Fed. Cir. 2007). Referencing a document that does not exist certainly does not satisfy this strict notice requirement.

22

23  [9] Other Apio product literature further supports Mann's constructions. A demonstration of the patented technology at work, for example, shows a gas pathway created in a section of the sealing sheet and a gas-permeable atmosphere control membrane placed over the pathway in

24  order to regulate the flow of oxygen and carbon dioxide in the sealed package. (Ex. J). Moreover, a pinholed sheet, such as that in the accused Mann trays, is not (and cannot be) the claimed

25  atmosphere control member because it would "result in the rapid accumulation of carbon dioxide" in the package, which would cause the foodstuffs within the package to spoil more

26  rapidly – which is contrary to the function of the patented technology. (Ex. I, distinguishing

27  microperf). This is fully consistent with the intrinsic record of the '818 patent.

28

Case No. 5:07-CV-5628-JF/PVT
Mann's Response to Apio's Claim Construction Brief

1   the art would not consider a sheet with pinholes to be part of the invention described in the

2   application as filed. *SciMed,* 242 F.3d at 1342-43 (effect of specification's criticism of prior art).

3   Any remarks to the contrary in the prosecution history are irrelevant because the prosecution

4   cannot expand the scope of the patent beyond the teachings of the specification as filed.

5   *Honeywell,* 452 F.3d at 1318-19 (broad, vague statements in file wrapper do not override clear

6   statements in specification describing invention narrowly).

7        When viewed in the context of the intrinsic record, Mann's proposed construction of

8   "atmosphere control member included in the sealing sheet" is appropriate and should be adopted

9   by the Court.

10  **V.    CONCLUSION**

11       For all of the foregoing reasons, Mann's proposed constructions for the terms "ribs,"

12  "sealing sheet," "atmosphere control member," and "atmosphere control member included in the

13  sealing sheet" are consistent with and supported by the intrinsic record of the '818 patent, and

14  should be adopted by the Court.

15                                      Respectfully submitted,

16  August 25, 2008                     MANN PACKING COMPANY, INC.
17                                      by its attorneys

18

19                                      Joseph S. Presta, Va. Bar No. 36197
                                        Michael E. Crawford, Va. Bar No. 39566
20                                      NIXON & VANDERHYE P.C.
                                        901 North Glebe Road
21                                      Arlington, VA 22203
                                        703-816-4000 (main)
22                                      703-816-4100 (facsimile)

23                                      Virginia A. Crisp, Cal. Bar No. 121387
24                                      COBLENTZ, PATCH, DUFFY & BASS, LLP
                                        One Ferry Building, Suite 200
25                                      San Francisco, CA 94111-4213
                                        415-391-4800 (main)
26                                      415-989-1663 (facsimile)

27

28