**EXHIBIT "A"**

Westlaw.

--- F.3d ----  
--- F.3d ----, 2008 WL 4072052 (C.A.Fed. (N.J.))

Page 1

**H**Howmedica Osteonics Corp. v. **Wright** Medical Technology, Inc.  
C.A.Fed. (N.J.),2008.  
Only the Westlaw citation is currently available.  
United States Court of Appeals,Federal Circuit.  
**HOWMEDICA OSTEONICS CORP.**, Plaintiff-Appellant,  
v.  
**WRIGHT MEDICAL TECHNOLOGY, INC.**, Defendant-Appellee.  
**No. 2007-1363.**

Sept. 2, 2008.

**Background:** Owner of patent directed to an artificial knee prosthesis or implant used to replace part or all of a patient's knee joint brought infringement action against competitor, and competitor, inter alia, asserted an affirmative defense based on release provision of settlement agreement between the parties. After the United States District Court for the District of New Jersey, Susan D. Wigenton, J., granted summary judgment in favor of patent owner on competitor's affirmative defense claim, it issued a claim construction order, which led to patent owner stipulating to a final judgment of noninfringement. Patent owner appealed.

**Holdings:** The Court of Appeals, Dyk, Circuit Judge, held that:  
(1) patent claim required only one condylar element in a bicondylar prosthesis to satisfy the claim limitations, and  
(2) patent owner did not release its infringement claim against competitor based on earlier settlement agreement.

Vacated and remanded.

Prost, Circuit Judge, dissented and filed an opinion.

[1] Patents 291 €→324.5

291 Patents  
    291XII Infringement  
        291XII(C) Suits in Equity

            291k324 Appeal  
                291k324.5 k. Scope and Extent of Review in General. Most Cited Cases  
Patent claim construction is an issue of law that an appellate court reviews de novo.

[2] Patents 291 €→101(3)

291 Patents  
    291IV Applications and Proceedings Thereon  
        291k101 Claims  
            291k101(3) k. Limitations in General. Most Cited Cases  
Claim of patent directed to an artificial knee prosthesis or implant used to replace part or all of a patient's knee joint, reciting a "femoral component including at least one condylar element" and requiring that the condylar element have a certain geometry, required only one condylar element in a bicondylar prosthesis to satisfy the claim limitations.

[3] Patents 291 €→165(2)

291 Patents  
    291IX Construction and Operation of Letters Patent  
        291IX(B) Limitation of Claims  
            291k165 Operation and Effect of Claims in General  
                291k165(2) k. Claims as Measure of Patentee's Rights. Most Cited Cases  
It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.

[4] Patents 291 €→159

291 Patents  
    291IX Construction and Operation of Letters Patent  
        291IX(A) In General  
            291k159 k. Extrinsic Evidence in General. Most Cited Cases

**Patents 291 €→168(2.1)**

291 Patents

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

291IX Construction and Operation of Letters Patent
    291IX(B) Limitation of Claims
        291k168 Proceedings in Patent Office in General
            291k168(2) Rejection and Amendment of Claims
                291k168(2.1) k. In General. Most Cited Cases

A letter between a prosecuting attorney and a patent applicant is not a representation to the patent examiner, and is therefore not part of the prosecution history; rather, it is extrinsic evidence, which can be of limited value to claim construction, considered in the context of the intrinsic evidence, if it can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean.

[5] Patents 291 ⌐157(1)

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(A) In General
            291k157 General Rules of Construction
                291k157(1) k. In General. Most Cited Cases

The testimony of an inventor cannot be relied on to change the meaning of patent claims.

[6] Patents 291 ⌐168(1)

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(B) Limitation of Claims
            291k168 Proceedings in Patent Office in General
                291k168(1) k. In General. Most Cited Cases

It is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the Patent and Trademark Office (PTO).

[7] Patents 291 ⌐159

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(A) In General
            291k159 k. Extrinsic Evidence in General. Most Cited Cases

The testimony of an inventor may be pertinent as a form of expert testimony, for example, as to understanding the established meaning of particular terms in the relevant art.

[8] Compromise and Settlement 89 ⌐12

89 Compromise and Settlement
    89I In General
        89k10 Construction of Agreement
            89k12 k. Matters Included. Most Cited Cases

Release 331 ⌐33

331 Release
    331II Construction and Operation
        331k33 k. Release of Specific Indebtedness or Liability in General. Most Cited Cases

Under New Jersey law, owner of patent directed to an artificial knee prosthesis or implant used to replace part or all of a patient's knee joint did not release its infringement claim against competitor based on an earlier settlement agreement between the parties; release provision in agreement stating that it applied to claims that were or could have been asserted by patent owner in the earlier litigation was ambiguous, and extrinsic evidence made clear that the parties did not intend the release provision to cover the disputed infringement claim.

[9] Federal Courts 170B ⌐754.1

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk754 Review Dependent on Whether Questions Are of Law or of Fact
                      170Bk754.1 k. In General. Most Cited Cases

Construction of a contract is an issue of law that an appellate court reviews without deference.

© 2008 Thomson Reuters/West. No Claim to Orig. US Govt. Works.

--- F.3d ----  
--- F.3d ----, 2008 WL 4072052 (C.A.Fed. (N.J.))

Page 3

**[10] Federal Courts 170B ⟲412.1**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk412 Contracts; Sales
                170Bk412.1 k. In General. Most Cited Cases
A court applies state contract law in interpreting a settlement agreement.

**[11] Evidence 157 ⟲397(1)**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(A) Contradicting, Varying, or Adding to Terms of Written Instrument
            157k397 Contracts in General
                157k397(1) k. In General. Most Cited Cases

**Evidence 157 ⟲448**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(D) Construction or Application of Language of Written Instrument
            157k448 k. Grounds for Admission of Extrinsic Evidence. Most Cited Cases
Under New Jersey law, a court may consider extrinsic evidence in interpreting a contract provision; such evidence is adducible only for the purpose of interpreting the writing, and not for the purpose of modifying or enlarging or curtailing its terms.

