**E-Filed 10/14/08**

NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| APIO. INC., a Delaware Corporation,<br><br>                              Plaintiff,<br><br>          v.<br><br>MANN PACKING COMPANY, INC., a California corporation; and DOES 1-10, inclusive,<br><br>                              Defendants. | Case Number C 07-5628 JF (PVT)<br><br>**ORDER[1] CONSTRUING CLAIMS OF UNITED STATES PATENT NO. 7,083,818** |

    Plaintiff Apio, Inc., ("Apio") filed the instant action on November 5, 2007, alleging infringement of United States Patent No. 7,083,818 ("the '818 patent") by Defendant Mann Packing Co., Inc. ("Mann").[2]  A court's first task in determining whether an accused device infringes a patent is to construe the claims to ascertain their proper scope. *Lockheed Martin*

---

[1] This disposition is not designated for publication in the official reports.

[2] On December 13, 2007, Mann filed an answer asserting a counterclaim against Apio for a declaratory judgment of noninfringement, invalidity, and unenforceability of Apio's patent.

1  *Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308 (Fed. Cir. 2003).  Accordingly, on October 1,

2  2008, the Court held a *Markman* hearing[3] to construe disputed terms in the '818 patent. After

3  consideration of the record and the arguments presented by the parties, the Court construes the

4  disputed terms as set forth herein.

5  ## I. BACKGROUND

6   The '818 patent pertains to a method of preparing so-called "party trays," which typically

7  contain a combination of fruits, vegetables, dip, or other foodstuffs displayed to consumers in a

8  supermarket.  Apio explains that the tray taught by the '818 patent is known as a "flip tray,"

9  whose construction "starts with a transparent container body" that in turn is filled with the

10  foodstuffs.  Apio Opening Br. at 4:2-5.  At that point,

11   [a] polymeric sealing sheet is placed on the container body to create a sealed
 package, and the support tray is then placed over the sealing sheet.  An
12   atmosphere control member is provided to help keep the vegetables fresh.  Next,
 the sealed package and the support are 'flipped' over so that the vegetables rest on
13   the sealing sheet and are visible to the consumer through the transparent container
 body. . . . [Subsequently, when] the party tray is turned upside down so that the
14   vegetables rest on the container body, the support tray is removed, and the sealing
 sheet is removed.  The consumer can then replace the support tray, flip the
15   assembly over again, remove the container body, and serve the vegetables on the
 support tray.

16  *Id*. at 4:5-13.  Apio states that these features give the trays "sufficient shelf life extension to

17  enable [them] to move through the complete supply chain," while ensuring that "the vegetables

18  appear fresh and are fresh, with freshness comparable to [that] of store made trays."  *Id*. at 4:13-

19  18.

20   The parties dispute the terms "ribs," "sealing sheet," atmosphere control member"

21  ("ACM") and "atmosphere control member included in the sealing sheet," all of which relate in

22  some form to the goal of ensuring freshness.[4]  At a minimum, the "ribs" appear to facilitate air

23  circulation so as to promote a certain packaging atmosphere.  Apio argues that "ribs" include

24

25   [3] *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995)*.*

26   [4] The parties agree that the term "solid color" should be construed as "uniform in tone,
27  and not clear or transparent," and that the term "display orientation" should be construed to mean
that "the container body is oriented so that the base of the container body in the loading
28  orientation provides the top surface of the sealed package."  See Apio Opening Br. at 2:7-11.

1    "any conformation which ensures that air can circulate between the support tray and the

2    atmosphere control member," while Mann argues for a narrower construction defined in part by

3    the ribs' location and alleged support function. *See* Apio Opening Br. at 2:18-21 (comparing

4    parties' proposed constructions). Similarly, Apio argues that the term "sealing sheet," if not

5    given its "ordinary meaning," should be construed as "a sheet that closes the container body,"

6    while Mann argues that the '818 patent requires such a sheet to be "substantially gas-

7    impervious." *Id*. at 2:24-26. As to the term "atmosphere control member," the parties agree that

8    such a member modifies the rates at which gases pass in and out of the sealed package, but

9    dispute whether it must be gas-permeable. *Id*. at 2:22-23. Finally, Mann argues that

10   "atmosphere control member included in the sealing sheet" refers to a distinct gas-permeable

11   element affixed to the sheet, while Apio contends that the phrase requires no such limitation. *Id*.

12   at 3:5-15.

13                              **II. CLAIM CONSTRUCTION PRINCIPLES**

14           Claim construction begins with the language of the claims themselves, *Z4 Technologies,*

15   *Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1348 (Fed. Cir. 2007), and claim language "generally

16   carries the ordinary meaning of the words in their normal usage in the field of invention,"

17   *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003). Materials

18   relevant to discovering the context and normal usage of words in a claim include "the

19   specification, the prior art, and other evidence, such as the understanding of skilled artisans at

20   the time of invention." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

21   Dictionaries "may also help supply the pertinent context and usage for claim construction." *Id*.

22   Furthermore, an applicant can serve as his own lexicographer, assigning to terms "a unique

23   definition that is different from its ordinary and customary meaning." *Helmsderfer v. Bobrick*

24   *Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008). Provided that the definition is

25   sufficiently clear and found in the patent's specification, it is usually controlling. *Sinorgchem*

26   *Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (noting that where

27   "a special definition [is] given to a claim term by the patentee that differs from the meaning it

28   would otherwise possess[,] . . . [t]he inventor's lexicography governs"); *Serrano v. Telular*

                                                     3

1   *Corp.*, 111 F.3d 1578, 1582 (Fed. Cir. 1997) ("The inventors' definition, as evidenced by the

2   specification, controls the interpretation of that claim term."); *Vitronics Corp. v. Conceptronic,*

3   *Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[I]t is always necessary to review the specification to

4   determine whether the inventor has used any terms in a manner inconsistent with their ordinary

5   meaning.").  If expressed not in the specification but in the prosecution history, an applicant's

6   definition at least is entitled to "weight" as "relevant in indicating the meaning that the inventor

7   ascribed to the term." *Honeywell Inc. v. Victor Co. of Japan, Ltd.*, 298 F.3d 1317, 1324 (Fed.

8   Cir. 2002).  However, "dictionary definitions added during the prosecution history, although

9   stating a broad definition of [a term], [cannot] serve to enlarge the scope of the claims."