**[12] Reformation of Instruments 328 ⟲23**

328 Reformation of Instruments
    328I Right of Action and Defenses
        328k23 k. Estoppel or Waiver. Most Cited Cases
Under New Jersey law, reformation of agreement between two companies that developed, manufactured, and sold orthopedic implants regarding patent dispute was available, even though a statement in summary judgment reply brief of company seeking reformation could have been read as disclaiming reformation; company seeking reformation quoted a reformation case in its opening brief, as well as its response to a summary judgment motion, clearly raising the issue of reformation, noting it was available in cases of mutual mistake.

**[13] Reformation of Instruments 328 ⟲19(1)**

328 Reformation of Instruments
    328I Right of Action and Defenses
        328k15 Grounds for Reformation
            328k19 Mutuality of Mistake
                328k19(1) k. In General. Most Cited Cases
Under New Jersey law, when a written contract fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement.

**[14] Reformation of Instruments 328 ⟲17(2)**

328 Reformation of Instruments
    328I Right of Action and Defenses
        328k15 Grounds for Reformation
            328k17 Mistake of Fact
                328k17(2) k. By Scrivener or Draftsman. Most Cited Cases
The purpose of contract reformation is to correct a mistake that occurred in reducing the parties' actual, negotiated agreement to writing.

**[15] Reformation of Instruments 328 ⟲25**

328 Reformation of Instruments
    328I Right of Action and Defenses
        328k25 k. Defenses and Objections to Relief. Most Cited Cases
Under New Jersey law, the mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude contract reformation, unless that party's fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

**[16] Reformation of Instruments 328 ⟲19(1)**

328 Reformation of Instruments
    328I Right of Action and Defenses
        328k15 Grounds for Reformation

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 4072052 (C.A.Fed. (N.J.))

Page 4

       328k19 Mutuality of Mistake
          328k19(1) k. In General. Most Cited Cases

**Reformation of Instruments 328 ⟶45(2)**

328 Reformation of Instruments
    328II Proceedings and Relief
       328k42 Evidence
          328k45 Weight and Sufficiency
             328k45(2) k. Contracts in General. Most Cited Cases
Under New Jersey law, reformation of a contract requires clear and convincing evidence of a mistake common to both parties that causes the written instrument not to reflect the real agreement between the parties; moreover, the mistake must be a material one, meaning that it must be one in the absence of which the party who made it would not have entered into the compromise.

[17] **Evidence 157 ⟶448**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
       157XI(D) Construction or Application of Language of Written Instrument
          157k448 k. Grounds for Admission of Extrinsic Evidence. Most Cited Cases
When a contract provision is ambiguous, New Jersey law permits reference to extrinsic evidence to determine the intent of the parties.

[18] **Contracts 95 ⟶168**

95 Contracts
    95II Construction and Operation
       95II(A) General Rules of Construction
          95k168 k. Terms Implied as Part of Contract. Most Cited Cases
Under New Jersey law, when it becomes clear that a certain factual result was within the contemplation of the parties, interpretation of an agreement between the parties should be affected by reasonable and necessary implications, so that the legal effect then given to the instrument will be such as to attain the intended factual result.

**Patents 291 ⟶328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
       291k328 Patents Enumerated
          291k328(2) k. Original Utility. Most Cited Cases

**Patents 291 ⟶328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
       291k328 Patents Enumerated
          291k328(2) k. Original Utility. Most Cited Cases
4,474,177, 4,892,549, 5,133,772, 5,192,324. Cited.

5,824,100. Construed.

Appeal from the United States District Court for the District of New Jersey in case no. 00-CV-1167, Judge Susan D. Wigenton.
William L. Mentlik, Lerner, David, Littenberg, Krumholz & Mentlik, LLP, of Westfield, NJ, argued for plaintiff-appellant. With him on the brief were Roy H. Wepner and Paul H. Kochanski. Of counsel on the brief was Joel M. Silverstein, Stern & Kilcullen, LLC, of Roseland, NJ.
L. Norwood Jameson, Duane Morris LLP, of Atlanta, GA, argued for defendant-appellee. With him on the brief were Matthew C. Gaudet, of Atlanta, GA, Anthony J. Fitzpatrick and Christopher S. Kroon, of Boston, MA, and Samuel W. Apicelli, of Philadelphia, PA. Of counsel was Shawn D. Sentilles, Wright Medical Technology, Inc., of Arlington, TN.

Before DYK and PROST, Circuit Judges, and HOCHBERG, District Judge.[FN*]

DYK, Circuit Judge.
*1 Plaintiff-Appellant Howmedica Osteonics Corporation ("Howmedica") appeals from a final judgment of noninfringement in this patent infringement action against defendant-appellee Wright Medical Technology, Inc. ("Wright"). Under the district court's claim construction of the term "femoral component including at least one condylar element," the parties stipulated that the accused product did not infringe the asserted patent claims.

Because we conclude that the construction of this claim term was incorrect, we cannot sustain the stipulated judgment. Furthermore, because we agree with the district court that Howmedica did not release its infringement claim as part of an earlier settlement agreement, Wright's asserted alternative ground for affirmance does not support the judgment. Accordingly, we vacate the judgment of noninfringement, and remand to the district court for further proceedings consistent with this opinion.

BACKGROUND

I

Both parties develop, manufacture, and sell orthopedic implants for use in the reconstruction of various joints of the human body. Howmedica is the owner of U.S. Patent No. 5,824,100 ("the '100 patent"), which is directed to an artificial knee prosthesis or implant used to replace part or all of a patient's knee joint. Claim 15, the only independent claim asserted in this action, provides in full:

> In a knee prosthesis for replacing the natural knee, the knee prosthesis having a femoral component and a tibial component, the tibial component including a bearing member and *the femoral component including at least one condylar element* for confronting and engaging the bearing member to accomplish articulation of the knee prosthesis throughout a range of flexion, including a primary range of flexion between a hyperextended position and a flexed position, the engagement between the condylar element of the femoral component and the bearing member of the tibial component ordinarily taking place at a contact area along articular surface areas of the condylar element and the bearing member, the improvement comprising:
>
>> anterior-posterior surface profile contours along the condylar element and the bearing member, *the anterior-posterior surface profile contour along the condylar element having an essentially constant anterior-posterior articular radius throughout the articular surface area of the condylar element which contacts the bearing member during articulation throughout the primary range of flexion*, the anterior-posterior articular radius having an origin lying generally along a line extending laterally between the medial and lateral collateral ligament attachment points on the femur of the natural knee.