10  *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998).

11          The doctrine of claim differentiation also may counsel for or against a particular

12  construction.  Although its precise scope is unclear, the doctrine at a minimum creates a

13  presumption against constructions that would render any claim meaningless in its entirety,

14  typically by making it identical in scope to another claim.  *See, e.g.*, *Sinorgchem*, 511 F.3d at

15  1136 (holding that where "the claims are not rendered identical," there is no claim

16  differentiation issue); *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir.

17  2000) (stating that claim differentiation creates a presumption that each claim in a patent has a

18  different scope).  A broader formulation requires that "the presence of a dependent claim that

19  adds a particular limitation raises a presumption that the limitation in question is not found in

20  the independent claim." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir.

21  2004).  Thus, constructions that would make *any* language in another claim redundant are

22  presumptively unsound, even if not rendering two claims identical in scope.  In any event, the

23  presumption is "especially strong when the limitation in dispute is the only meaningful

24  difference between an independent and dependent claim." *SunRace Roots Enter. Co. v. SRAM*

25  *Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003); *see also Ortho-McNeil Pharm., Inc. v. Mylan*

26  *Labs., Inc.*, 520 F.3d 1358, 1362 (Fed. Cir. 2008) (noting that the court "strives to reach a claim

27  construction that does not render claim language in dependent claims meaningless"); *Wenger*

28  *Mfg., Inc. v. Coating Machinery Systems, Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Claim

4

1  differentiation . . . is clearly applicable when there is a dispute over whether a limitation found

2  in a dependent claim should be read into an independent claim, and that limitation is the only

3  meaningful difference between the two claims.").

4      Of course, the doctrine of claim differentiation "only creates a presumption that each

5  claim in a patent has a different scope; it is not a hard and fast rule of construction." *Seachange*

6  *Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) (citing *Kraft Foods*, 203 F.3d at

7  1365-69 (citations omitted)).  The doctrine "cannot broaden claims beyond their correct scope,

8  determined in light of the specification and the prosecution history and any relevant extrinsic

9  evidence . . . , [and] claims that are written in different words may ultimately cover substantially

10  the same subject matter." *Id*. (citing *Multiform Desiccants*, 133 F.3d at 1480 (citations

11  omitted)).

12      The prosecution history also may be highly instructive, as it "constitutes a public record

13  of the patentee's representations concerning the scope and meaning of the claims, and

14  competitors are entitled to rely on those representations when ascertaining the degree of lawful

15  conduct." *Seachange*, 413 F.3d at 1372 (quoting *Hockerson-Halberstadt, Inc. v. Avia Group*

16  *Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000)).  The prosecution history may reveal "whether the

17  patentee disclaimed or disavowed subject matter, narrowing the scope of the claim terms." *Id*.

18  (quoting *Nystrom v. Trex Co.*, 374 F.3d 1105, 1113 (Fed. Cir. 2004)).  Courts therefore must

19  "examine the entire prosecution history, which includes amendments to claims and all

20  arguments to overcome and distinguish references." *Id*.  "Where an applicant argues that a

21  claim possesses a feature that the prior art does not possess in order to overcome a prior art

22  rejection, the argument may serve to narrow the scope of otherwise broad claim language." *Id*.

23  at 1372-73; *see also Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997)

24  ("[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating

25  what the claims do not cover, he is by implication surrendering such protection.").  Such

26  disavowal may occur even if the examiner did not rely on the argument in allowing or rejecting

27  claims. *Id*. at 1374 (citing *Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340, 1350

28  (Fed. Cir. 2004)).  Furthermore, an applicant's arguments constituting disavowal as to a single

5

1   claim may be read to encompass the entire claimed invention. *Id*. The applicant's statements

2   must, of course, "be read in the context of its overall argument," *Lucent Technologies, Inc. v.*

3   *Gateway, Inc.*, 525 F.3d 1200, 1211-12 (Fed. Cir. 2008), and any disclaimer must be clear and

4   unambiguous, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-25 (Fed. Cir. 2003).

5       Analysis of the intrinsic evidence usually will resolve any ambiguity regarding a

6   disputed term, in which case a court may not rely on extrinsic evidence. *Vitronics Corp. v.*

7   *Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). However, where the intrinsic evidence

8   is ambiguous as to a disputed term or the scope of the invention, a court may turn to extrinsic

9   evidence such as testimony from experts or the inventor. *Id*. at 1584. Such evidence may be

10  used to help the Court understand the claims but may not be used to vary or contradict the claim

11  language. *Id*.

12                                     **III. DISCUSSION**

13  **A.**    **"Ribs"**

14      Apio's proposed construction of ribs, noted above, is "any conformation which ensures

15  that air can circulate between the support tray and the atmosphere control member." Apio

16  Opening Br. at 2. Mann contends that the term covers only "upstanding projections that support

17  the portion of the sealing sheet that extends over the fillable compartments when the tray is

18  loaded and turned upside down and ensure that air can reach the atmosphere control member."

19  *Id*. Upon careful consideration of the intrinsic evidence, the Court concludes that Apio's

20  proposed construction is impermissibly broad and would cover features clearly beyond the scope

21  of the invention, both as set forth in the claims and specification and as argued to the PTO.

22  Apio's construction ignores express and implied limitations on the relationship between the ribs,

23  sealing sheet, atmosphere control member, and support tray. Conversely, Mann's proposed

24  construction essentially would limit the claims to a single preferred embodiment, which is

25  equally impermissible. The Court therefore will adopt a hybrid of the parties' proposed

26  constructions, as set forth below.

27                    **1. Claim language and specification**

28      Each of the three independent claims requires that the foodstuffs be sealed by a sealing

1  sheet and covered by a support tray.  After this step, the claims require "turning the sealed

2  package and the support tray placed thereon upside-down, so that the foodstuffs rest on the

3  sealing sheet, and the sealing sheet is supported by the support tray[,] the support tray

4  comprising ribs such that, after [the tray is flipped], air can circulate between the support tray

5  and the atmosphere control member."  Apio Ex. G (""818 Patent"), col. 10, lines. 4-12.  Each of

6  the dependent claims discussing ribs recites "[a] method according to [the relevant independent

7  claim] wherein the ribs on the support tray are discontinuous, upstanding ribs."  '818 Patent, col.