'100 patent col. 6 1.58-col. 8 1.3 (emphases added). Claim 18, which depends from claim 15, is also at issue in this litigation. Claim 18 describes: "The improvement of claim 15 wherein the hyperextended position is at about-15 ° in the range of flexion, and the flexed position is at about 75 ° in the range of flexion."*Id*. col. 8 ll.8-10.

*2 The knee joint is the point of connection between the lower end of the femur (thigh bone) and the upper end of the tibia (shin bone). In a natural knee, the lower end of the femur includes two rounded, generally smooth projections of bone called condyles, which engage with the upper end of the tibia. As pictured below, the femoral component (22) of the prosthesis described in claim 15 replaces a portion of the natural femur, including one or both condyles. A prosthesis is called "unicondylar" if it replaces only one condyle of the natural femur, and "bicondylar" if it replaces both natural condyles. The condylar element or elements (54) of the femoral component articulate against a "bearing member" (64), part of the "tibial component" (24) of the prosthesis, which is surgically implanted to replace an upper portion of the tibia.

The constant-radius geometry of the condylar element described by claim 15 furthers several goals: it allows "increased areas of contact between the condylar elements" and the tibial components "for lowered stress in the material of the bearing member during articulation of the knee prosthesis"; it facilitates "a better balance of the tension in the collateral ligaments of the knee"; it "enables a higher degree of conformity between the condylar elements and the bearing member for reduced stresses during normal activity"; it simplifies the configuration of the components, allowing easier manufacturing; and it "enables exemplary performance and increased reliability over an extended service life."*Id.* col. 1 ll.48-62.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



## II

The '100 patent issued on October 20, 1998. Howmedica did not immediately bring suit against Wright on the '100 patent. However, Howmedica in 1997 had commenced two lawsuits in New Jersey against Wright alleging infringement of U.S. Patent Nos. 5,192,324 ("the Kenna patent") and 5,133,772 ("the Hack patent"). In 1999, Howmedica filed a third lawsuit against Wright in New Jersey, alleging infringement of U.S. Patent No. 4,892,549 ("the Figgie patent"). At the same time, a lawsuit filed in 1991 by Wright's predecessor against Howmedica, alleging infringement of U.S. Patent No. 4,474, 177 ("the Whiteside patent"), was pending in Massachusetts.

In April 1999 the parties initiated settlement negotiations directed to resolving the four pending actions. These negotiations took place between Thomas Patton (Wright's President and Chief Executive Officer), Ned Lipes (Howmedica's President), Alfred Zarnowski (Howmedica's Senior Director of Intellectual Property), and the two parties' outside patent counsel. The parties reached an agreement at a meeting on November 15, 1999. Wright's counsel was responsible for drafting a written agreement reflecting the negotiations. At this point the parties contemplated that they would execute a single written agreement.

On November 23, 1999, Wright's counsel explained to Howmedica's counsel that they had "broken the settlement into two separate agreements since Wright Medical says this is required to comply with generally accepted accounting practices."J.A. at 978. One agreement, the New Jersey agreement, covered the Kenna, Hack, and Figgie patent lawsuits. The second agreement, the Massachusetts agreement, covered the Whiteside patent lawsuit. The two draft agreements sent to Howmedica by Wright included nearly identical mutual releases, which stated:

*3 *Howmedica Osteonics hereby releases and forever discharges Wright Medical ... from any and all manner of claims,* controversies, demands, damages, causes of action, or suits, that Howmedica Osteonics *has, have had, or may have against Wright Medical... upon or by reason of or*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

relating to any acts or omissions made by Wright Medical ... on or before the effective date of this Agreement, *including, but not limited to, any and all claims and counterclaims that were or could have been asserted by Howmedica Osteonics in the lawsuit.*

J.A. at 574 (draft Massachusetts agreement) (emphases added); *see also* J.A. at 586 (draft New Jersey agreement containing substantively identical language).[FN1]

In response to the draft agreements, Howmedica objected to the release provision of the Massachusetts agreement as being "too broad" and therefore not accurately reflecting the parties' agreement. J.A. at 389. Howmedica explained that, "[a]s drafted, Howmedica Osteonics would be releasing and discharging Wright Medical from claims involving patents owned by Howmedica Osteonics and other claims having nothing to do with any of the matters currently in dispute between the parties."*Id.* However, Howmedica did not separately object to the identical provision in the New Jersey agreement, although it did request other changes to that draft. In response to Howmedica's objection, Wright's counsel struck the words "including, but not limited to, any and all claims and counterclaims" from the release provision of the Massachusetts agreement. As revised, the Massachusetts release provision covered only claims or controversies "that were or could have been asserted" in the Whiteside patent lawsuit. *See id.* at 382. The "including, but not limited to" language was not stricken from the release provision of the New Jersey agreement, a redlined version of which was sent to Howmedica along with the revised Massachusetts agreement. The language of the New Jersey agreement was never conformed to the language of the Massachusetts agreement. Both settlement agreements were executed as of December 21, 1999.

III

On March 10, 2000, less than three months after the execution of the releases, Howmedica filed this action against Wright, alleging infringement of the '100 patent by Wright's ADVANCE® Total Knee System. Wright responded, asserting affirmative defenses of noninfringement and invalidity, and also filed a counterclaim seeking a declaration that the '100 patent was invalid and not infringed. Wright did not initially include an affirmative defense based on the release provision in the New Jersey agreement. However, after the case had been pending for over two years, Wright filed an amended answer and counterclaim, asserting as new affirmative defenses that the '100 patent was unenforceable for misuse and inequitable conduct, and that Howmedica's action was barred by the New Jersey release provision.

*4 Both parties subsequently cross-moved for summary judgment on Wright's release defense. In the memorandum in support of its summary judgment motion, Howmedica argued that the New Jersey release provision, based on the intentions of the parties, covered only the patents that were the subject matter of the four pending lawsuits resolved by the settlement. In opposition, Wright argued that the broad language of the New Jersey release provision barred the current action. Wright characterized Howmedica's position as seeking reformation of the New Jersey release, and argued that reformation was not appropriate because there was no mutual mistake as to the language of the provision. In reply, Howmedica urged that reformation was unnecessary under the New Jersey law of contract interpretation. The parties also took these positions in the simultaneous briefing on Wright's cross-motion for summary judgment.