8  10, lines 55-56.

9        Apio's argument rests on the absence of anything in the claim language that would

10  contradict its broad reading of "ribs," while Mann contends that the claims create certain

11  inherent or implied limitations.  The Court will look first to Mann's construction to determine

12  whether the claims or specification require any of the proposed limitations.  Mann argues that

13  the claimed ribs must be "*upstanding* and positioned to *support* the sealing sheet at a *location*

14  that is in close proximity to the atmosphere control member."  Mann Opp. at 7:24-26 (emphasis

15  added).  Mann stresses that absent such a configuration–defined by the orientation, support

16  function, and location of the ribs–the ACM would be "rendered inoperative by flush contact

17  with the support tray."  Mann Opp. at 7:18-21.

18        Neither the claim language nor the specification supports Mann's position sufficiently to

19  sustain these limitations.  With respect to the alleged support function, the claims merely require

20  that the sealing sheet rest on the support tray, and that the support tray "comprise" ribs.  To be

21  sure, Mann's reading draws support from common sense: given a support tray of the kind

22  described in the invention, and given the clarification in the dependent claims that the ribs

23  described in the independent claims must be "on" the support tray, *see* '818 Patent, col. 8, lines

24  20-21, it is difficult not to assume that the ribs are to form part of the support tray such that,

25  when the foodstuffs cause the sealing sheet to deform downwards, the latter rests on the ribs,

26  which allow airflow to the atmosphere control member.  But at least one other configuration is

27  possible, in which "ribs" at the edge of the tray suspend the sealing sheet over the support tray.

28  In this hypothetical configuration, the ribs could create a structural separation between the

7

support tray and the sealing sheet–thus allowing air circulation to the atmosphere control member–while still allowing the sealing sheet to be supported by the support tray as required by the claims.  Similarly, there is no inherent requirement that the ribs be positioned "in close proximity to the atmosphere control member."  Mann apparently believes that the claims can be embodied only as in figure 13 of the written description, but there is nothing in the specification to suggest that alternatives are impossible.  In short, Mann's proposals are not "central to the functioning of the claimed invention[]."  *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1351-52 (Fed. Cir. 2004) (implying limitation that was "central to the functioning of the claimed inventions") ; *Alloc, Inc. v. Int'l Trade Comm'n,* 342 F.3d 1361, 1369-70 (Fed. Cir. 2003) (construing claim to include limitation because the "very character of the invention" required that the limitation be part of every embodiment).  Thus, while Apio may have been "primarily focused on an embodiment of the invention . . . , nothing in the patent limits the claim to that embodiment."  *Alloc*, 342 F.3d at 1371 (quoting *Sunrace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1304-5 (Fed. Cir. 2003)).  The Court cannot be certain, with respect to any of Mann's proposed limitations, that "the limitation in issue is a limitation on the invention, not just a feature of a possible embodiment."  *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1370 (Fed. Cir. 2005).

Moreover, the doctrine of claim differentiation erects a presumption–albeit rebuttable–against Mann's claim that the ribs must be "upstanding."  In the '818 patent, claims 4 and 11 depend from identical claims 1 and 8.  The dependent claims both recite "[a] method according to [the respective independent claim] wherein the ribs on the support tray are discontinuous, upstanding ribs."  '818 Patent, col. 8, lines 20-21; *id.* at col. 9, lines 20-21. Mann argues that even if the term "upstanding" is read into the independent claims, the dependent claims would remain distinct in teaching a construction with "discontinuous" rather than "continuous" ribs.  The Court agrees that this is not a case in which "a limitation found in a dependent claim . . . is the *only* meaningful difference between" the independent and dependent claims, which would make the doctrine "clearly applicable."  *Wenger Mfg., Inc. v. Coating Machinery Systems, Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (emphasis added).  Nonetheless,

8

there is no question that the word "upstanding" would be redundant, which likely still implicates the doctrine. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004); *but see Sinorgchem*, 511 F.3d at 1136 (holding that where "the claims are not rendered identical," there is no claim differentiation issue). The Court therefore applies a presumption against limiting the claims to "upstanding" ribs.

## 2. Prosecution history

Apio relies on the prosecution history primarily to demonstrate two things: (1) that its proposed definition comes directly from the prosecution history and therefore should control; and (2) that the claimed "ribs" can be located at the periphery of the support tray and thus need not directly "support the portion of the sealing sheet that extends over the fillable compartments," as Mann proposes. Mann argues that Apio's distinctions from the prior art during prosecution of the '818 patent constitute clear disavowals of coverage and require the limitations of Mann's proposed construction, notwithstanding Apio's definition. The disputed statements occur in the following interactions between Apio and the PTO, which the Court addressed in turn: (1) the PTO's Office Action of February 9, 2005, Apio Ex. H ("2005 Office Action"), rejecting all pending claims, and Apio's April 11, 2005 Amendment and Response, Apio Ex. H ("2005 Response"); (2) the PTO's Office Action of October 26, 2006, Apio Ex. H ("2006 Office Action"), rejecting all pending claims, and Apio's January 16, 2006 Amendment and Response, Apio Ex. H ("2006 Response"); (3) an Information Disclosure Statement (IDS) filed in July 2006, less than a month before the patent issued, discussing a prior tray[5]; and (4) a 2008 statement by the inventor submitted to the patent office in a continuation application based on the '818 patent.

### a. 2005 Office Action and 2005 Response

Mann relies on this exchange, in which Apio distinguished the prior art of Albertson's and Wyslotsky, to establish three propositions: (1) that the claimed ribs must be in contact with the sealing sheet; (2) that the claimed ribs cannot merely provide rigidity, strength, or

---

[5] The parties dispute whether the tray in fact is prior art. *See infra* note 8.

9

1   permeability; and (3) that the ribs must support the sealing sheet from below–providing what the

2   Court, for convenience, will term "subjacent" support.  Upon careful consideration of the

3   relevant statements and their context, the Court concludes that Mann is correct as to the first two

4   contentions.  As to the third, however, although the relevant statements indicate that the ribs

5   must support the sealing sheet in some manner, the Court cannot say that such support always

6   must be subjacent rather than, for example, lateral.  Because Apio's disavowals do not preclude

7   lateral support (e.g., stretching or suspension) of the sealing sheet, the 2005 dialogue between

8   Apio and the PTO does not provide a basis for Mann's contention that the ribs must support "the

9   portion of the sealing sheet that extends over the fillable compartments."