On March 18, 2005, the district court denied Wright's motion and granted summary judgment in favor of Howmedica on the release defense. The court treated the New Jersey and Massachusetts agreements as though they were a single agreement, noting that "[t]he releases encompassed within the agreements were executed as part of the same settlement or compromise of the then-pending patent lawsuits."J.A. at 62. The court determined that the parties intended and understood the releases in the agreements to cover only the four lawsuits pending at the time (as well as one additional patent that was explicitly included in the New Jersey agreement). The court held that, under New Jersey law, it could interpret the provisions to not cover Howmedica's claim under the '100 patent. The district court concluded that reformation of the agreement to reflect the intention of the parties was thus unnecessary.

On November 29, 2005, following briefing and a *Markman* hearing, the district court issued a claim

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

construction order construing three disputed terms of claim 15 of the '100 patent. First, the court construed the phrase "femoral component including at least one condylar element" to require, in a bicondylar femoral component, both condyles to meet the geometric limitations of the claim. Second, the court construed "primary range of flexion" to be limited to a particular range of -15 ° of hyperextension to +75 ° of flexion, in accordance with the specification of the '100 patent. Finally, the court determined that the phrase "lying generally along a line extending laterally between the medial and lateral collateral ligament attachment points on the femur of the natural knee" was not indefinite.

Howmedica acknowledges that it could not prove that both condylar elements of Wright's accused products meet the geometric limitations of claim 15 throughout the primary range of flexion and, therefore, that it could not prove infringement under the district court's construction of the term "femoral component including at least one condylar element."Accordingly, Howmedica stipulated to a final judgment of noninfringement. Howmedica timely appealed that judgment to this court.[FN2] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).[FN3]

DISCUSSION

I

*5 [1] We first address claim construction. Claim construction is an issue of law that we review de novo. See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc). On appeal, Howmedica challenges the district court's construction of the term "femoral component including at least one condylar element."

[2] Claim 15 of the '100 patent recites a knee prosthesis with a "femoral component including at least one condylar element" and requires that the condylar element have a certain geometry, namely, that "the anterior-posterior surface profile contour" have "an essentially constant anterior-posterior articular radius throughout the articular surface area of the condylar element which contacts the bearing member during articulation throughout the primary range of flexion." '100 patent col. 6 ll.61-62, col. 7 ll.5-11. It is undisputed that claim 15 can cover a unicondylar prosthesis, where only one artificial condyle is employed and one natural condyle remains. However, based on the use of the plural "condyles" throughout the patent specification, "the importance of having the same radii on both condylar elements" to achieving the benefits of the patent, and the testimony of the inventor, the district court concluded that in a bicondylar prosthesis, where both condyles are replaced, "both condyles must meet [the geometric] requirements."J.A. at 37. Although this is a close case, we disagree.

[3] "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed.Cir.2004)). The plain language of claim 15 requires only one condylar element. The femoral component must include "at least one condylar element," which the district court correctly understood to mean "one or more." The claim then requires that "the condylar element" meet the specified geometric limitations. See '100 patent col. 7 ll.4-5, 6-7, 9. If the patentee had intended both condyles in a bicondylar prosthesis to meet these limitations, he could have drafted claim 15 to require that "both condylar elements" do so. The more natural way of drafting the claim language to achieve that result would be to require "each condylar element," rather than "the condylar element," to conform to the constant-radius geometry.

Wright makes several arguments in an attempt to show that, despite the plain language of the claim, such a prosthesis is not covered. First, it argues that because the purpose of the claim is "to accomplish articulation of the knee prosthesis throughout a range of flexion," and because both condyles are involved in articulation, both condyles should be required to meet the geometric limitations. Here we are dealing with a Jepson claim. The "articulation" requirement of the preamble is a claim limitation. See Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1029 (Fed.Cir.2002). However, it is a separate limitation from the geometric requirements appearing in the body of the claim. Wright does not assert that the articulation requirement is not satisfied. In other words, Wright does not argue that a bicondylar prosthesis in which only one condyle has the required

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

constant-radius geometry does not achieve articulation throughout the primary range of flexion, which the district court construed as "-15 ° of hyperextension to +75 ° of flexion."J.A. at 40. A prosthesis can satisfy the articulation requirement without satisfying the geometric requirements. Thus, the mere fact that both condyles are involved in articulation of the prosthesis does not require a construction of claim 15 in which both condyles must conform to the specified geometry.

*6 Wright next argues that a bicondylar prosthesis in which only one condyle meets the geometric limitations of claim 15 will not achieve several of the purposes of the invention as a whole, recited in the specification of the ' 100 patent. As we have explained, such an argument is not persuasive:

> The court's task is not to limit claim language to exclude particular devices because they do not serve a perceived "purpose" of the invention.... An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them.

E-Pass Techs., Inc. v. 3Com Corp., 343 F.3d 1364, 1370 (Fed.Cir.2003) (footnote omitted); see also Kim v. ConAgra Foods, Inc., 465 F.3d 1312, 1319 (Fed.Cir.2006) (refusing to limit claim based on "one object of the invention"); Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1301 (Fed.Cir.2003). As discussed above, the invention described by claim 15 serves multiple purposes, including a simplified configuration for ease of manufacturing, increased reliability of the prosthesis, reduced stress on the knee, and an increased area of contact between the condylar element and the bearing member of the tibial component. Wright does not attempt to show that a prosthesis in which only one condylar element has the recited geometric characteristics would not achieve *any* of these objectives. Indeed, Wright's own advertising for its accused product cites at least one of the same objectives, namely "provid[ing] greater tibio-femoral conformity with maximum contact area."J.A. at 2437.[FN4]