10      In the 2005 Office Action, the examiner rejected Apio's claims over the prior art of

11  Wyslotsky and Albertson's.  The examiner first noted that Wyslotsky taught the application of a

12  sealing sheet to the support tray prior to flipping the tray, and an atmosphere control member

13  covering a window in the container body, "along with ribs" across the body and tray of the

14  package to increase gas flow.  2005 Office Action, at H-190-91.  The examiner stated that "it

15  would have been further obvious to include ribs at all locations of the package (i.e., tray and

16  body) since Wyslotsky et al. teach [that] ribs across the entire package provides air flow."  *Id.* at

17  H-191.  Second, the examiner based the rejection on references to an Albertson's tray modified

18  in view of Brown and Wyslotsky.  The examiner noted that "modified Alberton's includes ribs

19  in both body and tray to provide sufficient air flow between the atmosphere control member and

20  the package, *but is silent in teaching the control member covers a window on the sealing sheet*

21  *and the ribs allow for air to circulate between the control member and the sealing sheet*."  *Id.* at

22  H-193 (emphasis added).  Because the prior art also indicated the desirability of "providing the

23  control member in the seal across the body . . . as long as the member is not blocked during

24  storage[,] . . . *i]t would have been further obvious that* a control member covers a window on

25  the sealing sheet and the *ribs allow for air to circulate between the control member and the*

26  *sealing sheet* since modified Albertson's includes ribs on both sections of the package (i.e., both

27  body and tray)."  *Id.* at H-193-94 (emphasis added).

28      With respect to Wyslotsky, Apio's 2005 Response states that the claims "require that the

10

1    foodstuffs rest on sealing sheet [sic] and that the sealing sheet is supported by the support tray.

2    This requirement is contrary to Wyslotsky's requirement that the sealing sheet lies between two

3    separate compartments–there is not (and cannot be) in Wyslotsky, a support tray which supports

4    the sealing sheet." Mann Ex. C at 4, ¶ 3b.  The Response also states that "the sealing sheet

5    comprises an ACM covering a window in the sealing sheet and . . . the support tray comprises

6    ribs such that air can circulate between the support tray and the ACM. . . . [Since] the purpose of

7    Wyslotsky's ribs is to increase the surface area of the container[,] [t]hey do not ensure the flow

8    of air to an ACM which would otherwise be blocked . . . "  *Id*.  Mann reads these statements to

9    require that the invention have "a *support tray* comprised of ribs *that supports the sealing sheet*

10   and that facilitates the circulation of air between the support tray and atmosphere control

11   member."  Mann Opp. at 12:4-6 (emphasis added).  The Court agrees, but notes that this does

12   not advance Mann's argument since it adds nothing to the relationships described in the claims

13   themselves; the ribs, at least hypothetically, need not be in a position to support the sealing sheet

14   in order to prevent contact between the sealing sheet and the atmosphere control member.  *See*

15   *supra* section III.A.1.

16           With respect to modified Albertson's,[6] Apio stated:

17                   (i) The atmosphere control member (ACM) is part of the main container
             (containing the principal foodstuff); it is not part of the sealing sheet;
18                   (ii) The sealing sheet lies between two distinct compartments, each
             formed by a concave container and each containing foodstuffs.  This makes it
19           impossible for the sealing sheet to be supported by a support tray or any other
             member;
20                   (iii) *The ribs on the body and the lid provide structural integrity and/or*
             *provide the compartments with additional permeability.  They are not in contact*
21           *with the sealing sheet.  They do not, therefore, either facilitate or hinder the*
             *operation of the atmosphere control member.*  In particular, they do not "provide
22           sufficient air flow between the atmosphere control member and the package."

23   Mann Ex. C at 54 (emphasis added).  Mann argues that this language supports all three

24   ───────────────

25           [6] "[S]tatements made during prosecution commit the inventor to a particular meaning of a
     claim that is binding during litigation."  *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*,
26   222 F.3d 951, 956 (Fed. Cir. 2000) (citation omitted).  Moreover, there is no question that
     statements made to distinguish "a hypothetical combination of the prior art" can constitute a
27   "clear disavowal" of claim coverage.  *Id*.  The parties do not dispute that Brown, Wyslotsky, and
     Alberton's were prior art with respect to the '818 patent.
28

11

1  propositions discussed above–specifically, that the language "makes clear that the ribs of the

2  support tray must be *in contact with* (and thus support) the otherwise unsupported sealing

3  sheet–not just 'ensure that air can circulate between the support tray and the atmosphere control

4  member'". Mann Opp. at 12:20-22. The Court agrees with Mann that, read in context, Apio's

5  distinction of the modified prior art constitutes a clear disavowal of ribs that do not achieve the

6  claimed purpose–ensuring air circulating between the ACM and the sealing sheet–through

7  *contact* with the sealing sheet.[7] Moreover, Apio's disclaimer with respect to any conformations

8  that merely "provide structural integrity and/or . . . additional permeability" could not be clearer.

9  Thus, it is essential that any construction of "ribs" cover only those conformations that, through

10 contact with the sealing sheet, create a structural relationship between the sealing sheet and

11 support tray where such relationship is necessary for the continued circulation of air to the

12 ACM. Peripheral ribs that merely allow air to enter some part of the package are not covered.

13      Finally, this required "contact" necessarily implies a support function. In the 2005

14 Office Action, the examiner left Apio an exceedingly narrow window within which to

15 distinguish the prior art, noting that modified Albertson's included ribs on the body and tray to

16 "provide sufficient air flow between the atmosphere control member and the package, such that

17 it was "obvious that . . . the ribs allow for air to circulate between the control member and the

18 sealing sheet." 2005 Office Action, at H-193-94 (emphasis added). In response, Apio specified

19 that its invention was different *because* of the contact with the sealing sheet. *See* Ex. C at 54

20 (noting that modified Albertson's ribs were not in contact with sealing sheet, and "therefore" did

21 not serve the claimed function). Thus, at a minimum, the ribs must create the structural

22 relationship between the support tray and the ACM such that air can circulate–a function that

23 unmistakably includes some form of support to the sealing sheet. That said, the Court is not

24 convinced that the disclaimer in the 2005 Response requires the contact and support to be

25 subjacent–as Mann clearly presumes–as opposed to lateral or superjacent. Thus, based solely on

26 the 2005 Response, the claims still would allow for ribs not directly interposed between the

27

28      [7] In fact, counsel for Apio conceded as much during oral argument on October 1, 2008.