Wright also argues, however, that the specification of the '100 patent does require both condylar elements of a bicondylar prosthesis to conform to the geometric limitations of claim 15. Wright correctly points out that every disclosure of a bicondylar knee in the specification shows two condyles each meeting the geometric requirements of claim 15. However, we have repeatedly held that the fact that the specification describes only a single embodiment, standing alone, is insufficient to limit otherwise broad claim language. See Phillips, 415 F.3d at 1323;Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed.Cir.2004); Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327-28 (Fed.Cir.2003). This is not a case in which the specification makes clear that the invention requires two condyles meeting the specified geometry. Compare Ormco Corp. v. Align Tech., Inc., 498 F.3d 1307, 1313-14 (Fed.Cir.2007) (limiting claims in part based on specification's identification of the "primary objective" of the invention and its distinction of the invention from the prior art based on that objective); SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1342-44 (Fed.Cir.2001) (limiting claims based on language in specification repeatedly stating that "the invention" required such limitation and that the limitation was applicable to "all embodiments of the present invention"). Again, Wright acknowledges that although a natural condyle may not meet the geometric limitations of claim 15, a unicondylar prosthesis used with such a natural condyle is nonetheless within the scope of the claim. Nothing in the specification supports a reading of claim 15 to include a unicondylar prosthesis but to exclude a bicondylar prosthesis in which only one condylar element has the required geometric characteristics.

*7 [4] Wright next argues that the prosecution history of the '100 patent requires its proposed construction. In making this argument, Wright relies on a letter sent by the attorney prosecuting the '100 patent to his client after an examiner interview. In this letter, the attorney explained the examiner's position that "the claims could be worded more clearly to bring out the fact that the constant radius in the present device does extend along enough of *each condylar element* to cover the range of articulation specified."J.A. at 1870 (emphasis added). Wright argues that the attorney's use of the word "each" demonstrates that both the attorney and the examiner understood that both condylar elements in a bicondylar prosthesis must have the required geometry. Whatever meaning it might have, this letter is not part of the prosecution history, which consists of "all express representations

made by or on behalf of the applicant to the examiner to induce a patent grant."*Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 452 (Fed.Cir.1985)*. A letter between a prosecuting attorney and a patent applicant is not a representation to the patent examiner, and is therefore not part of the prosecution history. Rather, it is extrinsic evidence, which can be of limited value to claim construction, "considered in the context of the intrinsic evidence," if it "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean."*Phillips, 415 F.3d at 1319*. The letter Wright relies on, reporting to the inventor on the results of an examiner interview, achieves neither of these objectives and is of no value to the construction of the disputed claim language.

[5] Finally, Wright argues that the testimony of Dr. Mark Kester, the lead inventor of the '100 patent, compels a construction of claim 15 that requires both condylar elements in a bicondylar prosthesis to meet the geometric limitations. Dr. Kester testified that the language "at least one condylar element" was added to the claims so that they would clearly cover unicondylar prostheses. He further testified that it was his "intention that both condylar elements [in a bicondylar prosthesis] would meet the requirement [ ] of having the constant anterior-posterior radius throughout the primary range of flexion."J.A. at 1668. The testimony of an inventor "cannot be relied on to change the meaning of the claims."*Markman v. Westview Instruments, Inc., 52 F.3d 967, 983 (Fed.Cir.1995)* (en banc), *aff'd,517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)*; *see also Hoechst Celanese Corp. v. BP Chems. Ltd., 78 F.3d 1575, 1580 (Fed.Cir.1996)* ("*Markman* requires us to give no deference to the testimony of the inventor about the meaning of the claims."). In particular, we have explained that "[t]he subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim."*Markman, 52 F.3d at 985*.

*8 [6][7] Wright argues that inventor testimony is relevant in cases where the inventor does not seek to enlarge the scope of the claims to cover an accused product, but rather admits that the claims are limited to exclude that product. Under such circumstances, according to Wright, the testimony is reliable because it is against the inventor's interest. We reject this distinction. Whether an inventor's testimony is consistent with a broader or narrower claim scope, that testimony is still limited by the fact that an inventor understands the invention but may not understand the claims, which are typically drafted by the attorney prosecuting the patent application. As we have explained, "it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO."*Id*. Moreover, Wright's asserted approach, to rely on inventor testimony when it is contrary to interest, is unworkable. It would require a case by case determination as to whether an inventor is testifying against his or her interest. The inventor might testify to a broad claim scope in order to increase the likelihood of a finding of infringement. The inventor also might testify to a narrower claim scope to avoid a challenge to the validity of the patent. We hold that inventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction.[FN5]

As explained above, the plain language of claim 15 makes clear that, whether a prosthesis is unicondylar or bicondylar, only one condylar element meeting the geometric limitations of the claim is required to bring that prosthesis within the scope of the claim. Wright offers no persuasive evidence that the claim should be interpreted other than by its plain language. Because we conclude that the claim requires only that one condylar element in a bicondylar prosthesis satisfy the claim limitations, we vacate the judgment and remand.

II

[8][9][10] As a separate and independent ground, Wright asserts that the judgment may nonetheless be affirmed on the basis that Howmedica's infringement suit is barred by the release provision in the New Jersey agreement. Wright argues that the district court incorrectly granted summary judgment in favor of Howmedica on the release defense because New Jersey law does not support a construction of the contract language here to exclude the present action from the release. We review the district court's summary judgment with regard to the release provision de novo. *See Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1287 (Fed.Cir.2008)*. Construction of a contract is an issue

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of law that we review without deference. See _Intel Corp. v. VIA Techs., Inc._, 319 F.3d 1357, 1361 (Fed.Cir.2003). We apply state contract law in interpreting a settlement agreement. See _Augustine Med., Inc. v. Progressive Dynamics, Inc._, 194 F.3d 1367, 1370 (Fed.Cir.1999).

*9 The district court concluded, "[a]fter reviewing all the facts and circumstances surrounding the creation of the Companion Settlement Agreements, as well as the actual language used, ... the instant action is not barred by the release provision."J.A. at 63. We agree with the result reached by the district court, although we rest our decision on slightly different grounds.