12

sealing sheet and the support tray.  In sum, the 2005 Office Action and Response supports only the first two of Mann's contentions: that the ribs must be in contact with the support tray, and that they cannot merely provide permeability or strength (or a combination of both) to the package.

**b.  2006 Office Action and 2006 Response**

Mann argues that this exchange further bolsters its argument regarding the ribs' subjacent support function.  Apio points out that the 2006 Response contains a verbatim definition of its proposed construction of "ribs" that contains no such limitations.  The Court finds that the 2006 prosecution documents lend little support to the contentions of either side. With respect to Apio's argument that its own definition should control, Apio misstates the significance of an applicant's definition of a term in the prosecution history.  The *Honeywell* case explains that, unlike a definition in the specification–which controls absent ambiguities, *see, e.g.*, *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007)–a definition in the prosecution history is relevant to claim construction in the same way that any other statement in that context is relevant.  *Honeywell Inc. v. Victor Co. of Japan, Ltd.*, 298 F.3d 1317, 1324 (Fed. Cir. 2002).  Such a definition must be accorded "weight" as "relevant in indicating the meaning" of the term.  *Id.*  Moreover, "dictionary definitions added during the prosecution history, although stating a broad definition of [a term], [cannot] serve to enlarge the scope of the claims."  *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998) (rejecting definitions offered during prosecution).

In the relevant portion of the 2006 Response, Apio stated that

> the term 'rib' is used, and would be understood by one of ordinary skill in the art to be used, in a broad sense to include any conformation which ensures that 'air can circulate between the support tray and the atmosphere control member.'  The Random House Dictionary, 2nd edition, unabridged, after giving various definitions of the term 'rib' in the fields of anatomy and architecture, then states: 5. *something resembling a rib in form, position or use, as a supporting or strengthening part*. 6. a *structural member that supports the shape of something: an umbrella rib*."

*See* Apio Opening Br. at 8:18-27 & Ex. N (emphasis added).  Strictly speaking, this definition lacks any reference to the form of the ribs, their location, or whether they support the sealing

13

sheet, thus suggesting a broad construction.  However, Apio did ground its definition in the

quoted dictionary entry, each part of which clearly attributes to ribs a function of supporting,

strengthening, or supporting the shape of something.  Apio Ex. N.  Because the invention does

*not* cover ribs that merely provide rigidity or structural strength–a function extensively

represented in the prior art and which Apio distinguished repeatedly, as discussed above–Apio

can be referring only to ribs that "support" or "support the shape of something."

Viewed in this context, the import of Apio's definition is that the ribs accomplish their

purpose by supporting the sealing sheet in order to prevent its contact with the support tray.

This comports with the language in the specification requiring that, at a minimum, the *ribs*–and

not some other component of the device such as the support tray itself–be positioned "such that

air can circulate between the support tray and at least the portion of the sealing sheet including

the atmosphere control member."  '818 Patent, col. 6, lines 30-32.  In the tray's upside-down

position, the foodstuffs press down upon the sealing sheet in any possible embodiment of the

claims, and it is thus *the ribs* that must ensure adequate structural separation between the

support tray and the ACM in the sealing sheet.  While this obviously does not amount to a

disclaimer of coverage, the Court notes that the definition is ambiguous on the point of

support–indeed pointing towards a support function–and cannot contradict other clear

disavowals in the prosecution history.

The 2006 documents provide equally little support for Mann's position.  The 2006

Office Action gave substantially the same grounds as its 2005 predecessor for rejecting the

claimed ribs, noting that Wyslotsky taught "including an atmosphere control member covering a

window for high oxygen diffusion and provid[ing] ribs on both the container body and tray to

increase gas flow," and that it was therefore "obvious to modify Albertson's container body and

include ribs in both the container body and tray[,] since Wyslotsky et al. teach [that] providing

ribs along the container body and tray of a vegetable package including a window covered by an

atmosphere control member will increase gas flow between the fresh vegetables and the

atmosphere control member."  2006 Office Action at H-078.

Apio's 2006 Response distinguished the invention by arguing that "the ribs disclosed in

14

1    Wyslotsky do not form part of a support tray on which rests a sealing sheet including an

2    atmosphere control member." Mann reads these statements to imply that the ribs must provide

3    some form of subjacent support to the sealing sheet, as in fig. 13 of the patent. Mann

4    emphasizes that, in conjunction with this statement in the January 16, 2006 submission, Apio

5    specifically amended the claims to require that after the support tray is placed over the sealing

6    sheet, the sealed package is turned upside-down "so that the foodstuffs rest on the sealing sheet,

7    and the sealing sheet is supported by the support tray, the support tray comprising ribs such that,

8    after step (E), air can circulate between the support tray and the atmosphere control member."

9    *See* Mann Opp. at 13:10-16. Mann notes that the claims were then allowed. Mann Opp. at

10   13:15. As previously noted, the most plausible reading is that the ribs must lie along the support

11   tray such that, when the foodstuffs come to rest on the support tray, as required by the allowed

12   claims, they also rest on the ribs. But the 2006 Response discloses no more than the claims

13   themselves with respect to the relationship between the foodstuffs, the sealing sheet, the ribs,

14   and the support tray. Mann's chain of inferences, while persuasive, is no more so here than in

15   the context of the claim language, where the Court has rejected it.