The district court found that "it was the intent of the parties that the settlement release only cover the four lawsuits that were the subject of the Companion Settlement Agreements."_Id._ However, on its face, the release provision of the New Jersey agreement applies to "any and all manner of claims ... that Howmedica ... has, ha[s] had, or may have against Wright Medical ... including, but not limited to, any and all claims and counterclaims that were or could have been asserted" in the New Jersey lawsuits. _Id._ at 302, ¶ 27. While releases generally are construed not to release future claims, _see Smith v. Smith_, 72 N.J. 350, 371 A.2d 1, 6 (N.J.1977); _Bilotti v. Accurate Forming Corp._, 39 N.J. 184, 188 A.2d 24, 35-36 (N.J.1963), this language would appear to release the claims in question since they existed at the time of the settlement agreement. See _Augustine_, 194 F.3d at 1372 (construing similar language broadly to "release[ ] all possible future claims"); _Three Rivers Motors Co. v. Ford Motor Co._, 522 F.2d 885, 895 (3d Cir.1975) (finding that similar language left "nothing open and unsettled between the parties").

[11][12] New Jersey law does allow a court interpreting a contract provision to consider extrinsic evidence. See _Halper v. Halper_, 164 F.3d 830, 840-41 (3d Cir.1999); _Atl. N. Airlines v. Schwimmer_, 12 N.J. 293, 96 A.2d 652, 656 (N.J.1953)."Such evidence is adducible only for the purpose of interpreting the writing-not for the purpose of modifying or enlarging or curtailing its terms."_Atl. N. Airlines_, 96 A.2d at 656. We agree with the district court that the intent of the parties was to have the same release language in both the New Jersey and the Massachusetts contracts. We need not reach the question of whether, under New Jersey law, this result can be achieved through "interpretation" of the contract because we conclude that reformation of the contract is appropriate to conform the language of the New Jersey agreement to match the language of the Massachusetts agreement and thus reflect the actual intention of the parties.[FN6]

[13][14][15][16] The undisputed facts show that reformation would be available even if we were to reject the contract interpretation analysis by the district court as being in reality a modification of the contract. When a written contract "fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement."Restatement (Second) of Contracts § 155 (1981). The purpose of reformation, therefore, is to correct a mistake that occurred in reducing the parties' actual, negotiated agreement to writing. "The mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude ... reformation," unless that party's "fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing."_Id._ § 157 & cmt. a. Reformation of a contract requires clear and convincing evidence of "a mistake common to both parties" that causes the written instrument not to reflect the real agreement between the parties._Brodzinsky_, 182 A.2d at 153. Moreover, "the mistake must be a material one; it must be one in the absence of which the party who made it would not have entered into the compromise."28 Richard A. Lord, _Williston on Contracts_ § 70:219 (4th ed.1990).

*10 The two agreements, drafted by Wright's counsel, originally had identical language. The testimony of both parties' representatives made clear that the parties understood that the two agreements would have the same effect. Indeed, Wright's President and Chief Executive Officer, Patton, testified that at the time of the settlement he did not realize that there was a difference between the language of the New Jersey and Massachusetts release provisions. Likewise, Zarnowski, Howmedica's Senior Director of Intellectual Property, testified that when he reviewed the final drafts of the two agreements, he "did not discover the differences between the two release clauses."J.A. at 620. In the district court proceedings, Wright conceded that, presumably, "if [Howmedica had]

asked for the change in the [New Jersey] agreement" that had been made in the Massachusetts agreement, "the change would have been made."J.A. at 767-68. Wright has identified no contrary evidence showing that the parties intended the two provisions to have different language or to be of different scope, or that there was any plausible reason as to why the parties would wish the New Jersey release provision to have a broader scope than the Massachusetts release provision. The testimony of Patton and Zarnowski demonstrates that the parties were mutually mistaken in believing there to be no difference between the two release provisions in the final drafts of the agreements. It is significant in this connection that the parties in the integration clause of the agreements indicated that each agreement would be construed to be consistent with the other-i.e., that the agreements were not designed to conflict, as would be the case if the two agreements had different release provisions. It is also significant that Wright did not even assert its release defense until Howmedica's action had been pending for over two years, suggesting a belated discovery of a drafting error. See _Journeyman Barbers v. Polling,_ 22 N.J. 389, 126 A.2d 194, 197 (N.J.1956) (noting that "practical interpretation" evidenced by parties' post-performance conduct was "entitled to great weight"); _Wheatly v. Sook Suh,_ 217 N.J.Super. 233, 525 A.2d 340, 345 (N.J.App.Div.1987) (relying on "the conduct of defendants after the execution of the agreement"). This mutual mistake was material. Accordingly, based on the parties' mutual and material mistake, the release provision of the New Jersey agreement should be reformed to have the same language as the Massachusetts release provision.

The question remains, however, what the meaning of that language is. Wright contends that even under the narrower language of the Massachusetts agreement, the current suit is barred. As reformed, the release provision applies to claims "that were or could have been asserted by Howmedica" in the earlier litigation. J.A. at 382. The meaning of this language, by itself, is ambiguous, and could be read to cover any infringement claim where the patent had issued and the accused product existed before the date of the agreement, or any infringement claim for which the patentee had completed a reasonable pre-suit investigation to allow a good faith filing of the claim, or only a claim that had matured to the point where both parties recognized the existence of a controversy that would be a predicate to filing an infringement suit.

*11 [17][18] Here the district court properly relied on the intent of the parties to interpret the ambiguous language. When a contract provision is ambiguous, New Jersey law permits reference to extrinsic evidence to determine the intent of the parties. _See Halper,_ 164 F.3d at 841;_Krosnowski v. Krosnowski,_ 22 N.J. 376, 126 A.2d 182, 187-88 (N.J.1956); _Atl. N. Airlines,_ 96 A.2d at 656. "When it becomes clear that a 'certain factual result' was within the contemplation of the parties, 'interpretation should be affected by reasonable and necessary implications, so that the legal effect then given to the instrument will be such as to attain the intended factual result.' " _Krosnowski,_ 126 A.2d at 188 (citation omitted).

The evidence makes clear that the parties did not intend the release provision to cover the current infringement action. As the district court noted, the primary purpose of the agreements was to resolve the pending litigation. Cross-licenses of the four asserted patents were made a part of the agreement. Although a license for use of another patent, the Averill patent, was included, Howmedica did not grant Wright any license under the '100 patent. Given the structure of the agreements it is on its face unlikely that the parties would exclude the '100 patent from the cross-licensing provisions but effectively grant rights in the patent to Wright with regard to existing products by virtue of the release provision.