16                          **c.  2006 Information Disclosure Statement**

17        Apio submitted the 2006 IDS in connection with a prior tray made by Foxy Foods, Inc.[8]

18   Apio argues that its comments in discussing the tray demonstrate that the claimed "ribs" can be

19   at the edge of the tray, not merely along the bottom. Mann argues that the disclosure establishes

20   two things: (1) that the claimed support tray cannot be flat at the location of the ACM; and (2)

21   that the ribs must be in close proximity to the ACM. The IDS supports neither party's

22   contentions. The IDS states, in relevant part, that:

23   _____

24        [8] The statements in the disclosure may be considered notwithstanding Apio's position that
     the Foxy 2001 tray is not prior art. Specific arguments made by an applicant in an IDS may serve
25   to narrow claim scope. *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997).
     *Abbott Labs v. Baxter*, in which the Federal Circuit refused to narrow claims based on an IDS
26   where there was no admission of prior art and the relevant statement was a mere "reference" to a
     prior sale of a product, is not to the contrary. 334 F.3d 1274, 1279 (Fed. Cir. 2003). In the
27   instant case, the statements were not mere references but extensive elaborations on the '818
     patent's relation to the Foxy tray.

28
                                          15

1
2
3
4

> If . . . the Foxy 2001 tray had been turned upside down, the foodstuffs would then have rested on the sealing sheet, which is thin and flexible.  This would have forced the sealing sheet, including the atmosphere control member, into contact with the lid.  *The section of the lid which would have been contacted by the atmosphere control member is completely flat, and as a result there would have been intimate contact between the atmosphere control member and the lid.*  This intimate contact would have rendered the atmospheric control member inoperative. . . .

5
6

Information Disclosure Statement ("2006 IDS"), Mann Ex. F at 8-9 (emphasis added).

7

Furthermore, in response to a statement from Foxy Foods noting that the Foxy 2001 tray

8

comprised "a plurality of ribs which extend from the lid," Apio noted:

9
10
11
12
13
14

> It appears that the "ribs" referred to in that statement are the conformations which form a circular pattern corresponding to the top of the dip container.  Whether or not those conformations permit air circulation around the top of the dip container under any circumstances, *they are too far removed from the atmosphere control member to permit air to circulate between the lid and the atmosphere control member if the party tray is turned upside down,* i.e., they will not prevent the intimate contact which would render the atmosphere control member inoperative, as noted above.  Thus, the allowed claims in this application are yet further distinguished from the 2001 Foxy Foods party trays by the requirement that the support tray comprises ribs such that, after step (E)–i.e. the step in which the party tray is turned upside down–air can circulate between the support tray and the atmosphere control member.

15

2006 IDS at 9 (emphasis added).

16

Preceding the above-quoted passage is Apio's statement that "[i]t is not apparent from

17

the photographs [of the Foxy Tray] that there are any ribs or other conformations on the

18

transparent lid, except around the periphery where the lid engages the rim of the container

19

body."  2006 IDS at 2.  Apio considers this an "acknowledg[ment]" that ribs can be at the

20

periphery of the tray.  Apio Opening Br. at 9:10-12.  Yet as the passage above demonstrates,

21

Apio found that the Foxy ribs failed to serve the claimed function.  While the Court finds no

22

indication that the ribs cannot be peripheral, this statement hardly is affirmative evidence that

23

peripheral ribs *can* serve the claimed function.

24

Conversely, as to Mann's contention that the support tray cannot be flat at the location of

25

the ACM, there is no indication that the peripheral ribs in the Foxy Foods 2001 tray *could not* be

26

designed to prevent contact between the sealing sheet and the ACM, only that they were not so

27

designed.  The flat-bottom support tray would have failed because it "would have been

28

contacted by the atmosphere control member."  If, however, the peripheral ribs could have

16

1   prevented contact with the ACM, then the flatness of the tray near the ACM would not have

2   been an issue.  Contact could have been prevented by suspending the sealing sheet from one of

3   the "ribs," such that the ACM in the sealing sheet would float above the flat-bottom support

4   tray.  The Court thus agrees with Apio that the comments on the Foxy tray are not a categorical

5   disclaimer of flat-bottom trays.

6        Nor can the Court accept Mann's contention that the ribs must be located in "close

7   proximity" to the ACM.  If, as the Court has found, the claimed ribs can provide lateral support

8   to the sealing sheet, partially suspending it over the support tray while allowing it to deform

9   downward and rest on the support tray as it must, there is no inherent requirement that the ACM

10  be in "close proximity" to the ribs.  Provided that the ribs themselves create a structural

11  separation between the ACM and the sealing sheet, the ACM's location is not critical.  The IDS

12  merely addresses the particular defects in the Foxy tray, which flow, inter alia, from that tray's

13  dimensions, the height and angle of its ribs, and the sturdiness of its sealing sheet.  Where, as

14  here, several variables account for whether a certain feature meets the requirements of an

15  invention, a statement that one configuration cannot meet the requirements will not serve to

16  disclaim that configuration where adjustment of other variables could bring it within the

17  invention.  *See Abbott Labs. v. Baxter Pharm. Prods.*, Inc., 334 F.3d 1274, 1278 (Fed. Cir.

18  2003) (holding that prior sale of a substance at a particular minimum concentration did not limit

19  the "effective amount" of the substance to that concentration because the substance had been

20  sold in a specific container, and the effective amount depended on several variables, including

21  the container).

22       The only unambiguous disclaimer in the 2006 IDS is of ribs that do not "prevent contact

23  between the sealing sheet and the ACM."  This indeed is the sole basis for distinguishing the

24  Foxy tray, and it is virtually self-evident.  Thus, while the Court does not agree that the ribs

25  necessarily must be in "close proximity" to the ACM in order to accomplish the claimed

26  function, it is clear that the ribs must be positioned such that *the ribs* themselves–as opposed so

27  some other feature of the support tray or sealing sheet–prevent contact between the ACM and

28  the sealing sheet.