The testimony of both parties confirms this reading of the agreements. Lipes (the President of Howmedica) and Zarnowski (Howmedica's Senior Director of Intellectual Property) both testified that Howmedica refused to agree during the settlement negotiations to grant Wright any rights with respect to the ' 100 patent or the ADVANCE® knee product. Zarnowski explained that both he and Lipes "had an understanding that there was not a dispute" with regard to the '100 patent, and that therefore "it was not part of the release."J.A. at 621. Patton (Wright's President and Chief Executive Officer) admitted that he did not believe the release provision applied to patents owned by the parties that were unrelated to the matters then in dispute, or to claims unrelated to those matters. Although Wright argues, and Patton's testimony confirms, that Wright was seeking what it called a "global settlement," Patton acknowledged that his understanding of the release provision was

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that it covered only current disputes between the parties. Although he knew of and had discussed with Lipes rumors that Howmedica might have a claim against the ADVANCE® knee product, Patton stated that his view was that this kind of "unsubstantiated allegation" did not constitute an actual controversy covered by the release provision. J.A. at 918.

Thus, we conclude that both parties intended that the reformed release language be limited to matters actually in dispute at the time. Accordingly, the district court correctly granted summary judgment in favor of Howmedica on Wright's affirmative defense based on the release. We therefore reject Wright's assertion that the defense is an alternative ground on which to affirm the district court's judgment.

## CONCLUSION

**\*12** For the reasons discussed above, we vacate the judgment of noninfringement, and remand to the district court for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

## COSTS

No costs.

Circuit Judge PROST dissents.
PROST, Circuit Judge, dissenting.
I would affirm the district court's construction of the claim phrase "femoral component including at least one condylar element" to require that, in a bi-condylar prosthesis, both condylar elements must satisfy the geometric limitations of the claim. Accordingly, I respectfully dissent.

### I

When construing a claim, we evaluate the meaning of a term or phrase in the context of the claim. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed.Cir.2005) (en banc). As noted by the majority, claim 15 recites:

> In a knee prosthesis for replacing the natural knee, the knee prosthesis having a femoral component and a tibial component, the tibial component including a bearing member and the femoral component including *at least one condylar element for confronting and engaging the bearing member to accomplish articulation of the knee prosthesis throughout a range of flexion*, including a primary range of flexion between a hyperextended position and a flexed position, the engagement between *the condylar element* of the femoral component and the bearing member of the tibial component ordinarily taking place at a contact area along articular surface areas of *the condylar element* and the bearing member, the improvement comprising:
>
>> anterior-posterior surface profile contours along *the condylar element* and the bearing member, the anterior-posterior surface profile contour along *the condylar element* having an essentially constant anterior-posterior articular radius throughout the articular surface area of *the condylar element* which contacts the bearing member during articulation throughout the primary range of flexion, the anterior-posterior articular radius having an origin lying generally along a line extending laterally between the medial and lateral collateral ligament attachment points on the femur of the natural knee.

'100 patent, col. 6 l.58-col. 8 l.3 (emphases added). This claim can be easily divided into two parts-the first paragraph contains the preamble of the claim and specifies the components of the claimed knee prosthesis, while the second paragraph details the "improvement" of the invention by identifying geometric characteristics of the claimed prosthesis.

In the first paragraph, the claim recites a knee prosthesis having a "tibial component" (for replacing part of the tibia, i.e., shin bone) and a "femoral component" (for replacing part of the femur, i.e., thigh bone).*Id.* at col. 6 ll.58-60; *see id.* at col. 2 ll. 49-56. The tibial component, then, includes a "bearing member," and the femoral component includes "at least one condylar element" that engages the bearing member to accomplish articulation (i.e., bending at the joint) of the knee prosthesis. *Id.* at col. 6 l.60-col. 7 l.3. In the second paragraph, the claim describes the "improvement," which consists of particular geometric limitations. *Id.* at col. 7 l.4-col. 8 l.3. While the specifics of these geometric limitations are not relevant on appeal, it is significant that the second paragraph describes these geometric

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

limitations as characteristics of "the condylar element" and "the bearing member"-components that were identified by the claim's first paragraph.

**\*13** With respect to the meaning of the particular phrase at issue, the claim specifies that the femoral component includes "at least one condylar element for confronting and engaging the bearing member to accomplish articulation of the knee prosthesis throughout a range of flexion."*Id.* at col. 6 ll.61-64. In other words, the claim requires "at least one condylar element" for engaging the bearing member to accomplish the bending of the knee prosthesis at the joint between "the condylar element" and the bearing member. [FN1]

With this language, the claim *defines* the term "at least one condylar element"-it is the part or parts of the femoral component of the knee prosthesis that "confront[ ] and engag[e] the bearing member to accomplish articulation of the knee prosthesis."As the majority explained, a bi-condylar prosthesis replaces both of a natural knee's condyles with two condylar elements, where, in a uni-condylar prosthesis, only one of the two condyles is replaced by a condylar element (the other natural condyle remains in the knee). The parties agreed that, in a bi-condylar prosthesis, both condylar elements *are necessary* to engage the bearing member "to accomplish articulation." On the other hand, in a uni-condylar prosthesis, the one condylar element works with the remaining natural condyle "to accomplish articulation." Because both condylar elements in a bi-condylar prosthesis are required to accomplish articulation, the term "at least one condylar element" must refer to both of the condylar elements of a bi-condylar prosthesis.

The claim, after identifying and defining the claim term "at least one condylar element" in this manner, later refers to "the condylar element." The parties agree that "the condylar element" is shorthand for "the [at least one] condylar element," and, thus, we know that the terms "at least one condylar element" and "the condylar element" are coextensive in scope.

Thus, because the claim defines "the [at least one] condylar element" to be all condylar elements that engage and confront the bearing member to accomplish articulation of the knee prosthesis, I would affirm the district court's construction of

"femoral component including at least one condylar element" to require that, in a bi-condylar prosthesis, both condylar elements must satisfy the geometric requirements specified in the second paragraph of the claim.