17

### d.  2008 inventor statement in related application

Finally, Mann draws attention to a statement by the inventor made in a continuation application on July 24, 2008.  The inventor states that he confronted the problem of "how to support the [foodstuffs] on a fragile sealing sheet when the tray was flipped over," and that he solved the problem by "sizing the support tray so that it not only supported the sealing sheet at locations around the rim of the container body, but also supported the sealing sheet at one or more locations within the circumference of the rim and spaced apart from the rim if, after flipping, the sealing sheet was deformed downwards by the weight of the [foodstuffs]."  Mann Ex. G ¶ 9.  Mann appears to assume that if the support tray were to be in contact with the sealing sheet only at "one or more locations within the circumference of the rim," those locations must be ribs, suggesting that the support provided by the ribs to the sealing sheet must be subjacent rather than lateral.  The inventor, however, explained that the *size* of the support tray dictates the extent of contact between the sealing sheet and the support tray, and one can imagine that, with a small tray including peripheral ribs, the sealing sheet could deform downwards but only make contact with the support tray near its center, away from the supporting ribs.  The inventor also stated that the above-noted problem occurred "in some versions" of the flip tray.  *Id.*  A statement that *some* trays would require ribs within the circumference of the container to support the sealing sheet does not mean that all embodiments of the invention–including those with support trays or peripheral ribs of different dimensions–must employ such interior ribs.  Thus, while "statements made by the inventor during continued prosecution of a related patent application can, in some circumstances, be relevant to claim construction," *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1174, 1184 (Fed. Cir. 2006), the statement at issue here does not support Mann's argument.

### 3. The Court's construction

Based on the foregoing discussion, the Court finds no support, either in the specification or the prosecution history, for Mann's contention that the ribs must be "upstanding."  While this may be the most *likely* construction, there is nothing in the patent or prosecution history that so limits the term.  To impose the limitation would conflict with the doctrine of claim

18

1    differentiation and amount to reading a preferred embodiment–Apio's figure 13–into the claim

2    requirements.  There is, however, ample support for limiting the term to include only those

3    "ribs" that are in contact with the sealing sheet and which in some way support it.  Moreover, it

4    is clear that Apio's ribs do not cover a mere ripple of plastic on the support tray that provides

5    permeability or structural strength; the ribs must be *necessary* to ensure air flow to the ACM by

6    preventing contact between the support tray and that part of the sealing sheet containing the

7    ACM.  Accordingly, the Court construes the term "ribs" to mean "any conformation on the

8    support tray that is in contact with the sealing sheet and necessary to permit air flow to the ACM

9    by preventing its contact with the support tray."

10   **B.    Sealing sheet**

11         Apio contends that the term "sealing sheet" should be given its plain meaning, but that if

12   the Court construes the term, it should be made to signify "a sheet that encloses the container

13   body."  Apio Opening Br. at 13-14.  Mann contends that any sealing sheet covered by the '818

14   patent is limited to a "substantially gas-impervious sheet."  Mann Opp. at 17:19-20.  The Court

15   is satisfied that the meaning of this term would be sufficiently clear to one of ordinary skill and

16   knowledge in the art that it need not be construed here.

17   **C.    Atmosphere control member**

18         Apio proposes that the term "atmosphere control member" be construed to mean "any

19   member which modifies the rate at which oxygen and carbon pass into and out of the sealed

20   package," while Mann argues that the term should mean "a gas-permeable element which

21   modifies the rate at which oxygen and carbon dioxide pass into and out of the sealed container."

22   Claims 1 and 8 recite "an atmosphere control member included in the sealing sheet," while

23   dependent claims 3 and 9 further recite "wherein the atmosphere control member covers a

24   window in the sealing sheet."  *See* '818 Patent, col. 8, lines 18-19; col.8, lines 16-17.

25         Apio notes that its proposed construction of the term "atmosphere control member"

26   derives from an identical definition provided in the specification and prosecution history.  Mann

27   argues that Apio "consistently characterized" the term as "an element 'that allows oxygen to

28   enter, and carbon dioxide to leave,' the atmosphere of the package environment."  Mann Opp. at

19

21:17-20 (quoting April 11, 2005 response to Office Action, Ex. C, and citing January 16, 2006 response to Office Action, Ex. E, at 3).  Mann argues further that, because the sealing sheet must be substantially gas-impervious, the ACM must be gas-permeable in order meaningfully to regulate the package atmosphere.

In this instance, Apio has chosen to act as its own lexicographer, and it has defined atmosphere control member to mean "any member which modifies the rate at which oxygen and carbon pass into and out of the sealed package."  *See* '818 Patent, col. 4, lines 47-50 ("The term 'atmosphere control member' is used herein to denote any member which modifies the rates at which oxygen and carbon dioxide pass into and out of the sealed package.").  This definition was offered again during the prosecution history.  *See* Apio Ex. H, Amendment and Response to Office Action filed on November 3, 2004, at H-259.  Provided that the definition in the specification is clear and unambiguous, it is presumed to control.  *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007).

Mann's proposed definition in effect adds only one requirement, namely, that the ACM be "gas-permeable."[9]  Mann is correct that the intrinsic record establishes that the ACM must be at least minimally gas permeable.  In distinguishing the prior art of Wyslotsky, Apio explained that Wyslotsky's sealing sheet was located between two compartments containing foodstuffs, and thus was not exposed to the exterior atmosphere.  Apio stated that "[i]t would not, therefore, function as an ACM, since it would not allow oxygen to enter, and carbon dioxide to leave, either of those atmospheres."  This statement plainly discloses that, if a certain feature does not allow oxygen to enter and carbon dioxide to leave the relevant packaging atmosphere, it is not an ACM.[10]

---

[9] While two additional requirements appear–that the ACM be an "element" rather than "any member," and that it "modif[y] the rate at which oxygen and carbon pass into and out of the sealed *container*" rather that the "sealed package"–there is no indication that either party prefers "container" or "package," and Mann clarified at the October 1, 2008 *Markman* hearing that in using the term "element," it did not intend to imply any distinction from the term "member."