Moreover, the specification supports the district court's claim construction. The specification always describes knee prostheses with two condylar elements, only includes embodiments where both condylar elements have the same geometric requirements, consistently describes characteristics of the "condylar elements 54" and "each condylar element 54," and never suggests or indicates that one of the two condylar elements may have different characteristics. While the claim language is admittedly broader than this disclosure-i.e., the parties agree that the claim encompasses a uni-condylar prosthesis which is never disclosed-the specification never indicates that it should be so broad as to encompass a bi-condylar prosthesis having only one of the condylar elements with the claimed geometric requirements, where the other condylar element has an unspecified geometry.

II

**\*14** Under the majority's claim construction, however, the claim requires that only one condylar element of a bi-condylar prosthesis satisfy the claim's geometric requirements. In support, the majority states that "[t]he plain language of claim 15 requires only one condylar element" and, if the patentee had intended to refer to both condylar elements, he could have drafted the claim more clearly. Majority Op. at 10. I disagree with this analysis for several reasons.

First, while the majority notes that "at least one condylar element" is correctly understood to mean "one or more," the opinion fails to explain how this comports with its conclusion that "[t]he plain language of claim 15 requires only one condylar element."*Id.*

Second, the majority overlooks the context of the claim, which specifies that the claimed prosthesis include "at least one condylar element *for confronting and engaging* the bearing member *to accomplish articulation* of the knee prosthesis throughout a range of flexion." '100 patent, col. 6 ll.61-64 (emphases added). While the majority

acknowledges that "to accomplish articulation" is a claim limitation, it characterizes this limitation as a mere "purpose" of the claim rather than a definition of the claimed "at least one condylar element." Majority Op. at 10-11. Then, noting that this purpose is "a separate limitation from the geometric requirements appearing in the body of the claim," the majority concludes that "the mere fact that both condyles are involved in articulation of the prosthesis does not require a construction of claim 15 in which both condyles must conform to the specified geometry." *Id.* at 11. While the majority is correct that these limitations are separate and distinct, the majority's conclusion does not follow from its premise. The separateness of these limitations has no relevance-the claim requires "the [at least one] condylar element" to satisfy *both* limitations.

Third, the majority's first-and apparently primary-reason for its construction is: "If the patentee had intended both condyles in a bicondylar prosthesis to meet these [geometric] limitations, he could have drafted claim 15" more naturally "to require '*each* condylar element,' rather than '*the* condylar element.' " *Id.* at 10. But the fact that a claim could have been drafted more clearly is not, by itself, a sufficient basis to adopt a particular interpretation of claim language. A claim can often be drafted more clearly-litigation only arises because it was not. Moreover, applying the majority's analysis, the claim's use of the phrase "at least one condylar element" rather than simply "*a* condylar element" supports the district court's conclusion. It demonstrates that the patentee did *not* intend to specify the geometric requirements of only *one* condylar element of a bi-condylar prosthesis, but rather, intended to place requirements on the knee prosthesis's condylar element or elements.

III

*15 In sum, the district court correctly construed the claim term at issue. As I would affirm the district court's judgment of non-infringement, I respectfully dissent.

FN* Honorable Faith S. Hochberg, District Judge, United States District Court for the District of New Jersey, sitting by designation.

FN1. The Massachusetts and New Jersey litigations involved different third parties as plaintiffs. The only difference in the two draft release provisions was the inclusion of the names of those parties.

FN2. Initially, Wright filed a cross-appeal challenging the district court's decision on the cross-motions for summary judgment. By order dated April 16, 2008, we dismissed Wright's cross-appeal as improper because it did not seek to enlarge the judgment but merely asserted an alternative ground to affirm the judgment. The briefs relating to the cross-appeal were stricken and the parties filed new, compliant briefs.

FN3. Unlike *Jang v. Boston Scientific Corp., 532 F.3d 1330 (Fed.Cir.2008)*, where we vacated and remanded a stipulated judgment, here the parties have identified a single claim term as dispositive of the infringement issue, and we are able to determine why the district court's construction of that term renders the accused product noninfringing.

FN4. Wright's expert witnesses, Dr. Kester (the '100 patent inventor) and Dr. Bradley, testified that a bicondylar prosthesis in which only one condyle met the geometric limitations of claim 15 would not satisfy the objectives of the '100 patent. This testimony is entitled to little weight.

FN5. The testimony of an inventor, of course, may be pertinent as a form of expert testimony, for example, as to understanding the established meaning of particular terms in the relevant art. *Phillips v. AWH Corp., 415 F.3d 1303, 1318 (Fed.Cir.2005)* (en banc). That is not the situation here.

FN6. We do not agree with Wright that the statements by Howmedica to the district court prevent us from determining whether reformation of the New Jersey agreement is appropriate. Although a statement by Howmedica in its summary judgment reply brief could be read as disclaiming reformation, Howmedica's quotation of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Brodzinsky v. Pulek,* 75 N.J.Super. 40, 182 A.2d 149 (N.J.Super.Ct.App.Div.1962), a reformation case, in its opening brief, as well as its response to Wright's summary judgment motion, clearly raised the issue of reformation and noted that it was available in cases of mutual mistake. Howmedica's reply brief simply made clear that, in its view, the court need not go so far. We have previously held that a party's inclusion of an argument in a "secondary role" in its trial court briefing is sufficient to defeat a charge that the party has waived that argument. *See Navajo Nation v. United States,* 501 F.3d 1327, 1337 (Fed.Cir.2007). This is because the principle of issue preservation "does not demand the incantation of particular words," but rather "requires that the lower court be fairly put on notice as to the substance of the issue." *Nelson v. Adams USA, Inc.,* 529 U.S. 460, 469, 120 S.Ct. 1579, 146 L.Ed.2d 530 (2000). Here, the district court and Wright were clearly put on notice of the substance of the dispute over the release provision, and were apprised of the possibility of reformation. Indeed, Wright's response treated the reformation issue extensively and exclusively. Accordingly, we reject Wright's argument that reformation of the New Jersey agreement is unavailable.

FN1. The parties' stipulated constructions clarify that "confronting" means facing, "engaging" means contacting, "articulation" is the movement of the knee as it flexes or bends, and the "range of flexion" means the range of bending of the knee joint.

C.A.Fed. (N.J.),2008.
Howmedica Osteonics Corp. v. Wright Medical Technology, Inc.
--- F.3d ----, 2008 WL 4072052 (C.A.Fed. (N.J.))

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.