[10] At the October 1, 2008 *Markman* hearing, counsel for Apio readily agreed that any ACM must be somewhat gas permeable to serve the claimed function.  However, Apio changed

1    Nonetheless, the Court finds it unnecessary to read gas permeability into Apio's

2    proposed definition.  The definition speaks of oxygen and carbon passing into and out of the

3    sealed package, and recites that the ACM "modifies" the rate of such passage.  Quite obviously,

4    the word "modify" does not include an ACM that is completely gas-impervious, such that there

5    would *be* no passage of oxygen or carbon dioxide; the plain meaning of "modify" does not

6    permit such a reading.  *See MCI v. AT&T*, 512 U.S. 218, 225 (1994) (explaining that the

7    ordinary meaning of the verb "modify" is to make minor or incremental changes in quality and

8    not, for example, to eliminate the specified action or condition).[11]  With the understanding that

9    Apio's proposed definition excludes on its face any ACM that is not to some minimal extent

10   gas-permeable, the Court adopts the definition in full.[12]

**D.    Atmosphere control member included in the sealing sheet**

12   Apio notes that the only term not elsewhere construed is "included in," and argues that it

13   should be given its ordinary meaning.  Apio argues that if the Court construes the term, it should

14   be taken to mean "comprises," such that the phrase in question would require that "the sealing

15   sheet comprise[] an atmosphere control member."  Mann proposes that the term be construed to

16   mean "a gas-permeable element placed over a gas pathway in a section of the sealing sheet

17   which modifies the rate at which oxygen and carbon dioxide pass into and out of the sealed

18   container."  As an initial matter, to the extent Mann's proposal incorporates its rejected

19   construction of "atmosphere control member," it too must be rejected.  Mann's proposed

20   construction in fact inserts the language "placed over a gas pathway in a section of the sealing

22   ──────────────

     its mind the following day, *see* Notice of Correction of Response in Claim Construction Hearing,
23   filed October 2, 2008, Document No. 63, at 1-2, again contesting this obvious fact.

24        [11]   Apio cites to a continuation application in which the examiner found the definition of
     "atmosphere control member" to be so broad as to encompass even "adding a second layer on top
25   of the sealed container[,] [which] would also modify the rate at which the oxygen and carbon
     dioxide would pass."  Apio Ex. I.  The Court agrees that such a feature could constitute an ACM,
26   but reject's Apio's unfounded contention that it need not be even minimally gas-permeable.  *See*
     Apio Reply at 11:6-7.
27

28        [12]Accordingly, the Court need not reach Apio's arguments based on extrinsic evidence.

Case No. C 07-5628 JF (PVT)
ORDER CONSTRUING PATENT CLAIMS
(JFLC3)

sheet" into its rejected definition of "atmosphere control member."  Eliminating the rejected

ACM language, the Court will treat Mann's proposed construction of "*included in*" the sealing

sheet as "*placed over a gas pathway in a section of*" the sealing sheet.

Apio first points out that the Federal Circuit "has consistently interpreted 'including' and

'comprising' to have the same meaning, namely, that the listed elements (i.e., method steps) are

essential but other elements may be added."  *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d

1200, 1214 (Fed. Cir. 2008).  Because terms are to be given their ordinary meaning where

possible, Apio's proposed definition is presumptively correct.  Mann responds with arguments

based on (1) the claim language, (2) the specification, and (3) prior patents expressly and fully

incorporated into the '818 patent.  Mann first argues that the language "atmosphere control

member included in the sealing sheet" makes clear that the ACM and the sealing sheet "are two

distinct elements."  Mann Opp. at 22:21-24.  Mann understands the quoted language to mean

that "the atmosphere control member *on* the sheet operates to control the package atmosphere,"

such that "the atmosphere control member *must be located over a gas pathway* in a section of

the sealing sheet."  Mann Opp. at 22-23 (emphasis added).  Mann assumes, without explanation,

that "included in" means "on," and then assumes that "on" means "over a gas pathway."

Mann's second set of arguments, regarding the specification, is equally puzzling.  Mann

quotes the specification's teaching that air must be able to circulate "between the support tray

and at least the portion of the sealing sheet including the atmosphere control member," Mann

Opp. at 23:6-8, and finds support in this fact for its claim that the ACM and sealing sheet are

two distinct elements.  However, the quoted statement simply contains no such limitation.

Mann also refers to the diagram marked as figure 11, which "clearly shows the atmosphere

control member as a separate element on a discrete section of the sealing sheet."  But it is

axiomatic that "patent coverage is not necessarily limited to inventions that look like the ones in

the figures," and that such limitations are "fraught with danger."  *MBO Labs., Inc. v. Becton,*

*Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) (internal quotation marks and citations

omitted).  Finally, Mann argues that several incorporated patents demonstrate that the ACM

must be a separate element placed over the sealing sheet.  The material Mann cites either does

22

not support its argument that the ACM is a discrete element,[13] or makes explicit that any such configuration is merely one embodiment.[14]  Mann's construction also implicates the doctrine of claim differentiation: dependent claims 3 and 9 alter the independent claims only by stating that "the atmosphere control member covers a window in the sealing sheet."  This requirement is substantially coextensive with Mann's proposed construction–where the ACM is "placed over a gas pathway in a section of the sealing sheet"–and would render the dependent claim meaningless.  Mann does not address this argument.  Accordingly, the Court will give the phrase its ordinary meaning of "comprises."

## IV. CONCLUSION

For the foregoing reasons, the disputed terms are construed as follows: "Ribs" shall mean "any conformation on the support tray that is in contact with the sealing sheet and necessary to permit air flow to the ACM by preventing its contact with the support tray."  The term "sealing sheet" shall be given its ordinary meaning.  "Atmosphere control member" shall mean "any member which modifies the rate at which oxygen and carbon pass into and out of the sealed package."  "Atmosphere control member included in the sealing sheet" shall describe a condition in which the sealing sheet "comprises" an atmosphere control member.

**IT IS SO ORDERED.**

----

[13] For example, Mann quotes language stating that gas-permeable membranes presumably acting as ACMs "generally [are] used as control sections which provide the sole, or at least the principal, pathway for gases to enter or leave a sealed container containing respiring material." See Mann Opp. at 23:17-20.  The Court fails to see how the use of the terms "control sections" or "pathway" supports Mann's argument that the ACM must be a discrete element lying over the sealing sheet.

[14] Another quotation in the referenced patents describes an ACM as a membrane that covers an aperture in the container, but begins by qualifying the configuration as "one embodiment."  *See* U.S. Patent No. 6,376,032, Mann Ex. H, col. 8, lines 19-27.

23

DATED: 10/14/08

_____
JEREMY FOGEL
United States District Judge

24

This Order has been served upon the following persons:

Jeffrey Glenn Sheldon          jgsheldon@usip.com

Joseph Scott Presta            jsp@nixonvan.com

Marc Allen Karish              mkarish@usip.com

Michael Edward Crawford        mec@nixonvan.com

Virginia A. Crisp              EfilingVAC@cpdb.com

Case No. C 07-5628 JF (PVT)
ORDER CONSTRUING PATENT CLAIMS
(JFLC3)